# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

DAVID KEITH, individually
and as the parent and natural guardian
of D.K.,

                                        Plaintiff,

          v.                                        5:24-CV-1391
                                                    (BKS/MJK)

OFFICER COLIN MAHAR,
OFFICER DANIEL MEDLOCK,
OFFICER JASON LADD
OFFICER DANIEL FAHEY
OFFICER KIMBERLY DISHAW, and
SERGEANT JONATHAN TUCKER

                                        Defendants.

---

DAVID KEITH individually and o/b/o D.K., Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE BRENDA K. SANNES, CHIEF U.S. DISTRICT JUDGE

### ORDER and REPORT-RECOMMENDATION

On November 15, 2024, pro se plaintiff filed a civil rights complaint pursuant to

42 U.S.C. § 1983 on behalf of himself and his minor child, D.K. (Dkt. No. 1).  In

addition to the complaint, plaintiff filed an application to proceed in forma pauperis

("IFP"). (Dkt. No. 2).

1

## I.    <u>IFP Application</u>

Plaintiff declares in his IFP application that he is unable to pay the filing fee. (Dkt. No. 2).  After reviewing his application, this court finds that plaintiff is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915.  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering *sua sponte* dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir.

2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Iqbal,* 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).

## II.    **Complaint**

Plaintiff alleges that on November 17, 2021 at approximately 9:53 a.m., he was peacefully protesting at 2200 Onondaga Creek Boulevard because his minor daughter was being bullied at South Side Academy Charter School. (Compl., pg. 3).[1] The

---

[1] All page references are to the CM/ECF pagination system.

complaint alleges that on November 16, 2021, plaintiff was asked to take his twelve-year daughter home because she had written a paper about harming other children as a result of having been bullied. (*Id.*). According to the complaint, school officials refused to discuss the matter with plaintiff. (*Id.*).

Plaintiff claims that while he was speaking to a parent/staff member of South Side Academy Charter School on November 17, 2021, Officer Mahar approached him, wanting to speak to him about "some alleged serious threats" he made (*Id.*). According to the complaint, Officer Mahar told his partner, Officer Ladd, that plaintiff was "obviously a porkchop so stay put, we'll have to detain him because he's being a porkchop." (*Id.*). When asked what a "porkchop" was, Officer Mahar explained to plaintiff that "I suppose a porkchop would be someone who walks into a school, says he's going to shoot it up, then stands outside and acts like this. That would be a porkchop by my definition." (*Id.*, pg. 4*)*. Officer Mahar did not ask plaintiff any "pertinent questions" about the situation and Officers Mahar and Ladd proceeded to frisk plaintiff and place him in hand cuffs. (*Id.*). Shortly thereafter, the complaint alleges that Officers Medlock, Fahey, and Dishaw arrived and were informed by Officer Mahar that plaintiff was "super uncooperative" and that is why he was sitting in the "back of his crusier." (*Id.*). After conferring with Officer Mahar, Officers Medlock, Fahey and Dishaw went inside to South Side Academy Charter School at approximately 10:00 a.m. When Officer Fahey asked Principal Pugh whether she had called and whether she heard plaintiff make any threats, a different staff member told Officer Fahey that plaintiff had not made any threats. (*Id.*). According to the complaint, plaintiff

4

was not released after Officer Fahey was informed that plaintiff had not made any
threats. (*Id.*).

Plaintiff experienced trouble breathing while he was detained, and Officer Mahar
called an ambulance. (*Id.*). Plaintiff was examined by the paramedics but was not taken
to the hospital. (*Id.*). At approximately 10:27 a.m., Officer Fahey informed Officer
Mahar that plaintiff "did not make any threats." (*Id.*). Nevertheless, Officer Mahar said
"[w]e will keep him detained." (*Id.*). The paramedics told Officers Ladd and Mahar that
they would "be standing over there" in case they were needed. (*Id.*). Plaintiff continued
to have trouble breathing and "all of the officers refused to alert the paramedics to
[plaintiff's] difficulty breathing again." (*Id.*). Plaintiff alleges that Officer Mahar told
him that "the ambulance just checked you and they said you were fine." (*Id.*).

Plaintiff also alleges that the handcuffs were too tight and when Officer Mahar
adjusted them, "he pulled on the chain causing more pain in the right cuff." (*Id*).
Plaintiff alleges that Officer Mahar's conduct was deliberate. (*Id.*). The complaint
further alleges that he was kept in handcuffs while the five officers and Sergeant Tucker
investigated whether D.K. was seen by mental health. (*Id.*). Plaintiff alleges that all of
the officers discussed the fact that plaintiff had not committed a crime and that Officer
Medlock suggested that plaintiff be held until D.K. was found. (*Id., pg.* 5).

Plaintiff was released after approximately seventy minutes and returned home to
find that Officers Medlock and Fahey were standing outside of his house with D.K.
(*Id.*). Plaintiff discovered that Officers Medlock and Fahey had entered his home
without permission while he was being detained, and transported D.K. to CPEP without

5

his permission. (*Id.*). Plaintiff also learned that on several occasions, D.K. asked to go home, but was denied. (*Id.*).

Plaintiff seeks relief against the defendants in their individual and personal capacities in varying amounts. (Compl., pg. 10).

## III.    <u>First and Eleventh Claims (Unlawful Detainment)</u>

### A. Legal Standard

Plaintiff contends that he was improperly detained by defendants in violation of his Fourth Amendment rights. "[T]he first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998). A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not at liberty to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. However, "mere police questioning does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 101, (2005) (internal quotation omitted).

## B. Analysis

The complaint plausibly alleges a claim for unlawful detainment against Officer Mahar, Ladd, and Medlock. Here, plaintiff alleges two separate claims for unlawful detainment, both of which arise from the same underlying facts. Specifically, plaintiff alleges that the defendants detained him and held him in handcuffs even though all defendants were allegedly aware that he had not committed a crime. (Compl., pg. 4). As pleaded, it was reasonable for plaintiff to believe that he was "not at liberty to leave." *Mendenhall*, 446 U.S. at 554. At this juncture, it is not for the court to determine whether the detainment was in fact a "constitutionally cognizable seizure." *Medeiros*, 150 F.3d at 167. Accordingly, the court recommends that plaintiff's claims for unlawful detainment survive *sua sponte* review and that a response be required.

## IV.  Second Claim (Unlawful Arrest)

### A. Legal Standard

A section 1983 claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "False arrest is simply false imprisonment accomplished by means of an unlawful arrest." *Jenkins v. City of N.Y.*, 478 F.3d 76, 88 n.10 (2d Cir. 2007). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). The elements of a

7

Fourth Amendment false arrest/imprisonment claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law. *See Kraft v. City of New York*, 696 F. Supp. 2d 403, 418 (S.D.N.Y. 2010). The New York State standard for false arrest requires that: "'(1) the defendants intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *3 (E.D.N.Y. Jun. 3, 2014) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (citations and quotations omitted).

### B. Analysis

The court recommends that plaintiff's claim against Officer Mahar for false arrest should survive *sua sponte* review and that a response be required. The complaint alleges sufficient facts at this juncture to satisfy the elements set forth in *Sethi,* 2014 WL 2526620, at *3 . Although the court is recommending that a response be required, it is not suggesting that plaintiff's claim for false arrest would survive a properly filed dispositive motion.

## V.    **Third Claim (Denial of Medical Attention)**

### A. Legal Standard

"The Due Process Clause . . . does require the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). "In fact, the due process rights of a person in [the arrestee's] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535, n. 16 (1979)). A claim for deliberate indifference to a serious medical need for an arrestee are governed by the same standard as a pretrial detainee when their claim arises from their arrest. *See Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 394-95 (S.D.N.Y. 2020). Plaintiff's claim, to the extent it is construed as one for deliberate indifference to medical care, is governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). "This, in turn, requires a two-step inquiry … First, the plaintiff must satisfy the 'objective prong' by showing a sufficiently serious need … Second, the plaintiff must meet the 'subjective prong' which requires the officer to have acted with 'deliberate indifference' to the challenged condition." *Id.* (citing *Darnell*, 849 F.3d at 29) (international citations omitted). However, a claim for "'deliberate indifference' does not require proof of 'a malicious or callous state of mind' and is

instead akin to recklessness, requiring a plaintiff to show that the official knew or should have known of the excessive risk to the plaintiff's health." *Id.* at 803, n.2.

### B. Analysis

Plaintiffs fails to plausibly allege a claim against Officers Medlock, Mahar, Ladd, Fahey, and Sergeant Tucker for deliberate indifference to his medical needs. The complaint alleges that Officer Mahar called an ambulance when plaintiff reported having difficulty breathing. (Compl., pg. 4). Plaintiff was seen by paramedics, but not taken to the hospital. (*Id.*). After examining plaintiff, the paramedics informed Officers Ladd and Mahar that "[j]ust in case we'll be standing over there." (*Id.*). When plaintiff complained again about having difficulty breathing, Officer Mahar said to plaintiff "[w]ell the ambulance just checked you and they said you were fine." (*Id.*). Absent from the complaint are any allegations that plaintiff had a medical need that was "sufficiently serious." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted). Nor has plaintiff alleged that the defendants acted with "deliberate indifference" to his medical need. As the complaint fails to plausibly allege both that plaintiff suffered an objective, sufficiently serious deprivation of medical care and that any defendant was deliberately indifferent toward plaintiff's medical condition, it is the court's recommendation that plaintiff's deliberate medical indifference claim be dismissed without prejudice and with leave to amend.

**VI.** **Fourth Claim (Due Process and Equal Protection)**
**Twelfth Claim (Due Process)**

Plaintiff's fourth claim alleges due process and equal protection claims against Officer Mahar under the Fourteenth Amendment. Plaintiff's twelfth claim alleges a violation of his Fourteenth Amendment due process rights against Officers Medlock and Mahar. The court will analyze plaintiff's due process claims asserted in the fourth and twelfth claims together.

**A. Due Process**

**1. Legal Standard**

The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law." U.S. Const. amend. XIV. The Due Process Clause contains both a procedural and substantive component. Procedural due process claims concern the "adequacy of the procedure provided by [a] governmental body for the protection of liberty or property rights of an individual." *Sanchez v. Univ. of Connecticut Health Care*, 292 F. Supp. 2d 385, 397 (D. Conn. 2003) (citation omitted). To successfully state a claim under section 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004); *see also Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted).

In addition to its governance over fair process, the Fourteenth Amendment "cover[s] a substantive sphere as well, barring certain government actions regardless of

the fairness of the procedures used to implement them." *Hurd v. Fredenburgh*, No. 19-3482, 2021 WL 96886, at \*7 (2d Cir. Jan. 12, 2021) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, (1998) (internal quotation marks and citations omitted)). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id*. (quoting *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

## 2. Analysis

Here, the complaint plausibly alleges that plaintiff's constitutional due process rights were violated when he remained handcuffed after all the officers on scene, including Officers Mahar and Medlock, were aware that plaintiff had not committed a crime. (Compl., pg. 4). Nevertheless, the complaint alleges that Officer Medlock "suggested that [plaintiff] be held until [his] daughter [was] found." (Compl., pg. 5). Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, and without expressing an opinion as to whether plaintiff can withstand a properly filed motion to dismiss or for summary judgment, the court recommends that a response be required to plaintiff's Fourteenth Amendment due process claims against Officers Medlock and Mahar.

## B. Equal Protection

### 1. Legal Standard

"Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, the Second Circuit has

long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 6 (S.D.N.Y.), *aff'd,* 705 F. App'x 50 (2d Cir. 2017) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)) (cleaned up).  There exist two theories for this kind of Equal Protection violation: "selective enforcement" and "class of one" discrimination. *Bristol v. Town of Camden*, 669 F. Supp. 3d 135, 154 (N.D.N.Y. Apr. 19, 2023) (citing *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)). However, both selective enforcement and class-of-one claims require the plaintiff to "make a showing of different or unequal treatment." *Bristol*, 699 F. Supp. 3d at 154.

### 2.  Analysis

Plaintiff's equal protection claim fails to allege that he is a member of an identifiable group, or that he was treated differently from a comparable plaintiff. Accordingly, his equal protection claims must fail. *See MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353 (E.D.N.Y. Sept. 7, 2010) (finding plaintiff's equal protection claim deficient as a matter of law because plaintiff's complaint "failed to identify any comparators or similarly situated entities at all"). The court therefore recommends that plaintiff's equal protection claim against Officer Mahar be dismissed without prejudice and with leave to amend.

## VII.  **Fifth Claim (Retaliation)**

### A. Legal Standard

Claims brought under Section 1983 generally must be filed within three years of the date a claim accrues.[2] Section 1983 claims generally accrue when a plaintiff knows or has reason to know of the injury that is the basis of the claim. *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013).  Here, the underlying events giving rise to plaintiff's First Amendment retaliation claim occurred on October 9, 2021, more than three years prior to the filing this action.

Thus, in the absence of some basis for tolling or disregarding the limitations period,[3] plaintiff's § 1983 claim is subject to dismissal as untimely asserted. *See Abbas v. Dixon*, 480 F.3d 636, 640-41 (2d Cir. 2007) (explaining that a district court should not dismiss a complaint as time-barred without providing a *pro se* plaintiff with notice

---

[2] The statute of limitations for Section 1983 claims is found in the "general or residual [state] statute [of limitations] for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, that period is three years. See N.Y. C.P.L.R. § 214(5).

[3] Equitable tolling is available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act," and "the party acted with reasonable diligence throughout the period" to be tolled. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005). As the Second Circuit recognized in *Abbas*, New York law recognizes the equitable tolling doctrine where a plaintiff demonstrates that he was induced by fraud, misrepresentations, or deception to refrain from timely commencing an action, and that he acted with due diligence throughout the period to be tolled. *See Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007); *see also Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances.").

and an opportunity to be heard as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered timely); *see also Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.") (internal quotation marks and citation omitted); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds).

Even if plaintiff's First Amendment claim for retaliation was not time barred, it is nevertheless subject to dismissal. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff - namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action - in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

**B. Analysis**

Plaintiff's allegations that he called Officer Mahar "obscenities and disrespectful names on a previous occasion" constitutes protected speech under the First Amendment. *See Wilson v. New York City,* No. 92-CV-2709, 1996 WL 63053, at *3 (S.D.N.Y. Feb. 14, 1996) (citation omitted) ("Criticism of police officers and obscene words and gestures directed at police officers are protected speech that may not be punished by the state."). However, plaintiff has failed to allege any causal connection between the October 9, 2021 incident and the alleged retaliatory act, i.e., the unlawful detainment that is the subject of this action. "A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Dadaille v. Coxsackie Correctional Facility,* No. 9:23-CV-1583 (GTS/ML), 2024 WL 1257378, at *6 (N.D.N.Y. Mar. 25, 2024) (citing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted)). While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" *Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), "the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months" *Ashok v. Barnhart*, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003); *see also Espinal,* 558 F.3d at 129 (the passage of only six months is sufficient to support an inference of a causal connection; *Gorman–Bakos,* 252

16

F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection). Since the alleged retaliatory act by Officer Mahar occurred thirty-seven months after the October 9, 2021 incident, the court recommends that plaintiff's fifth claim against Officer Mahar for retaliation be dismissed with prejudice and without leave to amend.

## VIII.  <u>Sixth Claim (Failure to Intervene)</u>

### A. Legal Standard

To state a failure-to-intervene claim, a plaintiff must allege that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). To determine whether the defendant had a realistic chance to intervene, courts in this Circuit consider a number of factors, including "(1) the number of police officers present; (2) the officers' relative placement; (3) the environment in which the officers acted; [and] (4) the nature of the assault." *Johnson v. City of New York*, No. 15-CV-6915, 2019 WL 294796, at *9 (S.D.N.Y. Jan. 23, 2019) (citing *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016)). The duration of the alleged violation "will always be relevant and will frequently assume great importance." *Id.*; *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (finding that officers did not have realistic opportunity to intervene where another officer hit the plaintiff three times in rapid succession); *Ross v. Willis*,

No. 16-CV-6704, 2021 WL 3500163, at *15 (S.D.N.Y. Aug. 9, 2021) (same where another officer pepper sprayed the plaintiff, because the spraying lasted only seconds); *Arminio v. Holder*, No. 15-CV-5812, 2019 WL 176804, at *6 (S.D.N.Y. Jan. 11, 2019) ("On some occasions, as in this case, the seconds it takes for excessive force to occur are not enough to provide an officer with a realistic opportunity to intervene.").

### C. Analysis

The complaint plausibly alleges a claim against Officer Ladd, Medlock, Fahey, Dishaw, and Sergeant Tucker for failure to intervene against all defendants. Specifically, plaintiff alleges that Officer Fahey was informed by a school staff member that plaintiff did not make any threats (Compl., pg. 4) and that "each officer present discussed me not committing any crime and Officer Medlock suggested I be held until my daughter is found." (Compl., pgs. 4-5). Nevertheless, the complaint alleges that plaintiff was restrained in handcuffs for seventy minutes. (Compl., pg. 5). The court therefore recommends that plaintiff's sixth claim for failure to intervene survive *supa sponte* review and that a response be required.

## IX.  <u>Seventh Claim (Excessive Use of Force)</u>

### A. Legal Standard

"Claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

"[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397).

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). This modified standard reflects the need for a careful balance. On the one hand, "[i]t is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion … [and] to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214-15 (E.D.N.Y. Mar. 16, 2005) (citations omitted). On the other hand, "overly tight handcuffing can constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. Jun. 13, 2008). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Esmont*, 371 F. Supp. 2d at 215 (citations omitted). As always, this inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified. *See Matthews v. City of New York*, 889 F. Supp. 2d 418, 2012 WL 3839505, at *18 (E.D.N.Y. Sept. 5, 2012) (noting

19

that where "plaintiffs allegedly were compliant with police orders and not violent or resisting arrest," this fact "suggests that their arrests likely did not necessitate an unusual degree of force").

The injury requirement is "particularly important." *Sachs*, 2012 WL 3822220, at *14. "Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result." *Gonzalez v. City of New York*, No. 98-CV-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000). However, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch*, 567 F. Supp. 2d at 468; *see also Gonzalez v. The City of New York*, No. 98-CV-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) ("[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force."). These injuries need not be "severe or permanent," *Vogeler v. Colbath*, No. 04-CV-6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005), but must be more than merely "de minimis," *Washpon v. Parr*, 561 F. Supp. 2d 394, 407. The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage. *Id.* (scarring), *Esmont*, 371 F. Supp. 2d at 214-15 (nerve damage).

**B. Analysis**

Here, plaintiff alleges that after he complained that the handcuffs placed on him were too tight, Officer Mahar adjusted them and "pulled on the chain causing more pain in the right cuff." (Compl., pg. 4). Absent from the complaint are any allegations that the handcuffs caused any injury beyond some "temporary discomfort." *Lynch*, 567 F. Supp. 2d at 468. Accordingly, the court recommends that plaintiff's claim for excessive use of force be dismissed against Officer Mahar without prejudice and with leave to amend.

**X.    Eighth Claim (Failure to Supervise)**

**A. Legal Standard**

Plaintiff's eighth claim alleges that defendant Sgt. Tucker "was aware and allowed Officers Fahey and Medlock [to go] to my home and interview[] my minor child without my knowledge and/or permission knowing that I was in police custody at the time." (Compl., pg. 8).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). To prevail on a section 1983 claim against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional

participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a [supervisory] official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Tangreti*, 983 F.3d at 618. The Second Circuit explained that, "'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

### B. Analysis

Here, the complaint plausibly alleges a claim against Sergeant Tucker for failure to supervise. Plaintiff alleges that Sergeant Tucker was personally involved with plaintiff's detention and was aware that plaintiff had not committed a crime. (Compl., pg. 4). Nevertheless, the complaint alleges that Officers Medlock and Fahey removed plaintiff's minor daughter from his house without consent. (Compl., pg. 11). Although the complaint does not provide significant detail relative to this claim, the allegations as plead do meet the minimal pleading requirements of Federal Rule of Civil Procedure 8. The purpose of Rule 8 is to give adequate notice regarding the nature of the claim being asserted so that the defendant can prepare an adequate defense. *See Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995). Accordingly, the court recommends that plaintiff's claims against Sergeant Tucker for failure to supervise survive *sua sponte* review and that a response be required.

## XI.    <u>Ninth Claim (Unlawful Entry)</u>

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748, (1984) (internal quotation marks omitted). It is thus a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 749.

In order to overcome this presumption, the warrantless entry of a home must fall under a relevant exception, such as the "exigent circumstances" or "emergency aid" doctrine, which excuses a warrantless entry "if law enforcement has probable cause to believe that a person is 'seriously injured or threatened with such injury.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Police seeking to apply the doctrine bear a heavy burden to demonstrate that "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *Chamberlain*, 960 F.3d 100 at 106 (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)); *see also Hogan v. Caputo,* No. 02-CV-1040 (LFK/RFT), 2024 WL 1376395, at*6 (N.D.N.Y. Jun. 21, 2004) ("When a warrantless entry is made, the burden lies with the government to establish an exception to the warrant requirement.") (citation omitted). The presumption can also be overcome "if authorities have obtained the voluntary consent of a person authorized to grant such permission." *United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996).

## C. Analysis

Plaintiff plausibly alleges a claim against Officers Medlock and Fahey for unlawful entry. The complaint specifically alleges that Officers Medlock and Fahey "entered [plaintiff's] home while [plaintiff] was being detained and they removed [D.K.] from the home without [plaintiff's] permission." Plaintiff, having plead that he

did not grant Officers Medlock and Fahey permission to enter his home, shifts the burden to Officers Medlock and Fahey to establish that their warrantless entry was necessitated by "exigent circumstances" or the need for "emergency aid." *See Chamberlain*, 960 F.3d at 105. The court therefore recommends that plaintiff's claim for unlawful entry survive *sua sponte* review and that a response be required.

## XII.   **Tenth Claim (Unlawful Detainment of D.K.)**

"A litigant in federal court has a right to act as his or her own counsel." *Cheung v. Youth Orchestra Found.*, 906 F.2d 59, 61 (2d Cir. 1990) (citing 28 U.S.C. § 1654). "The statutory right to proceed pro se reflects a respect for the choice of an individual citizen to plead his or her own cause." *Id*. However, "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *Id*. This is because the choice to appear *pro se* is not a true choice for minors who, under state law, cannot determine their own legal actions. *Id*. (citing Fed. R. Civ. P. 17(b)).  Minor children "are entitled to trained legal assistance so their rights may be fully protected." *Cheung v. Youth Orchestra Found.*, 906 F.2d at 61. Thus, the "court has an affirmative duty to enforce the rule that a non-attorney parent must be represented by counsel when bringing an action on behalf of his or her child."[4] *Fauconier v. Comm. on Special*

---

[4] The Second Circuit has carved out limited exceptions to this general rule, including for claims filed on behalf of minors under the Individuals with Disabilities Education Act ("IDEA") and actions relating to social security benefits.  Liberally construed, plaintiff's complaint does not fall within any of the noted, limited exceptions.

*Educ.*, No. 02 Civ. 1050, 2003 WL 21345549, at *1 (S.D.N.Y. June 10, 2003), *aff'd sub nom. Fauconier v. Comm. on Special Educ.*, 112 F. App'x 85 (2d Cir. 2004). Here, the non-attorney plaintiff may not appear *pro se* on behalf of his minor daughter, and the tenth and seventeenth claims in the complaint must therefore be dismissed as asserted on D.K.'s behalf.

## XIII.  **New York State Constitutional Claims**

Plaintiff's thirteenth through eighteenth claims seeking relief under the New York State Constitution are duplicative of his Section 1983 claims under the United States Constitution and are therefore dismissed. "Where a § 1983 claim is brought for a parallel constitutional right, a court will properly dismiss state constitutional claims." *Barzilay v. City of N.Y.*, 610 F. Supp. 3d 544, 619 (S.D.N.Y. 2022) (citation omitted); *see also Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) ("The New York State Constitution provides a right of action where remedies are otherwise unavailable at common law or under § 1983."); *see also Talarico v. Port Auth. N.Y. & N.J.*, 367 F. Supp. 3d 161, 171 ("[W]here a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed."). The court therefore recommends dismissing plaintiff's New York State constitutional claims against all defendants without prejudice and with leave to amend only if plaintiff can identify a

remedy that is available under the New York State Constitution that is not otherwise available to him under United States Constitution.

## XIV.  **Damages**

Plaintiff seeks damages against all defendants in various amounts in their individual and professional capacities. The court recommends that plaintiff's claims for damages against the individual defendants in their official capacities, be dismissed with prejudice pursuant to the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alteration in original) (quotation marks and citation omitted). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id*. (citation omitted). DOCCS is a state agency for purposes of the Eleventh Amendment. *See Simmons v. Gowanda Corr. Facility*, No. 13-CV-647, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013); see also *Jackson v. Johnson*, 985 F.Supp. 422, 426 (S.D.N.Y. 1997). Moreover, plaintiff's claims against the defendants in their official capacities are construed as claims against New York State and are also barred by Eleventh Amendment immunity. *See Drawhorne v. Aloise*, 23-CV-1278 (TJM/TWD), 2023 WL 8188396, at *3 (N.D.N.Y. Nov. 27, 2023).

## XV.  **Opportunity to Amend**

Generally, before the court dismisses a pro se complaint or any part of the complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Futility is present when the problem with plaintiff's claims is substantive such that better pleading will not cure it.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

The court recommends that plaintiff be allowed to amend his complaint as follows:

       a. Plaintiff's third claim for denial of medical attention against Officers Medlock, Ladd, Mahar, Fahey and Sergeant Tucker be dismissed without prejudice and with leave to amend;

       b. Plaintiff's fourth claim for violation of his equal protection rights against Officer Mahar be dismissed without prejudice and with leave to amend;

       c. Plaintiff's seventh claim for excessive use of force against Officer Mahar be dismissed without prejudice and with leave to amend; and

       d. Plaintiff's thirteenth through and including his eighteenth claims be dismissed without prejudice and with leave to amend only if plaintiff can identify a remedy that is available under the New York State Constitution that is not otherwise available to him under United States Constitution.

28

If the court approves this recommendation and allows plaintiff to submit a proposed amended complaint, plaintiff should be warned that any amended complaint must be a ***complete and separate pleading***.  Plaintiff must state all of his claims in the new pleading, and may not incorporate by reference any part of his original complaint.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) be **GRANTED**, and it is

**RECOMMENDED,** that:

a. Plaintiff's first and eleventh claims for unlawful detainment against Officers Mahar, Ladd, and Medlock survive *sua sponte* review and that a response be required;

b. Plaintiff's second claim for unlawful arrest against Officer Mahar survive *sua sponte* review and that a response be required;

c. Plaintiff's third claim for denial of medical attention against Officers Medlock, Ladd, Mahar, Fahey and Sergeant Tucker be **DISMISSED WITHOUT PREJUDICE** and with leave to amend;

d. Plaintiff's fourth claim for violation of his due process rights against Officer Mahar survive *sua sponte* review and that a response be required, that plaintiff's fourth claim for violation of his equal protection rights against Officer Mahar be dismissed without prejudice and with leave to amend, and that plaintiff's twelfth claim against Officers Medlock and Mahar for violation of his due process rights survive *sua sponte* review and that a response be required;

29

e. Plaintiff's fifth claim for retaliation against Officer Mahar be **DISMISSED WITH PREJUDICE** and without leave to amend;

f. Plaintiff's sixth claim for failure to intervene against Officers Ladd, Medlock, Fahey, Dishaw and Sergeant Tucker  survive *sua sponte* review and that a response be required;

g. Plaintiff's seventh claim for excessive use of force against Officer Mahar be **DISMISSED WITHOUT PREJUDICE** and with leave to amend;

h. Plaintiff's eighth claim for failure to supervise against Sergeant Tucker survive *sua sponte* review and that a response be required;

i. Plaintiff's ninth claim for unlawful entry against Officers Medlock and Fahey survive *sua sponte* review and that a response be required;

j. Plaintiff's tenth claim for unlawful detention of D.K. be **DISMISSED WITHOUT PREJUDICE**;

k. Plaintiff's thirteenth through and including his eighteenth claims be **DISMISSED WITHOUT PREJUDICE** and with leave to amend only if plaintiff can identify a remedy that is available under the New York State Constitution that is not otherwise available to him under United States Constitution.; and

l. Plaintiff's claims for damages against all defendants in their official capacities are **DISMISSED WITH PREJUDICE** and without leave to amend.

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.[5]

---

[5] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  December 11, 2024

Mitchell J. Katz
U.S. Magistrate Judge

31

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 32 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,

v.

COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)

|

Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

[1]    On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

BRENDA K. SANNES, United States District Judge

**I. Introduction**

 **\*1**  The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

**II. IFP Application**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

[2]    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

**III. Initial Screening**

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

 **\*2**  Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 33 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank,* No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown,* 335 Fed.Appx. 102, 104 (2d Cir. 2009).

## IV. Summary of the Complaint [4]

[4]    Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz,* No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally.* On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 34 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled. [5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

[5]    The Use of Force report was not annexed as an exhibit to the complaint.

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search. [6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report. [7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

[6]    The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

[7]    The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment

**\*4**  The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 W L 156764 at *2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 35 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan*, 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville*, 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207*, 180 F.3d 409, 411 (2d Cir. 1999)).

### B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey*, No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

**\*5** The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew and consciously disregarded that risk." *See Walsh v. Goord*, No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 36 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata*

*v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

**\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at \*29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983

Case 5:24-cv-01391-BKS-MJK Document 5 Filed 12/11/24 Page 37 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV-7263, 2008 W L 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988).

*7 It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf,* 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart,* No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 38 of 158

2016 WL 6267968

1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591). [8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

[8]    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

**\*8**  In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a

constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at \*\*4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Fourteenth Amendment

#### 1. Equal Protection/Discrimination

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race. *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Due Process

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 39 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson*, 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence.[9]

[9]    The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See*

Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.*, 714 F.3d at 106; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133.[10]

[10]    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 40 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g.,* *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

 **\*10**  In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has also failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 W L 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v.*

*Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

 **\*11**  Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 W L 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 41 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v. Winnebago Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F. Cause of Action for Criminal Charges/Perjury

"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs*, No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### G. Injunctive Relief Against DOCCS

Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

*12 Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York*, 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

### VI. Conclusion

**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

[11]   Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 42 of 158

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

[12]    If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**\*13 ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2526620
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Arsharan SETHI, Plaintiff,

v.

NASSAU COUNTY, Nassau County Police Department,
Nassau County P.O. Jeff Bigger, sued herein individually
and in his official capacity, P.O. Eviscerate, sued herein
in his individual and official capacity, Rxr Security Guard
Randy Lnu, Rxr Management Company, Defendants.

No. 11–CV–6380 (SJF)(GRB).
|
Signed June 3, 2014.

**Attorneys and Law Firms**

Harsharan Sethi, Plainview, NY, pro se.

Liora M. Ben-Sorek, Mineola, NY, Heath Adam Bender,
Eustace & Marquez, White Plains, NY, for Defendants.

**ORDER**

FEUERSTEIN, District Judge.

 **\*1** On December 30, 2011, plaintiff Harsharan Sethi
("plaintiff") commenced this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983") against Nassau County, Nassau
County Police Department, Police Officer Jeff Biggers
(s/h/a "P.O. Jeff Bigger"), and Police Officer Gregory
Echevarria (s/h/a "P.O. Eviscerate") (collectively, the
"County Defendants"), and RXR Management Company and
"RXR Security Guard Randy" (together, "RXR").[1] Compl.
On March 23, 2012, the County Defendants answered and
asserted a cross-claim against RXR. [Docket Entry No. 2].
On March 13, 2013, this Court granted RXR's motion for
summary judgment and dismissed all claims and cross-
claims against RXR with prejudice. [Docket Entry No. 26].
Now before the Court is the County Defendants' motion for
summary judgment. [Docket Entry No. 45]. For the reasons
that follow, the County Defendants' motion is GRANTED.

[1]     Specifically, plaintiff asserts three (3) "causes of
        action." First, plaintiff claims that Officer Biggers

and Officer Echevarria "confined plaintiff and
assaulted him without probable cause." Complaint
("Compl.") [Docket Entry No. 1], ¶ 30. The
Court will address this "cause of action" as
two (2) separate claims: (i) false arrest or false
imprisonment (the "false arrest claim"); and (ii)
excessive force. Second, plaintiff alleges that
the "failure of [Nassau County and the Nassau
County Police Department] to provide training
and supervision regarding when a seizure of
a private citizen is appropriate and what is
reasonable force to be used in connection with
such seizure constitutes gross negligence and/or
deliberate indifference to the rights and safety
of the citizens of the state of New York and
the County of Nassau (the *"Monell* claim"
or "municipal liability claim"). Compl. ¶ 34.
Third, plaintiff asserts that RXR assisted Officer
Biggers and Officer Echevarria "in assaulting
plaintiff, unlawfully seizing plaintiff and forcefully
removing him from the premises without reason or
probable cause." Compl. ¶ 40.

I. Factual Background [2]

[2]     The facts are taken from the undisputed statements
        in the County Defendants' Statement of Material
        Facts Pursuant to Local Civil Rule 56.1 ("Defs.'
        56.1 Stmt.") [Docket Entry No. 47], plaintiffs'
        Response to Defendants' Statement of Material
        Facts Pursuant to Rule 56.1 ("PL' 56.1 Stmt.")
        [Docket Entry No. 49], the declaration of
        Liora M. Ben–Sorik in support of the County
        Defendants' motion for summary judgment ("Ben–
        Sorik Decl.") [Docket Entry No. 46] and the
        exhibits attached thereto, and my review of the
        record.

On December 1, 2011, Michelle Trabucchi ("Trabucchi") [3]
called 911 to report that a former employee of Cambridge,
whom she identified as plaintiff Harsharan Sethi, was seen
taking photographs of employees in the lobby level of the
office building, located at 498 RXR Plaza, Uniondale, New
York ("RXR Plaza"). (Defs.' 56.1 Stmt. ¶¶ 2–4; Nassau
Cnty. P.D. Event Search, at 1–2). Trabucchi informed the
911 operator that Cambridge "has an ongoing lawsuit with
[plaintiff]," that plaintiff was "now pacing back and forth"
and "looks a little off," and that employees were "very upset"
and "very nervous." (Defs.' 56.1 Stmt. ¶ 3; Nassau Cnty. P.D.
Event Search, at 2).

3      Plaintiff contends that Trabucchi "was an employee of Worldwide Who's Who ... and was calling for Worldwide Who's Who." (Pl.' 56.1 Stmt. ¶ 2). This is belied by the record. Nassau County Police Department records identify the caller as "Cambridge Who's Who." (Ben–Sorik Decl., Ex. C ("Nassau Cnty. P.D. Event Search"), at 1). Trabucchi testified that she has never worked for Worldwide Who's Who, which is the "umbrella company" for four (4) companies-Cambridge Who's Who Publishing ("Cambridge"), Elite American Publishing ("Elite"), Professional Biographers, and Who's Who Publishers-that are all in the same building and are owned by the same person. (Ben–Sorik Decl., Ex. J ("Trabucchi Depo."), at 6, 25–26). Trabucchi worked for Cambridge as a senior human resources generalist from February 2008 through November 2011, and then began working for Elite. (*Id.* at 6–7). Trabucchi was working for Elite when she made the 911 call on December 1, 2011. (*Id.* at 7). While employed as a senior human resources generalist for both Cambridge and Elite, Trabucchi reported to Deb Morrissey, a Cambridge employee. (*Id.*).

In response to Trabucchi's 911 call, Officer Biggers and Officer Echevarria (together, the "Officers") arrived at RXR Plaza and spoke with Cambridge personnel. (Defs.' 56.1 Stmt. ¶¶ 7, 9). The Officers were told that plaintiff had been fired from his position at Cambridge. (Ben–Sorik Decl., Ex. H ("Biggers Depo."), at 30). The Officers were informed that "one of [Cambridge's] employees was down in the cafeteria and being followed by [plaintiff] and he was taking pictures ... of her." (Ben–Sork Decl., Ex. G ("Echevarria Depo."), at 12–13). The Officers were shown a postcard with "derogatory statements" about Cambridge, purportedly sent by plaintiff to Cambridge employees and/or clients, which included photographs of Cambridge employees. (Biggers Depo., at 29–31; Echevarria Depo., at 12–13; Trabucchi Depo., at 30–32). Following their conversation with Cambridge personnel, the Officers returned to the lobby level of RXR Plaza, where a female Cambridge employee identified plaintiff. (Defs.' 56.1 Stmt. ¶¶ 10–11; Echevarria Depo., at 13–15).

The Officers approached plaintiff and asked him for identification, but plaintiff refused to provide identification and "became very agitated." (Echevarria Depo., at 15–17; Defs.' 56.1 Stmt. ¶¶ 13–17). According to Officer Biggers, plaintiff "was immediately being combative with us" and

"[r]efused to show us his I.D." (Biggers Depo., at 22). At some point, plaintiff told the Officers that he was at RXR Plaza for a dental appointment and presented an appointment card for a future date. [4] (Defs.' 56.1 Stmt. ¶¶ 18; Biggers Depo., at 23–24; Transcript, at 4–5). Officer Biggers went to the dentist's office and was informed that "[plaintiff] was not a patient, [and] was not there for an appointment." (Biggers Depo., at 28; Defs.' 56.1 Stmt. ¶¶ 19–20). Upon concluding that plaintiff "had no legitimate reason to be in the building," the Officers asked plaintiff to leave RXR Plaza. (Biggers Depo., at 28–29; Defs.' 56.1 Stmt. ¶¶ 21–23).

4      On December 1, 2011, plaintiff carried a recording device in the breast pocket of his shirt, which recorded all of his interactions at RXR Plaza. (Ben–Sorik Decl., Ex. I ("Sethi Depo."), at 68–75). The transcript of the audio recording reveals that plaintiff was at the dentist's office for approximately nine (9) minutes, during which time he spoke with the receptionist about insurance coverage and x-rays, and scheduled an appointment for January 11, 2011. (Ben–Sorik Decl., Ex. F ("Transcript"), at 1–3). Plaintiff was not treated by a dentist on December 1, 2011. (Sethi Depo., at 66).

**\*2** When plaintiff did not immediately leave RXR Plaza following the Officers' request, the Officers escorted plaintiff outside, with Officer Echevarria holding plaintiffs right wrist and triceps, and Officer Biggers with a hand on plaintiff's back. [5] (Defs.' 56.1 Stmt. ¶¶ 24–27; Echevarria Depo., at 28–30; Biggers Depo., at 36–41). Once outside, the Officers instructed plaintiff to "get in [his] car" and "leave the property." (Transcript, at 11–12).

5      During the encounter, plaintiff accused the Officers of "hitting" him while he was escorted from the building. (Transcript, at 6). However, plaintiff admitted during his deposition that he used the word "hitting" to describe that one of the officers "pulled my hand and he extended all the way back and twist it." (Sethi Depo., at 134).

Plaintiff did not seek medical treatment for any injuries alleged to have been incurred during the December 1, 2011 encounter with the Officers, nor has plaintiff sought any mental health counseling. (Sethi Depo. at 138, 141). Plaintiff did not file a complaint with any agency regarding the events of December 1, 2011. (*Id.* at 145).

## II. Analysis

### A. Standard of Review

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks and citation omitted). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (internal quotation marks and citation omitted); *see also Fabrikant v. French,* 691 F.3d 193, 205 (2d Cir.2012).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010) (citation omitted). If this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown,* 654 F.3d at 358 (citation omitted). In order to defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted); *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir.2005) ("At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks and citation omitted)).

### B. Section 1983

**\*3** Section 1983 of Title 42 of the United States Code provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia,* —— U.S. ——, ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). Thus, to state a Section 1983 claim, a plaintiff must allege: (1) that the challenged conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States," and (2) that such challenged conduct was "committed by a person acting under color of state law." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Paulk,* —— U.S. ——, ——— – ———, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

#### 1. Claims Against the Officers

##### a. False Arrest Claim

Plaintiff claims that the Officers subjected "him to an illegal seizure and forc[ed] him from the building without probable cause or reason." Compl. ¶ 3. A claim for false arrest, based on the Fourth Amendment right to be free from unreasonable seizures, is "substantially the same as a false arrest claim under New York law." *Weyant v. Okst,* 101 F.3d 856 (2d Cir.1996). To state a claim for false arrest, a plaintiff must show that: "(1) the defendant[s] intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier,* 316 F.3d 128, 134–35 (2d Cir.2003) (internal quotation marks and citation omitted).

The County Defendants contend that plaintiff was merely "temporarily stopped to enable Police Officers Biggers and Echevarria in investigating a 911 call of harassment," and that plaintiff was not arrested because he "was free to leave, and even encouraged to leave, the RXR premises." Memorandum of Law in Support of the County Defendants' Motion for Summary Judgment ("Defs.' Mot.") [Docket Entry No. 48], at 6–7. Alternatively, defendants argue that even if plaintiff s detention constituted an arrest, it was privileged "in light of the existence of probable cause." *Id.* at 7.

Police officers may conduct investigatory stops if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Arrests, on the other hand, must be supported by probable cause. *See United States v. Vargas,* 369 F.3d 98, 101 (2d Cir.2004). "Whether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness." *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991). "A permissive investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.' " *United States v. Tehrani,* 49 F.3d 54, 61 (2d Cir.1995) (quoting *United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993)). "In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the 'the amount of force used by the police, the need for such force, and the extent to which the individual's freedom of movement was restrained.' " *Vargas,* 369 F.3d at 101 (quoting *Perea,* 986 F.2d at 645).

**\*4** Assuming, *arguendo,* that plaintiff's brief encounter with the Officers constituted an arrest, plaintiff may not succeed on his false arrest claim if the Officers had probable cause. *See Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). Probable cause exists whenever "an arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* at 119 (internal quotation marks and citation omitted). Probable cause may "exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."

*Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citation omitted). "The burden of establishing the absence of probable cause rests on the plaintiff." *Nelson v. Hernandez,* 524 F.Supp.2d 212, 220 (E.D.N.Y.2007) (citations omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant,* 101 F.3d at 845.

The Officers arrived at RXR Plaza in response to a 911 call "for a suspicious person who was harassing and following his former employee and fellow employers," "videotaping them with his cell phone," and who "appeared to be nervous and acting erratically." (Biggers Depo., at 10–11). Upon speaking with Cambridge personnel, the Officers learned that plaintiff had harassed employees in the past. The Officers were shown cards, purportedly sent by plaintiff, which included derogatory comments and photographs of Cambridge employees. A Cambridge employee identified plaintiff to the Officers. Based on this information, the Officers had "reasonably trustworthy information" to believe that plaintiff had, and was presently, harassing CWW employees. [6] *See Singer,* 63 F.3d at 119. Plaintiff submits no evidence other than his own unsubstantiated conclusion, which is insufficient to satisfy his burden to establish that the Officers lacked probable cause. *See Nelson,* 524 F.Supp.2d at 220.

[6]     Under New York law, a person who "intentionally and repeatedly harasses another person by following such person in or about a public place" is guilty of harassment in the first degree. N.Y. Penal Law § 240.25. A person is guilty of harassment in the second degree when, "with intent to harass, annoy or alarm another person ... [he] follows a person in or about a public place," or "engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." N.Y. Penal Law § 240.26. A person who, "with intent to harass, annoy, threaten or alarm another person ... communicates with a person, anonymously or otherwise, by ... mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm" is guilty of aggravated harassment in the second degree. N.Y. Penal Law § 240.30.

Furthermore, plaintiff was not restrained during the encounter with the Officers, and was in fact, encouraged to leave RXR Plaza. (Defs.' Mot., at 7). It was not until plaintiff ignored the Officers' request that plaintiff leave the premises that the Officers physically touched plaintiff and escorted him out of the building. Under these specific circumstances, plaintiff's encounter with the Officers constituted an investigatory stop, and not an arrest. At the very least, based upon the totality of the circumstances and the facts as told to them, the Officers had a reasonable basis to support an investigatory stop. *See United States v. Gori,* 230 F.3d 44, 53 (2d Cir.2000) (police officer may stop a person to investigate possible criminal behavior based upon reasonable suspicion, even if there is no probable cause to make an arrest); *Floyd v. City of N.Y.,* 959 F.Supp.2d 540, 648 (S.D.N.Y.2013) ("The police has reasonable suspicion to forcibly stop [the suspect] for suspected harassment because he matched a specific description provided by an identified victim, and was in close proximity to the reported harassment just minutes after it allegedly occurred."); *United States v. McCargo,* 464 F.3d 192, 197 (2d Cir.2006) (officers had reasonable suspicion for investigatory stop, where defendant was within proximity of reported crime, even though officers had no physical description of the suspect). Accordingly, the County Defendants' motion for summary judgment is granted with respect to plaintiff's false arrest claim.

b. Excessive Force Claim

**\*5** Plaintiff complains that he was subjected to excessive force during his encounter with the Officers on December 1, 2011. Claims "that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' " are "analyzed under the Fourth Amendment's 'objective reasonableness standard.' " *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Terranova v. New York,* 676 F.3d 305, 308 (2d Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 414, 184 L.Ed.2d 156 (2012) ("Claims that the police used excessive force are judged under the Fourth Amendment's 'objective reasonableness' standard." (internal quotation marks and citations omitted)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 409 U.S. at 396–97; *see also Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) (accord).

The force used by the Officers to remove plaintiff from RXR Plaza was reasonable under the circumstances where, as discussed above, plaintiff refused to provide identification, became "agitated" and "combative," and failed to comply with the Officers' request that he leave RXR Plaza. (Echevarria Depo., at 17; Biggers Depo., at 22). While plaintiff complained that the Officers were "hitting" him as he was escorted from RXR Plaza, plaintiff later admitted that he used the word "hitting" to describe that one of the officers "pulled [his] hand and [ ] extended all the way back and twist[ed] it." (Transcript at 6; Sethi Depo. at 134). Furthermore, plaintiff admits that he sustained no injuries as a result of the encounter and did not require any medical treatment. Therefore, as a matter of law, "such amount of force cannot be considered excessive ." *Petway v. City of N.Y.,* No. 02–CV–279, 2014 WL 839931, at \*8 (E.D.N.Y. Mar. 4, 2014) (granting summary judgment and dismissing excessive force claim where officer's "slight shove" caused plaintiff no injury and required no medical treatment); *see also Genia v. N, Y. State Troopers,* No. 03–CV–0870, 2007 WL 869594, at \*20 (E.D.N.Y. Mar. 20, 2007) (holding "alleged 'push' cannot constitute unreasonable excessive force in violation of the Fourth Amendment" where plaintiff did not seek medical attention and did not allege any specific injuries); *Roundtree v. City of N.Y.,* 778 F.Supp. 614, 622 (E.D.N.Y.1991) ("[T]o conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that *any* physical contact by the arresting officer with an arrested person is actionable."). Accordingly, the County Defendants' motion for summary judgment is granted with respect to plaintiff's excessive force claim. [7]

---

[7]      Defendants argue that even if the Officers' brief detention and minimal physical contact with plaintiff constitute a constitutional deprivation, the Officers are entitled to qualified immunity. (Defs .' Mot., at 14–15). "As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Kerman v. City of N.Y.,* 374 F.3d 93, 108 (2d Cir.2004) (citations omitted). However, "[i]f the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover." *Cowan v. Breen,* 352 F.3d 756, 761 (2d Cir.2003) (internal quotation marks and citations

omitted). Because plaintiff has failed to establish a constitutional violation, plaintiff's false arrest and excessive force claims fail and no qualified immunity analysis is required.

### C. Municipal Liability Claim

**\*6** Under *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town ofE. Haven,* 691 F.3d 72, 80 (2d Cir.2012). In order to prevail on such a claim against a municipal defendant, the plaintiff must establish as a prerequisite an underlying constitutional violation on the part of individual municipal actors. *See Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."); *Askins v. Doe No. 1,* 727 F.3d 248, 253 (2d Cir.2013) (same).

Plaintiff asserts a *Monell* claim against Nassau County and the Nassau County Police Department. Compl. ¶¶ 32–38. "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep 't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (citations omitted). The Nassau County Police Department is an administrative arm of Nassau County,

and thus, lacks capacity to be sued. *See id.* (dismissing claim against police department because it is merely administrative arm of municipality); *Sorell v. Inc. Vill. ofLynbrook,* No. 10–cv–49, 2012 WL 1999642, at \*5 (E.D.N.Y. June 4, 2012) (dismissing claims against the Nassau County Police Department because it is merely an administrative arm of Nassau County, which had been named separately as a defendant for each of plaintiff s claims); *Wharton v. Cnty. of Nassau,* No. 07–cv–2137, 2010 WL 3749077, at \*3 (E.D.N.Y. Sep.20, 2010) (dismissing claims against the Nassau County Police Department because, as an administrative arm of Nassau county, it lacked capacity to be sued). Accordingly, all claims against the Nassau County Police Department are dismissed.

Furthermore, plaintiff has not established an underlying constitutional violation to which *Monell* liability can extend. *See Segal,* 459 F.3d at 219. Therefore, plaintiff's *Monell* claim against Nassau County is dismissed.

### III. Conclusion

For the foregoing reasons, the County Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is granted. The Clerk of the Court shall enter judgment accordingly and close this case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2526620

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Steele-Warrick v. Microgenics Corporation,
E.D.N.Y., April 26, 2023

984 F.3d 1075
United States Court of Appeals, Second Circuit.

Devar HURD, Plaintiff-Appellant,

v.

Stacey FREDENBURGH, in Her

Individual Capacity, Defendant-Appellee. †

† The Clerk of the Court is directed to amend the
official caption as set forth above.

Docket No. 19-3482
|
August Term 2020
|
Argued: November 18, 2020
|
Decided: January 12, 2021

**Synopsis**

**Background:** Former prisoner brought action under
§ 1983 against inmate records coordinator for New
York State Department of Corrections and Community
Supervision alleging deprivation of his Eighth and Fourteenth
Amendment rights due to error in sentencing calculations that
caused him to be imprisoned for almost year past date on
which New York law mandated his release. The United States
District Court for the Eastern District of New York, Kiyo
A. Matsumoto, J., 2019 WL 4696364, granted coordinator's
motion to dismiss. Prisoner appealed.

**Holdings:** The Court of Appeals, Wesley, Senior Circuit
Judge, held that:

[1] prisoner suffered harm of constitutional magnitude under
Eighth Amendment;

[2] prisoner had cognizable liberty interest in conditional
release for purposes of substantive due process;

[3] coordinator was entitled to qualified immunity on Eighth
Amendment claim; and

[4] coordinator was entitled to qualified immunity on
substantive due process claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (36)

[1] **Evidence** 👉 Particular Cases

Court of Appeals would take judicial notice
of New York Court of Claims' decision
on former prisoner's New York law false
imprisonment claim only to establish decision's
existence and that Court of Claims made
certain factual findings, which was necessary to
complete narrative of prisoner's federal action
and provide context for defenses set forth
by inmate records coordinator for New York
State Department of Corrections and Community
Supervision, in prisoner's action under § 1983
alleging deprivation of Eighth and Fourteenth
Amendment rights due to error in sentencing
calculations that caused him to be imprisoned for
almost year past date on which New York law
mandated his release. U.S. Const. Amends. 8, 14;
42 U.S.C.A. § 1983.

2 Cases that cite this headnote
More cases on this issue

[2] **Federal Courts** 👉 Pleading

**Federal Courts** 👉 Immunity

The Court of Appeals reviews de novo a district
court's decision granting a motion to dismiss for
failure to state a claim, including on qualified
immunity grounds. Fed. R. Civ. P. 12(b)(6).

[3] **Federal Courts** 👉 Dismissal for failure to
state a claim

In conducting a review of a district court's
decision granting a motion to dismiss for failure
to state a claim, the Court of Appeals accepts

2021 WL 96886

as true all factual allegations and draws from them all reasonable inferences; but the Court of Appeals is not required to credit conclusory allegations or legal conclusions couched as factual allegations. Fed. R. Civ. P. 12(b)(6).

**[4]**    **Civil Rights** 🔑 Government Agencies and Officers

     **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The qualified immunity analysis is guided by two questions, including, first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions; a court may address these questions in either order, and, if it answers either question in the negative, qualified immunity attaches.

5 Cases that cite this headnote

**[5]**    **Civil Rights** 🔑 Government Agencies and Officers

     **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The two-step procedure in the qualified immunity analysis, i.e., whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights and whether the right was clearly established at the time of the defendants' actions, promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.

4 Cases that cite this headnote

**[6]**    **Prisons** 🔑 Conditional release; community placement

     **Sentencing and Punishment** 🔑 Confinement beyond term of sentence

Former prisoner, who was imprisoned for almost year past date on which New York law mandated his release due to error in sentencing calculations, suffered harm of constitutional magnitude under Eighth Amendment for purposes of his § 1983 claim; once prisoner met statutory requirements for conditional release, his release was mandatory under state law, New York State Department of Corrections and Community Supervision had no authority to keep prisoner incarcerated past conditional release date for crimes of which he was convicted and sentenced, and, even assuming New York could impose some supervisory conditions following release, prisoner's continued imprisonment was punishment that was neither authorized by law nor justified by any penological interest asserted by New York. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2) (b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

3 Cases that cite this headnote

**[7]**    **Sentencing and Punishment** 🔑 Scope of Prohibition

A plaintiff asserting an Eighth Amendment claim pursuant to § 1983 must meet two requirements: first, the alleged deprivation must be, in objective terms, sufficiently serious, and, second, the charged official must act with a sufficiently culpable state of mind. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[8]**    **Sentencing and Punishment** 🔑 Scope of Prohibition

To satisfy the first requirement for asserting an Eighth Amendment claim under § 1983, i.e., that the alleged deprivation must be, in objective terms, sufficiently serious, a plaintiff must plead a harm of a magnitude that violates a person's Eighth Amendment rights. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[9]**    **Sentencing and Punishment** 🔑 Scope of Prohibition

The Eighth Amendment proscribes more than physically barbarous punishments; it prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency. U.S. Const. Amend. 8.

**[10]**    **Sentencing and Punishment** 🔑 Scope of Prohibition

An Eighth Amendment claim is not measured by the punishment alone, for an Eighth Amendment violation typically requires a state of mind that is the equivalent of criminal recklessness. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[11]**    **Sentencing and Punishment** 🔑 Deliberate indifference in general

The Eighth Amendment standard equivalent to criminal recklessness requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[12]**    **Sentencing and Punishment** 🔑 Deliberate indifference in general

Under the Eighth Amendment standard equivalent to criminal recklessness, prison officials can be found deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors. U.S. Const. Amend. 8.

4 Cases that cite this headnote

**[13]**    **Sentencing and Punishment** 🔑 Cruelty and unnecessary infliction of pain

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain, including punishments that are totally without penological justification. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[14]**    **Sentencing and Punishment** 🔑 Confinement beyond term of sentence

Under the Eighth Amendment, there is no penological justification for incarceration beyond a mandatory release date because any deterrent and retributive purposes served by the inmate's time in jail were fulfilled as of that date. U.S. Const. Amend. 8.

4 Cases that cite this headnote

**[15]**    **Sentencing and Punishment** 🔑 Confinement beyond term of sentence

Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by the Constitution; for that reason, unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis. U.S. Const. Amend. 8.

9 Cases that cite this headnote

**[16]**    **Sentencing and Punishment** 🔑 Confinement beyond term of sentence

If a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability under § 1983; the deliberate indifference prong will do most of the work under these and similar circumstances, as the degree to which a harm is unnecessary in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the Eighth Amendment. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[17]**    **Sentencing and Punishment**    ⬤    Confinement
beyond term of sentence

On a claim of an Eighth Amendment violation
under § 1983, there must be a causal connection
between the official's response to the problem
and the infliction of the unjustified detention.
U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[18]**    **Constitutional Law**    ⬤    Discharge and release

**Prisons**    ⬤    Conditional release;  community
placement

Former prisoner, who was imprisoned for
almost year past date on which New York
law mandated his release due to error in
sentencing calculations, had cognizable liberty
interest in conditional release for purposes of his
substantive due process claim under § 1983; it
was of no moment that conditional release was
state-created right, and, once prisoner satisfied
statutory requirements for conditional release, he
had liberty interest in freedom from detention
upon his conditional release date, as guaranteed
by New York law. U.S. Const. Amend. 14; 42
U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)
(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law
§§ 600-a, 803(1)(a).

2 Cases that cite this headnote

**[19]**    **Constitutional Law**    ⬤    Substantive Due
Process in General

The Fourteenth Amendment guarantees more
than fair process; it covers a substantive sphere
as well, barring certain government actions
regardless of the fairness of the procedures used
to implement them. U.S. Const. Amend. 14.

13 Cases that cite this headnote

**[20]**    **Constitutional Law**    ⬤    Reasonableness,
rationality, and relationship to object

Substantive due process rights safeguard persons
against the government's exercise of power
without any reasonable justification in the
service of a legitimate governmental objective.
U.S. Const. Amend. 14.

16 Cases that cite this headnote

**[21]**    **Constitutional Law**    ⬤    Rights and interests
protected;  fundamental rights

The first step in substantive due process analysis
is to identify the constitutional right at stake. U.S.
Const. Amend. 14.

23 Cases that cite this headnote

**[22]**    **Constitutional Law**    ⬤    Egregiousness;
"shock the conscience" test

After identifying the constitutional right at
stake, a plaintiff claiming a substantive due
process violation must demonstrate that the state
action was so egregious, so outrageous, that it
may fairly be said to shock the contemporary
conscience. U.S. Const. Amend. 14.

38 Cases that cite this headnote

**[23]**    **Constitutional Law**    ⬤    Egregiousness;
"shock the conscience" test

On a claim of a substantive due process
violation, the interference with the plaintiff's
protected right must be so shocking, arbitrary,
and egregious that the Due Process Clause would
not countenance it even were it accompanied by
full procedural protection. U.S. Const. Amend.
14.

36 Cases that cite this headnote

**[24]**    **Constitutional Law**    ⬤    Discharge and release

Although there is no right under the Federal
Constitution to be conditionally released before
the expiration of a valid sentence, that does not
establish that state inmates lack a liberty interest
in conditional release where the state has created
a statutory mechanism providing for mandatory
conditional release for eligible inmates; it means
only that an inmate has no constitutional right
to demand or expect conditional release where
the incarcerating authority does not offer such an
opportunity under its law.

1 Case that cites this headnote

**[25]    Constitutional Law** 🔑 Restraint,
commitment, and detention

Because freedom from bodily restraint has
always been at the core of the liberty protected
by the Due Process Clause from arbitrary
governmental action, commitment for any
purpose constitutes a significant deprivation of
liberty that requires due process protection. U.S.
Const. Amend. 14.

4 Cases that cite this headnote

**[26]    Constitutional Law** 🔑 Restraint,
commitment, and detention

Inmates eligible for mandatory conditional
release are not limited to the confines of
procedural due process in protecting that
right; they also are entitled to substantive
due process protection against egregious and
arbitrary government interference. U.S. Const.
Amend. 14.

6 Cases that cite this headnote

**[27]    Constitutional Law** 🔑 Rights and interests
protected; fundamental rights

Substantive due process protects rights that are
rooted in the principles of ordered liberty. U.S.
Const. Amend. 14.

**[28]    Constitutional Law** 🔑 Rights and interests
protected; fundamental rights

Although many state-created rights are not
recognized under the substantive Due Process
Clause, state-created rights that trigger core
constitutional interests are entitled to its
protection; it is the nature of the right, not just its
origin, that matters. U.S. Const. Amend. 14.

3 Cases that cite this headnote

**[29]    Prisons** 🔑 Conditional release; community
placement

Conditional release under New York law is not
akin to a state-created right of contract; it is
a state-created right of mandatory release from
prison, preventing unlawful continued physical
restraint.

**[30]    Civil Rights** 🔑 Prisons, jails, and their
officers; parole and probation officers

It was not clearly established during period
of former prisoner's prolonged detention
that inmate suffered harm of constitutional
magnitude under Eighth Amendment when
imprisoned past their mandatory conditional
release date and, thus, inmate records
coordinator for New York State Department of
Corrections and Community Supervision was
entitled to qualified immunity in prisoner's action
under § 1983 alleging deprivation of Eighth
Amendment right due to error in sentencing
calculations that caused him to be imprisoned
for almost year past date on which New York
Law mandated his release; although it was
clearly established that New York could not
detain prisoner past expiration of his maximum
sentence, it was not clearly established that,
once his conditional release date was approved,
continued detention beyond that date qualified
as constitutional harm under Eighth Amendment.
U.S. Const. Amend. 8; 42 U.S.C.A. § 1983; N.Y.
Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b);
N.Y. Correction Law §§ 600-a, 803(1)(a).

6 Cases that cite this headnote

**[31]    Civil Rights** 🔑 Good faith and
reasonableness; knowledge and clarity of law;
motive and intent, in general

Government actors are entitled to qualified
immunity insofar as their conduct does
not violate clearly established statutory or
constitutional rights of which a reasonable
person would have known.

6 Cases that cite this headnote

**[32]**　**Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Under the qualified immunity analysis, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

5 Cases that cite this headnote

**[33]**　**Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful.

1 Case that cites this headnote

**[34]**　**Prisons** 🔑 Discharge and release in general

No federal, state, or local authority can keep an inmate detained past the expiration of the sentence imposed on them.

**[35]**　**Civil Rights** 🔑 Prisons, jails, and their officers; parole and probation officers

It was not clearly established during period of former prisoner's prolonged detention that inmate had liberty interest in mandatory conditional release protected by substantive Due Process Clause and, thus, inmate records coordinator for New York State Department of Corrections and Community Supervision was entitled to qualified immunity in prisoner's action under § 1983 alleging deprivation of substantive due process due to error in sentencing calculations that caused him to be imprisoned for almost year past date on which New York Law mandated his release; prisoner admitted that no decision had held that imprisonment past mandatory conditional release date violated Fourteenth Amendment's substantive protections, and prisoner's liberty interest in conditional release did not obviously

follow from procedural due process cases on which he relied. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

1 Case that cites this headnote

**[36]**　**Constitutional Law** 🔑 Procedural due process in general

**Constitutional Law** 🔑 Substantive Due Process in General

The substantive due process analysis differs from procedural due process; and it is not the case that one must follow from the other. U.S. Const. Amend. 14.

4 Cases that cite this headnote

**\*1080** Appeal from a judgment of the United States District Court for the Eastern District of New York (Matsumoto, J.)

**Attorneys and Law Firms**

JACOB LOUP (Joel B. Rudin, on the brief), Law Offices of Joel B. Rudin, P.C., New York, NY, for Plaintiff-Appellant.

LINDA FANG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, on the brief), for Letitia James, Attorney General of the State of New York, New York, NY, for Defendant-Appellee.

Before: WALKER, KATZMANN, WESLEY, Circuit Judges.

**Opinion**

WESLEY, Circuit Judge:

**\*\*1** Devar Hurd was charged in a single state indictment with nine misdemeanors and one felony, which took three trials to resolve. He remained in local custody throughout the lengthy trial process. Hurd received a sentence specific to each conviction, but those sentences merged into one by operation of New York law. When Hurd was transferred into state custody to serve what became his single felony sentence, his credit for time already served and good behavior entitled him to immediate release. But Hurd was not released from state custody for nearly a year. He contends this prolonged

incarceration violated his rights under the Eighth Amendment and the Fourteenth Amendment's substantive due process clause.

## BACKGROUND[1]

[1]    Except as otherwise noted, these facts are as alleged in Hurd's First Amended Complaint.

Devar Hurd was arrested in July 2013 and indicted for seven counts of misdemeanor criminal contempt in the second **\*1081** degree, one count of misdemeanor stalking in the fourth degree, one count of misdemeanor harassment in the first degree, and one count of felony stalking in the second degree. He was held in the custody of the New York City Department of Correction ("NYCDOC") following his arrest, where he remained during multiple trials on the indictment.

Hurd's first trial in December 2014 ended in a mistrial. At his retrial in October 2015, the jury convicted Hurd of the nine misdemeanor counts; the state court declared a mistrial on the felony. The state court imposed a set of definite sentences for the misdemeanors ranging from 90 days to one year each, to run consecutive to the others, in the custody of NYCDOC. Under New York law, however, because the aggregate term of these definite sentences exceeded two years, Hurd's term of imprisonment on the misdemeanor counts was capped at two years. *See* N.Y. Penal Law § 70.30(2)(b).

Hurd faced another retrial on the felony count in March 2016; the jury convicted him of stalking in the second degree. The state court sentenced Hurd to an indeterminate sentence with a minimum of one-and-one-third years and a maximum of four years, to be served in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Because the state court did not specify the manner in which Hurd's felony sentence was to run, New York law mandated that it would run concurrently with his two-year sentence on the misdemeanors. *See id.* § 70.25(1)(a). Hurd's misdemeanor and felony sentences also merged by operation of New York law. *See id.* § 70.35. Thus, Hurd's maximum sentence on the indictment was four years.

Hurd would not have to serve four full years in prison after his sentence was imposed, however. New York law provides that any sentence "shall be credited with and diminished by the amount of time the person spent in custody prior to the commencement of such sentence as a result of the charge that

culminated in the sentence." *Id.* § 70.30(3). This is known as "jail-time credit." Thus, Hurd was entitled to credit against his maximum four-year "state sentence" for all the time he spent in NYCDOC custody from his arrest in July 2013 to his transfer to DOCCS custody in April 2016.

**\*\*2**  New York law also provides for "good-time credit," whereby an inmate "may receive time allowance against the term or maximum term of his or her sentence ... for good behavior ...." N.Y. Corr. Law § 803(1)(a). Once good-time credit is approved, an inmate "*shall*, if he or she so requests, be conditionally released from the institution in which he or she is confined when the total good behavior time allowed to him or her ... is equal to the unserved portion of his or her term, maximum term or aggregate maximum term." N.Y. Penal Law § 70.40(1)(b) (emphasis added). This is known as the inmate's "conditional release date."

The New York Court of Appeals has referred to a conditional release date as "the statutorily mandated release date, calculated by applying both his good behavior time and his jail time, or time served awaiting trial." *Eiseman v. New York*, 70 N.Y.2d 175, 180, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987) (Kaye, *J.*) (internal quotation marks and citations omitted). Thus, conditional release under New York law is unlike parole, which is a discretionary decision reserved to the judgment of the parole board. As then-Judge Kaye's explanation suggests, conditional release is a mathematical concept: an inmate will have completed their term of imprisonment when (1) the number of pre- and post-trial custody days served, plus (2) the **\*1082** number of approved days earned for good behavior, equals the inmate's sentence term. By sheer calculation of days, the inmate has satisfied their term of imprisonment, and they are entitled to immediate release from prison.

Hurd was transferred from NYCDOC custody into DOCCS custody in April 2016. Whenever an inmate is transferred from local to state custody, the local jurisdiction must calculate the inmate's jail-time credit and provide DOCCS with a certified record of that credit. *See* N.Y. Corr. Law § 600-a. Accordingly, NYCDOC officials issued a "Jail Time Certification" ("JTC"), confirming that Hurd was entitled to 996 days of jail-time credit against his maximum four-year sentence. DOCCS officials also produced a "Legal Date Computation," indicating Hurd's eligibility for good-time credit of up to one year and four months and jail-time credit of two years, eight months, and 26 days.

Assuming his good-time credit would be approved, the combination of his jail-time credit and good-time credit gave Hurd a conditional release date of March 17, 2016—pre-dating his transfer into DOCCS custody. This conditional release date was reflected on the Legal Date Computation. Thus, at the time of his arrival in state custody, Hurd "was told that he was eligible to be immediately released." J.A. 17. DOCCS approved Hurd's good-time credit on April 19, 2016, at which point he satisfied the statutory requirements entitling him to conditional release.

DOCCS Inmate Records Coordinator Stacey Fredenburgh began to process Hurd's release documents. Hurd's complaint sets out a series of interactions between Fredenburgh and NYCDOC all centered around verifying the correct computation of his local jail-time credit. Without identifying a reason for any animus towards him, Hurd alleges that Fredenburgh and NYCDOC employees—most notably Principal Administrative Associate for NYCDOC's Legal Division, Edwin Felicien—"agreed to reduce Mr. Hurd's jail-time credit so that he would not be released." J.A. 17. Between April and June 2016, Felicien sent Fredenburgh four amended JTCs, each of which reflected a different, and much lower, jail-time credit than the 996 days reflected in the original JTC. It is undisputed that each of these revised JTCs was wrong. The last amended JTC credited Hurd with 508 days of jail-time credit. As a result, DOCCS no longer considered Hurd eligible for conditional release; Hurd remained in prison.

**\*3** Hurd pursued the official grievance process, filed two notices of claim, and lodged informal letter complaints to prison officials, including Fredenburgh, protesting that he was being held past his conditional release date. Fredenburgh responded in a letter to Hurd, telling him "that she could do nothing to address his concerns and that he must contact 'Rikers Island' " (an apparent reference to NYCDOC). J.A. 19. DOCCS took no other action in response to Hurd's complaints.

Finally, Hurd's counsel contacted NYCDOC's legal department on March 20, 2017. Three days later, NYCDOC sent an amended JTC crediting Hurd with the original 996 days of jail-time credit. DOCCS released Hurd on March 30, 2017—11 months and 11 days after the date on which he was entitled to immediate release.

Hurd filed the instant lawsuit under 42 U.S.C. § 1983 against New York City (the "City"), an NYCDOC employee, and Fredenburgh for violating his rights under the Eighth

Amendment and the Fourteenth Amendment's substantive due process clause. Hurd settled with the City defendants. The district court thereafter granted Fredenburgh's motion to dismiss under **\*1083** Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, holding that the prolonged imprisonment beyond Hurd's mandatory conditional release date was not a cognizable injury under the Eighth and Fourteenth Amendments, and, in the alternative, that Fredenburgh was entitled to qualified immunity.

**[1]** Hurd also filed a state law false imprisonment claim in New York's Court of Claims. Two weeks after the district court dismissed Hurd's § 1983 complaint, the Court of Claims granted summary judgment for the State, concluding that Fredenburgh acted reasonably considering her state law obligations and that Hurd's prolonged detention was attributable to the City's errors only.[2]

> [2]    The parties dispute whether we can (or should) consider the Court of Claims record in resolving this appeal. As discussed below, we need not answer this question. We take judicial notice of that court's decision only to establish its existence and that the court made certain factual findings, which is necessary to complete the narrative of Hurd's federal action and provide context for Fredenburgh's defenses. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). We do not give any effect to those factual findings, nor do we consider them for their truth or use them to support any factual determination (for we make none) in this appeal.

The Court of Claims noted that NYCDOC has the obligation under Penal Law § 600-a to send a JTC to DOCCS when an inmate is transferred from local to state custody. It noted further that the State "is bound by the jail time certifications it receives from local authorities and 'may not add or subtract therefrom.' " Add. 34 (quoting *McLamb v. Fischer*, 70 A.D.3d 1090, 1091, 895 N.Y.S.2d 223 (3d Dep't 2010)); *see also Torres v. Bennett*, 271 A.D.2d 830, 831, 707 N.Y.S.2d 264 (3d Dep't 2000). Although the State "changed its policy in 2014 to take affirmative steps to review a local commitment order after an inmate is returned to state custody from a local jail," *Torres v. New York*, 149 A.D.3d 1290, 1292 n.\*, 52 N.Y.S.3d 152 (3d Dep't 2017), the Court of Claims found

that Fredenburgh's communications with Felicien satisfied the necessary review.

The Court of Claims concluded that, although "Fredenburgh's actions may have resulted in DOCCS receiving incorrect information, ... her actions were reasonable at the time." Add. 35. It reasoned that the City's errors caused Hurd's prolonged detention, and Hurd's proper recourse was against the City, not the State. Hurd did not appeal the decision.

**\*\*4** Hurd did appeal the dismissal of his federal complaint.

### DISCUSSION

**[2]** **[3]** We review *de novo* a district court's decision granting a Rule 12(b)(6) motion, including on qualified immunity grounds. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019); *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000). In conducting our review, we "accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez*, 939 F.3d at 198 (citation omitted).

The crux of both of Hurd's constitutional arguments is that "[o]n April 19, 2016, Hurd had enough jail-time credit and approved good-time credit to make his conditional release from prison *mandatory* under state law. However, Fredenburgh worked with an official of [NYCDOC] to reduce Hurd's jail-time credit so that he would not be released on his mandatory **\*1084** conditional release date ...." Appellant Br. 2–3. The district court rejected this theory, determining that neither the Eighth Amendment nor the Fourteenth Amendment's substantive due process clause protects an inmate's right to, or interest in, conditional release under state law. The district court concluded that Hurd failed to plead a violation of his Eighth Amendment rights because "he was released prior to the date his maximum sentence expired," J.A. 39, and that Hurd failed to allege a violation of his Fourteenth Amendment rights because he "has no substantive due process right to conditional release" before the expiration of his maximum sentence, J.A. 51, 54.

**[4]** **[5]** After finding that Hurd failed to state a claim for violations of his Eighth or Fourteenth Amendment rights, the district court concluded in the alternative that Fredenburgh was entitled to qualified immunity. We agree with the district court's latter determination, but we disagree with its

conclusions that Hurd did not plausibly allege harm to either his Eighth or Fourteenth Amendment rights. [3]

[3]    Our qualified immunity analysis "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (internal quotation marks, alteration, and citation omitted). "We may address these questions in either order," and "[i]f we answer either question in the negative, qualified immunity attaches." *Id.* Although it has become the virtual default practice of federal courts considering a qualified immunity defense to assume the constitutional violation in the first question and resolve a case on the clearly established prong, "it is often beneficial" to analyze both prongs of the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "[T]he two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* This is such a case.

### I. Eighth Amendment

**\*\*5** **[6]** **[7]** "A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

**[8]** **[9]** To satisfy the first requirement, a plaintiff must plead "a harm of a magnitude that violates a person's eighth amendment rights." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 654 (2d Cir. 1993) (internal quotation marks and citation omitted). "The Eighth Amendment[ ] ... proscribes more than physically barbarous punishments. It prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (internal quotation marks, alteration, and citations omitted).

**[10]    [11]    [12]**  The constitutional claim is not measured by the punishment alone, for "an Eighth Amendment violation typically requires a state of mind that is the equivalent of criminal recklessness." *Francis*, 942 F.3d at 150 (internal quotation marks and citation omitted). "This standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Id.* (alteration and citation omitted). Under this standard, prison officials can be found "deliberately indifferent to their own clerical errors on the basis of **\*1085** their refusals to investigate well-founded complaints regarding these errors." *Id.* at 151 (internal quotation marks and citations omitted).

**[13]    [14]**  The district court concluded that Hurd failed to allege a harm of constitutional magnitude because he was released before his maximum sentence expired. We disagree. The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain," including punishments that are "totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). There is no penological justification for incarceration beyond a mandatory release date because "any deterrent and retributive purposes served by [the inmate's] time in jail were fulfilled as of that date." *See Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989).

**[15]**  "Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution." *Id.* at 1109. For that reason, unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis.[4]  Hurd's unauthorized imprisonment for almost one year certainly qualifies under that standard. *See id.* ("Detention for a significant period beyond the term of one's sentence inflicts a harm of a magnitude [recognized under the Eighth Amendment].").

[4]    We acknowledge that, in *Calhoun*, we stated that a "five-day extension of [the plaintiff's] release date did not inflict 'a harm of a magnitude' that violates a person's eighth amendment rights." 999 F.2d at 654. But we did not announce this as a constitutional rule. The single paragraph devoted to the plaintiff's Eighth Amendment claim in *Calhoun* included only a descriptive, rather than normative, discussion of this issue, and we are not bound by

its conclusion in announcing a constitutional rule here.

Indeed, in *Calhoun* we cited to *Sample*, which relied on the deliberate indifference prong as dispositive in cases of unavoidable administrative delay, mistakes, errors, and accidents. *See, e.g.*, *Sample*, 885 F.2d at 1109 ("Because such discretion is necessary to the administration of prisons, an official acting in good faith within that discretion, although in the process perhaps injuring an inmate, has not inflicted a cruel and unusual punishment upon that inmate."). This approach—recognizing a harm of constitutional magnitude whenever an inmate is detained without authorization but finding a constitutional violation only where that harm is deliberately inflicted—avoids the arbitrary task of distinguishing between the permissible and impermissible length of unauthorized detention under the Constitution. Moreover, it reflects the notion that freedom from unlawful restraint is a right so core to our understanding of liberty that suffering even one day of unlawful detention is a harm recognized by the Constitution.

**\*\*6**  It matters not that Hurd was detained past his statutory conditional release date as opposed to the expiration of the maximum sentence imposed on him by the sentencing judge. By using the word "shall," New York chose to make conditional release mandatory upon the approval of good-time credit and the inmate's request for release. *See* N.Y. Penal Law § 70.40(1)(b). It is the mandatory nature of that release, not the label of "conditional" or "maximum," that is dispositive.

In effect, Hurd's conditional release date became the operative date on which his maximum term of imprisonment expired. Once Hurd met the statutory requirements for conditional release, his release from prison was mandatory under state law. Fredenburgh does not dispute that DOCCS had no authority to keep Hurd incarcerated past his conditional release date for the crimes of which he was convicted and sentenced. Even assuming the State could impose some supervisory conditions **\*1086** following Hurd's release,[5] his continued *imprisonment* was a punishment that was neither authorized by law nor justified by any penological interest asserted by the State. *See Sample*, 885 F.2d at 1108. Because the State detained him for over 11 months past the last date on which New York law authorized his imprisonment, Hurd suffered a harm of constitutional

magnitude under the Eighth Amendment. The district court erred in concluding otherwise.

5    New York law provides that inmates granted conditional release "shall be under the supervision of the state department of corrections and community supervision for a period equal to the unserved portion of the [maximum] term," and that "[t]he conditions of release, including those governing post-release supervision, shall be such as may be imposed by the state board of parole in accordance with the provisions of the executive law." N.Y. Penal Law § 70.40(1)(b); see also N.Y. Exec. Law § 259-c(2) (granting the state board of parole authority of "determining the conditions of release of the person who may be ... conditionally released"). As noted above, the State's right to impose *some* form of punishment through supervision or other conditions of release (if any) does not justify a punishment of *imprisonment* that is unauthorized by law.

**[16]** That does not mean Hurd suffered a violation of his Eighth Amendment rights, however. Nor does it mean an inmate whose release is not processed on their conditional release date is entitled to damages under § 1983. Far from it. If a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability. The deliberate indifference prong will do most of the work under these and similar circumstances, as "[t]he degree to which a harm is 'unnecessary' in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the eighth amendment." *Sample*, 885 F.2d at 1109.

To that end, the district court concluded that "Fredenburgh's alleged conduct is troublesome and would certainly satisfy deliberate indifference if not willfulness, as [Hurd] alleges Fredenburgh *agreed* with Felicien to keep [Hurd] incarcerated past his conditional release date." J.A. 57. Fredenburgh argues that collateral estoppel applies here because of the Court of Claims' finding that she acted reasonably under the circumstances, and that Hurd is therefore precluded from arguing that Fredenburgh acted with deliberate indifference.

**7** **[17]** Regardless of the Court of Claims' decision, we are skeptical that Fredenburgh—whom Hurd failed to

demonstrate has any authority or duty to change an erroneous JTC from the City—can be deliberately indifferent to any harm suffered because of that error. There must be "a causal connection between the official's response to the problem and the infliction of the unjustified detention," *Sample*, 885 F.2d at 1110, and if Fredenburgh could not do anything about Hurd's prolonged detention as a matter of law, then any deliberate indifference on her part would likely be irrelevant.

For example, in this case, Hurd cites to no authority or factual allegations establishing that Fredenburgh had an obligation under New York law or DOCCS policy to confirm the accuracy of the JTCs she received. Nor is it clear how Fredenburgh would or could have accomplished that, given that Penal Law § 600-a delegates the sole responsibility for certifying jail-time credit to NYCDOC, and the relevant information would be contained within NYCDOC  **\*1087** records regardless. Nor are there any allegations that the prison had "procedures in place calling for [Fredenburgh] to pursue the matter," or that "given ... [Fredenburgh's] job description or the role ... she has assumed in the administration of the prison, [the jail-time credit] calculation problem will not likely be resolved unless ... she addresses it or refers it to others ...." *Id.* Hurd's legal conclusion that Fredenburgh had such a duty or responsibility is not entitled to unquestioned acceptance at the motion to dismiss stage.

We acknowledge that Hurd's allegations do not concern only Fredenburgh's ability to change his jail-time credit but also her alleged conduct in agreeing to create the erroneous JTCs to keep Hurd in prison in the first place. As the district court concluded, such allegations could amount to deliberate indifference. We need not resolve this issue. Nor do we reach the issue of whether the Court of Claims' reasonableness finding has preclusive effect here. Because it was not clearly established that prolonged detention past one's mandatory conditional release date constitutes a harm of constitutional magnitude under the Eighth Amendment, Fredenburgh is entitled to qualified immunity on Hurd's claim. Before addressing that point, however, we turn to Hurd's Fourteenth Amendment argument.

## II. Fourteenth Amendment

**[18]** **[19]** **[20]** The Fourteenth Amendment guarantees "more than fair process"; it "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotation marks and

2021 WL 96886

citations omitted). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

**[21]  [22]  [23]**  "The first step in substantive due process analysis is to identify the constitutional right at stake." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). Next, the plaintiff "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Southerland*, 680 F.3d at 151–52 (internal quotation marks and citation omitted). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* at 152 (internal quotation marks and citation omitted).

**\*\*8**  The district court rejected Hurd's substantive due process claim, concluding that he lacked a cognizable liberty interest in conditional release because it is a state-created right. We disagree.

**[24]**  The district court reasoned that conditional release "is clearly a state-created right, as the Supreme Court has held that conditional release is not protected by the Constitution." J.A. 51. Although "[t]here is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence," *Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011), that does not establish that state inmates lack a liberty interest in conditional release where the state has created a statutory mechanism providing for *mandatory* conditional release for eligible inmates. It means only that an inmate has no constitutional right to demand or expect conditional release where the incarcerating authority **\*1088** does not offer such an opportunity under its law. [6]

[6]    Along these lines, the district court relied on our reaffirmation in *Graziano v. Pataki*, 689 F.3d 110, 114–15 (2d Cir. 2012) (per curiam), that New York inmates lack a liberty interest in parole because New York's parole scheme does not create a legitimate expectation of release. But New York's parole scheme differs from the promise of conditional release. No inmate is entitled to parole; it is a discretionary decision reserved to

the judgment of the parole board. *See id.* at 113– 14. *All* state inmates are eligible for conditional release. Unlike parole, where inmates have only a possibility or probability of being granted the chance to complete their sentence outside prison, inmates such as Hurd who satisfy the statutory requirements for conditional release are guaranteed immediate release from prison. That difference creates a legitimate expectation of release, and by extension a liberty interest protected by the due process clause.

**[25]  [26]**  Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] ... commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (internal quotation marks and citations omitted); *see also Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (noting that individuals have a "protected liberty interest in being free from wrongful, prolonged incarceration"). Inmates eligible for mandatory conditional release are not limited to the confines of procedural due process in protecting that right. *Cf. Swarthout*, 562 U.S. at 220, 131 S.Ct. 859. They also are entitled to substantive due process protection against egregious and arbitrary government interference.

**[27]**  Substantive due process protects rights that are rooted in the principles of ordered liberty. Freedom from unlawful restraint is exactly that. Hurd remained in prison for almost one year while the State lacked any authority to further detain him. Because New York's conditional release scheme is mandatory, there is no meaningful difference in Hurd's liberty interest in release from prison at the expiration of his maximum sentence and conditional release when he became entitled to an earlier release date. Once Hurd's good-time credit was approved, the expiration date of his maximum term of imprisonment and his "conditional" release date were one and the same for substantive due process purposes.

**\*\*9  [28]  [29]**  It is of no moment that conditional release is a state-created right. Although many state-created rights are not recognized under the substantive due process clause, state-created rights that trigger core constitutional interests are entitled to its protection. *Cf. Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) (explaining that the substantive due process clause does not protect "simple, state-law contractual

rights, without more"). It is the nature of the right, not just its origin, that matters. Conditional release under New York law is not akin to a state-created right of contract; it is a state-created right of mandatory release from prison, preventing unlawful continued physical restraint. Cf. *Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) ("[I]nterest[s] entitled to protection as a matter of substantive due process [must] resembl[e] the individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life." (internal quotation marks and citation omitted)); *see also Local 342*, 31 F.3d at 1196 (substantive due process protects rights that are "so vital that neither liberty nor justice would exist **\*1089** if they were sacrificed" (internal quotation marks and citation omitted)). That distinction makes all the difference. Once Hurd satisfied the statutory requirements for conditional release, he had a liberty interest in freedom from detention upon his conditional release date, as guaranteed by New York law. [7]

[7]     Although Fredenburgh does not raise the issue, we acknowledge that the Supreme Court cautions against expanding the substantive due process clause where a more specific Amendment provides a source for protection against government conduct. *See, e.g.*, *Lewis*, 523 U.S. at 842, 118 S.Ct. 1708. Our holding does not expand the protection of the Fourteenth Amendment's substantive due process clause, however. We are applying the clause to one of the explicit concepts it exists to protect: liberty from unjustified restraint. *Cf. Davis*, 375 F.3d at 714. Our conclusion that Hurd also alleged a harm of constitutional magnitude under the Eighth Amendment does not deprive him of a liberty interest in his mandatory conditional release.

Fredenburgh's error is considered at the second step of the substantive due process analysis—the nature of the alleged interference with Hurd's liberty interest. Specifically, we must determine whether Fredenburgh's conduct was egregious and shocking to the conscience.

The district court reasoned that, "if true, [Hurd's] allegations that Fredenburgh *intentionally* took actions to keep [Hurd] imprisoned without justification might shock the judicial conscience ...." J.A. 52. Here, too, Fredenburgh argues that collateral estoppel applies because of the Court of Claims' finding that she acted reasonably under the circumstances,

which precludes any finding in this case that her conduct satisfied the high standard for a substantive due process violation. Again, we need not reach this issue, because it was not clearly established that Hurd had a liberty interest in his mandatory conditional release at the time of the sentencing miscalculations.

## III. Clearly Established Law

[30] [31] [32] [33]    "Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432–33 (2d Cir. 2009) (internal quotation marks and citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 433 (citation omitted). "The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (internal quotation marks and citation omitted).

Fredenburgh is entitled to qualified immunity under this standard. It was not clearly established during the period of Hurd's prolonged detention that an inmate suffers harm of a constitutional magnitude under the Eighth Amendment when they are imprisoned past their mandatory conditional release date, nor was it clearly established that an inmate has a liberty interest in mandatory conditional release protected by the Fourteenth Amendment's substantive due process clause.

**\*\*10** [34]    Hurd nevertheless urges us to find that these rights were clearly established because they follow from existing precedent. For his Eighth Amendment claim, Hurd relies on *Sample*, 885 F.2d 1099, *Calhoun*, 999 F.2d 647, *Sudler v. City of New York*, 689 F.3d 159 (2d Cir. 2012), and *Francis*, 942 F.3d 126. These cases confirm a uniform legal principle that no federal, state, or local authority **\*1090** can keep an inmate detained past the expiration of the sentence imposed on them. But in the qualified immunity analysis, the Supreme Court has admonished that rights should not be defined at a high level of generality and instead must be "particularized to the facts of the case." *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017) (internal quotation marks and citation omitted). None of the cases upon which Hurd relies addresses a conditional release scheme, let alone one in which an inmate is entitled to mandatory release prior to the expiration of their maximum sentence. More to the point, none of them confirm that

prolonging an inmate's detention past their conditional release date might violate the inmate's rights under the Eighth Amendment.

*Sample* concerned Pennsylvania inmate Joseph Sample, who was granted bail pending a new trial after his life sentence was vacated on appeal. 885 F.2d at 1102. The senior records officer at a Pittsburgh detention facility was instructed to determine whether Sample could be released; the officer erroneously informed authorities that Sample still had time left on another sentence. *Id.* Sample served nine extra months in prison as a result. *Id.* at 1102–03.

Because of his authority and job responsibilities, the records officer's error rendered him liable under the Eighth Amendment. *Id.* at 1110–12. Specifically, the Third Circuit held that prolonged incarceration past the expiration of a prison sentence constitutes punishment under the Eighth Amendment. *Id.* at 1108. Where there is no penological justification for that incarceration, as determined by the deliberate indifference prong, that punishment is cruel and unusual; and to be liable under § 1983, the officer's deliberate indifference must have caused the prolonged incarceration. *Id.* at 1108–11.

To be sure, *Sample* clearly established that "imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment." 885 F.2d at 1108. But it did not establish that the Eighth Amendment prohibits imprisonment beyond a mandatory conditional release date that occurs prior to the expiration of the maximum sentence.

*Calhoun* concerned New York inmate Bennie Calhoun, who was sentenced to a maximum term of six years, released on parole, arrested for a parole violation with two months left on the maximum term, and reincarcerated on a finding of probable cause for the parole violation. 999 F.2d at 650. The parole board declared Calhoun a "delinquent," meaning the time between his arrest and reincarceration—in this case, five days—was added to his maximum sentence. *Id.* at 650–51. New York law entitled Calhoun to a final parole revocation hearing to determine his guilt on the parole violation, but his amended maximum sentence expired before this hearing could take place, and Calhoun was administratively discharged. *Id.* He sued based on this prolonged incarceration of five days. *Id.* at 651–52.

We focused on Calhoun's due process claim—that he was sentenced based on a parole violation charge, rather than any

finding of guilt. *Id.* at 652–54. But in a single paragraph, we noted (again, as a descriptive matter) that five extra days in prison does not satisfy the constitutional harm prong of the Eighth Amendment analysis, and even if it did, Calhoun could not show any deliberate indifference and his Eighth Amendment claim failed. *Id.* at 654. We distinguished those five days from the nine months of prolonged detention in *Sample*—long enough to qualify as harm of a constitutional magnitude. *Id.* Thus, at most, *Calhoun* reinforced *Sample*'s holding that unlawful detention past the expiration **\*1091** of a maximum sentence constitutes punishment under the Eighth Amendment. Like *Sample*, *Calhoun* did not touch on conditional release.

**\*\*11** *Sudler* concerned New York inmates who were sentenced to felony state prison terms, released on parole, convicted of misdemeanor parole violations, sentenced to concurrent sentences in City custody for those parole violations, and denied "parole jail-time credit" by prison officials upon their transfer back into state custody to complete their original sentence terms. 689 F.3d at 162–65. By denying the inmates credit for the time served on their misdemeanor parole violations against their felony prison terms, the prison officials effectively imposed consecutive sentences and prolonged the terms of the inmates' sentences, without an order from the sentencing judges.

We held that the prison officials were entitled to qualified immunity because it was not clearly established that an inmate's procedural due process rights are violated when an administrator alters a sentence imposed by the court. *Id.* at 174–77. After introducing the inmates' due process theory, we noted in a footnote that "[w]e have suggested in the past, and other courts within and without this Circuit have held, that detention beyond that authorized by law may violate the Eighth Amendment." *Id.* at 169 n.11. In addition to *Sample*, we cited to *Calhoun* for support, describing the latter decision as "assuming that detention of a prisoner beyond the end of his term could violate the Eighth Amendment in appropriate circumstances, but finding no violation where the unauthorized detention lasted only five days and the plaintiff failed to demonstrate the defendants' deliberate indifference." *Id.* Because no party in *Sudler* raised the issue, however, any Eighth Amendment claim was waived. *Id.* Accordingly, *Sudler* only reinforces the principle established in *Sample* and acknowledged in *Calhoun* that the Eighth Amendment protects against prolonged imprisonment that is not authorized by law. It too did not discuss conditional

release or how conditional release relates to the expiration of a maximum term of imprisonment.

*Francis* concerned New York inmate Byran Francis, who was sentenced in state court to serve time concurrent with a federal sentence yet to be imposed, contrary to New York law. 942 F.3d at 131–35. The subsequently imposed federal sentence was not ordered to run concurrently with the previously imposed state sentence. *Id.* at 132. After Francis commenced his federal sentence, DOCCS officials realized the state court's error, determined of their own accord that Francis's sentences were consecutive, and requested the federal authorities transfer him back to state custody at the completion of his federal sentence, without seeking clarification or providing Francis an opportunity to be heard. *Id.* at 134–36. Upon release from federal custody into state custody, Francis sought resentencing in state court and was released four months later. *Id.* at 136–37.

We held that this violated the Francis's procedural due process rights. *Id.* at 141–45. The officials were entitled to qualified immunity, however, because the specific procedural protections to which we found Francis entitled were not clearly established before that decision. *Id.* at 148–49. By contrast, we declined to reach the merits of Francis's Eighth Amendment claim in determining that the officials were entitled to qualified immunity for any constitutional violation. *Id.* at 149–51.

We acknowledged in *Francis* that "[n]o case establishes that these four months of additional incarceration, although of serious dimension, crossed the threshold of **\*1092** sufficient objective seriousness to constitute cruel and unusual punishment under the Eighth Amendment." *Id.* at 150 (internal quotation marks, alteration, and citation omitted). In doing so, we rejected the inmate's argument that *Haygood v. Younger*, 769 F.2d 1350, 1352–53, 1358 (9th Cir. 1985) (en banc)—where an inmate remained incarcerated for five years due to an erroneous interpretation of state law—and *Sample*, 885 F.2d 1099, clearly foreshadowed a constitutional determination.

**\*\*12** Although these courts hinted at the outcome in this case, our legal conclusion was not manifest. Each case concerns detention beyond an inmate's maximum sentence. Before today, we have never held that an inmate suffers a constitutional harm under the Eighth Amendment when they are detained beyond a statutorily mandated release date, even if that mandatory release date precedes the expiration of the maximum term of their sentence. It was clearly established that New York State could not detain Hurd past the expiration of his maximum sentence, but it was not clearly established that once Hurd's conditional release date was approved, continued detention beyond that date qualifies as a constitutional harm for Eighth Amendment purposes.

**[35]**  As for his substantive due process claim, Hurd admits that no decision has held that imprisonment past a mandatory conditional release date violates the Fourteenth Amendment's substantive protections. He nevertheless argues that "such a conclusion follows inescapably from the procedural due process cases, as a prisoner must have such a right once state officials have actually granted him discretionary early release." Appellant Br. 39.

**[36]**  We disagree. The substantive due process analysis differs from procedural due process; and it is not the case that one must follow from the other. And for the same reasons that our precedents do not dictate the outcome of his Eighth Amendment claim, Hurd's liberty interest in conditional release does not obviously follow from the procedural due process cases upon which Hurd relies.

Fredenburgh is therefore entitled to qualified immunity on Hurd's Eighth and Fourteenth Amendment claims.

### CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

**All Citations**

984 F.3d 1075, 2021 WL 96886

---

**End of Document**                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Wilson v. Roberson, Not Reported in F.Supp. (1996)

1996 WL 63053

KeyCite Yellow Flag - Negative Treatment

Distinguished by   McDermott v. Justices of Supreme Court, New York, County of New York,   S.D.N.Y.,   July 20, 2001

1996 WL 63053
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Edward WILSON, Plaintiff,

v.

New York City Housing Police Officers
ROBERSON and Hart and the New York
City Housing Authority, Defendants.

No. 92 Civ. 2709 (KMW).
|
Feb. 14, 1996.

OPINION AND ORDER

KIMBA M. WOOD, District Judge.

**\*1**  Plaintiff seeks injunctive and declaratory relief along with monetary damages, alleging that he was illegally arrested on January 12, 1992 by two New York City Housing Police Officers, defendants Roberson and Hart. Currently before the court is a motion for summary judgment filed by defendants Roberson and Hart (the "Officers"), a motion to dismiss filed by defendant New York City Housing Authority ("NYCHA"), and a motion *in limine* to exclude certain police documents prepared by defendants.

For the reasons set forth below, I deny the Officers' motion for summary judgment and the NYCHA's motion to dismiss. I grant plaintiff's motion to exclude certain police documents *in limine.*

I. *Background*

After a verbal altercation between plaintiff and the Officers, plaintiff was arrested and prosecuted on a charge of disorderly conduct. In an Order dated March 16, 1993 and a Memorandum Opinion and Order dated April 14, 1993, I denied a motion by NYCHA to dismiss the original complaint in this case and directed plaintiff to submit an Amended

Complaint. NYCHA now moves to dismiss the Amended Complaint.

The Amended Complaint asserts four claims. The first three claims, brought against only the Officers pursuant to 42 U.S.C. § 1983, allege constitutional violations stemming from the Officers' (1) falsely arresting and detaining plaintiff; (2) prohibiting plaintiff from and punishing plaintiff for exercising his right to speak freely; and (3) using unreasonable force against plaintiff. The fourth claim, which is brought against both the Officers and the NYCHA, alleges a host of state law torts -- namely, trespass on the person, negligence, intentional infliction of emotional distress, false arrest, false imprisonment, malicious prosecution and other violations New York state constitutional rights. These claims are brought against NYCHA on the theory of respondeat superior.

II. *Analysis*

A. *The Officers' Summary Judgment Motion*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 710 (2d Cir. 1991). When deciding a motion for summary judgment, a court must "'resolve all ambiguities and inferences ... in the light most favorable to the party opposing the motion.'" *Shockley v. Vermont State Colleges,* 793 F.2d 478, 481 (2d Cir. 1986) (citations omitted). The moving party bears the initial burden of demonstrating that there exists no material issue of fact and that he or she is entitled to judgment as a matter of law. *See Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir. 1988) (citations omitted). Motions for summary judgment must be denied if reasonable minds could differ as to the importance of the evidence and if "'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn ....'" *Id.*

**\*2**  For the reasons set forth below, the Officers have not met their burden. Because there are disputed issued of material fact, and because none of plaintiff's claims can be denied as a matter of law, the Officers' motion to dismiss is denied.

1996 WL 63053

### 1. *Qualified Immunity*

The Officers contend that they are entitled to qualified immunity from suit based on the actions they took in arresting plaintiff. The Second Circuit has articulated a specific summary judgment standard to be used in cases in which the moving party asserts qualified immunity as a defense. Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly but insubstantial lawsuits. *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982). According to the Second Circuit, "a defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendants to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right.'" *Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir. 1995) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987). The Second Circuit has also stated that "[a]n officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* When "the factual record is not in serious dispute .... [t]he ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), *cert. denied,* 498 U.S. 967 (1990).

In this case, serious factual disputes exist. Looking at the evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did not violate an established federally protected right.

Plaintiff alleges the following facts: On the night before the incident in question, plaintiff was robbed; immediately after the robbery, he attempted to flag down a passing police car, but it drove by him; early in the morning on January 12, 1992, while walking on the street with a friend discussing the robbery and the failure of the police to assist him, he shouted an obscenity at a passing police car; the police car made a U-turn and drove back to where plaintiff was standing; the Officers stepped out of their car, and Officer Roberson addressed plaintiff, using an obscenity; plaintiff responded, expressing his frustration about the failure of any police officers to assist him when he was robbed; officer Roberson

and plaintiff proceeded to have an argument; there was nobody on the block to hear this argument except plaintiff, his friend and the two police officers; no crowd gathered and nobody was alarmed, annoyed or inconvenienced; eventually, Officer Roberson threatened to arrest plaintiff if he did not shut up; when plaintiff attempted to walk away from the situation and into a nearby store, Officer Roberson followed him in, threw him against the counter, twisted his arm behind his back and threatened to break his arm; officer Roberson then handcuffed plaintiff and pushed him into a police car; on the way to the precinct, Officer Hart, who was sitting next to plaintiff, slapped plaintiff in the face several times.

**\*3** Plaintiff was arrested for disorderly conduct pursuant to New York Penal Law § 240.20(3), which states that:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... in a public place, he uses obscene language, or makes an obscene gesture.

If the facts are as plaintiff alleges, a reasonable officer could not have believed that there was probable cause to arrest plaintiff under this provision. Given that there was, according to plaintiff, no one around to be alarmed, annoyed, or inconvenienced, there was no evidence that the plaintiff intended to create public inconvenience, annoyance, or alarm. *See Duran v. City of Douglas,* 904 F.2d 1372, 1377 (9th Cir. 1990) (probable cause did not exist for arrest in case in which plaintiff making obscene gestures and yelling profanities at police officer could not have disturbed peace or incited riot because car in which plaintiff was riding was travelling late at night on deserted road). It is for a jury to determine whether the facts are as plaintiff alleges. Thus, the officers are not entitled to qualified immunity on the false arrest claim.

### 2. *The First Amendment Claim*

The Officers' motion for summary judgment on the First Amendment claim also fails. Criticism of police officers and obscene words and gestures directed at police officers are protected speech that may not be punished by the state. *City of Houston v. Hill,* 482 U.S. 457, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police

1996 WL 63053

action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). When police officers arrest someone in retaliation for such speech, they violate that person's First Amendment rights. *See Duran,* 904 F.2d at 1372 ("Whether or not [the defendant officer] was aware of the fine points of First Amendment law, to the extent that he is found to have detained [plaintiff] as punishment for the latter's insults, we hold that he ought to have known that he was exercising his authority in violation of well-established constitutional rights.").

The Officers allege that they arrested plaintiff not because of the content of his speech, but because he was making a public nuisance of himself. Plaintiff disputes this claim. A reasonable trier of fact could find that the Officers arrested plaintiff to punish speech protected by the First Amendment. Because there are material facts in dispute, the First Amendment Section 1983 claim cannot be dismissed on summary judgment.

### 3. *The Malicious Prosecution Claim*

In order to prove a claim of malicious prosecution, plaintiff must demonstrate that "(1) the defendant[s] either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice." *Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir. 1991). The Officers contend that this court should grant summary judgment on this claim in their favor because the underlying criminal proceeding was not terminated in plaintiff's favor.

**\*4** In the underlying criminal proceeding, the case against plaintiff was dismissed for facial insufficiency. Under New York law, a dismissal for facial insufficiency constitutes a favorable disposition for the purpose of a malicious prosecution claim. *See Chmielewski v. Smith,* 425 N.Y.S.2d 419, 419-20 (4th Dep't 1980). Thus, I decline to grant summary judgment on this claim.

### 4. *The Use of Unreasonable Force Claim*

The Officers claim that the force used against plaintiff was too minimal to sustain a claim for use of unreasonable force. However, whether the Officers' use of force was unreasonable and excessive under the circumstances turns on facts that are in dispute. Thus, it is not a question appropriately resolved on summary judgment. "[I]f the force used was unreasonable

and excessive, [[[plaintiff] may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via,* 821 F.2d 913, 924 (2d Cir. 1987). Both the extent of the force used and the circumstances surrounding the use of force are in dispute. Thus, I deny the motion for summary judgment on the use of unreasonable force claim.

### B. *NYCHA's Motion to Dismiss*

Plaintiff's amended complaint makes clear that the first three claims of the complaint, all brought pursuant to 42 U.S.C. § 1983, are brought against only the individual defendants and not against NYCHA. Thus, I need not consider NYCHA's arguments with respect to these Section 1983 claims. The only claims brought against NYCHA in the amended complaint are a host of state law tort claims -- namely trespass on the person, negligence, intentional infliction of emotional distress, false arrest, false imprisonment, malicious prosecution and other violations of rights guaranteed under the New York State Constitution.

### 1. *New York State Notice of Claim Requirement*

NYCHA argues that because plaintiff has failed to plead compliance with the New York State "notice of claim" requirement the complaint must be dismissed. Plaintiff in fact has complied with the notice of claim requirement, but failed to plead that compliance in the complaint. That deficiency is amply remedied by NYCHA's actual previous notice of plaintiff's compliance with the requirement, and by plaintiff's allegations of compliance with the requirement in the brief submitted with respect to this motion. *See* N.Y. Pub. Hous. Law § 157(1) (McKinney 1994) (allegation of compliance with notice of claim requirement must be made in "complaint or any necessary moving papers"); *see also Snyder v. Board of Education,* 347 N.Y.S.2d 727, 729 (2d Dep't 1981) (deeming complaint amended to plead service of notice of claim in case involving New York General Municipal Law § 50, the provision analogous to N.Y. Pub. Hous. Law § 157(1) applying to claims brought against the City of New York).

### 2. *The Respondeat Superior Theory*

NYCHA argues that the state tort law claims brought against NYCHA should be dismissed because they cannot be sustained under a respondeat superior theory. I have already ruled on that issue in deciding NYCHA's first motion to dismiss. Memorandum Opinion and Order of April 12, 1993 at n. 2.[1] The New York State Court of Appeals has held that "the State and its civil subdivisions [[[are] liable for

1996 WL 63053

torts of their agents on the basis of respondeat superior, notwithstanding the fact that the agent was engaged in 'governmental' activity." *Jones v. State of New York,* 307 N.E.2d 236, 237-38 (N.Y. 1973).

### C. *NYCHA's Arguments With Respect to Specific State Claims*

**\*5** In considering the motion for summary judgment brought by the Officers, I have already addressed all of the points NYCHA raises regarding the state law civil rights claims against it. As I noted above, plaintiff has made the requisite showing to defeat either a motion for summary judgment or a motion to dismiss on the malicious prosecution, false arrest and excessive force claims. Each element either has been established or presents a dispute of material fact that must be decided by a jury.

### C. *Plaintiff's Motion In Limine to Exclude Police Documents*

Plaintiff has moved to exclude *in limine* memo book entries that the Officers prepared after the arrest and a complaint report prepared by Officer Roberson on the ground that they are inadmissible hearsay. Defendants' only opposition to the motion is their statement that the documents "may be admissible by the defendant police officers as a prior consistent statement in the event that plaintiff claims that the trial testimony is a recent fabrication."

I grant plaintiff's motion to exclude *in limine* the memo book entries of the Officers prepared after the arrest with regard to the incident in question and the complaint report prepared by Officer Roberson. If plaintiff makes a claim of recent fabrication at trial, defendants may request reconsideration of this ruling.

### III. *Conclusion*

The new ready trial date for this case is February 29, 1996. After that date the parties must be ready to come to trial with 48 hours notice. Parties should inform the court in advance of any dates on which they or their witnesses could not appear for trial.

So Ordered.

1    Plaintiff does not bring any Section 1983 claims against NYCHA. Thus, NYCHA's arguments with regard to the use of a respondeat superior theory under Section 1983 are inapposite.

**All Citations**

Not Reported in F.Supp., 1996 WL 63053

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 68 of 158

2024 WL 1257378
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Steven DADAILLE [1], Plaintiff,

v.

COXSACKIE CORRECTIONAL

FACILITY, et al., [2] Defendants.

[1]  The Clerk of the Court is directed to amend the
Docket Report to reflect the proper spelling of
plaintiff's name.

[2]  The Clerk of the Court is direct to amend the
Docket Report to include defendants named in the
list of parties but inadvertently omitted from the
Eastern District Docket Report: Mr. Brandon King,
"Securit(ies) Who Are In Charge of P.A. System
on the Center and North Yard," and Mental Health
Department.

9:23-CV-1583 (GTS/ML)
|
Signed March 25, 2024

**Attorneys and Law Firms**

STEVEN DADAILLE, Plaintiff, pro se, 10-A-6076,
Coxsackie Correctional Facility, P.O. Box 999, Coxsackie,
NY 12051.

**DECISION AND ORDER**

GLENN T. SUDDABY, United States District Judge

**I. INTRODUCTION**

**\*1**  This action was commenced on or about November
30, 2023, in the United States District Court for the
Eastern District of New York ("Eastern District") by pro
se plaintiff Steven Dadaille ("plaintiff"). In the complaint,
plaintiff asserts claims for the violation of his constitutional
rights arising out of his confinement in the custody of
the Department of Corrections and Community Supervision
("DOCCS") at Coxsackie Correctional Facility ("Coxsackie
C.F."). *See generally* Compl. At the time plaintiff filed his
complaint, he also applied to proceed in the action in forma
pauperis ("IFP"). Dkt. No. 2 ("IFP Application").

On December 15, 2023, United States District Judge James
R. Cho transferred this matter to this District because all of
the facts giving rise to plaintiff's claims occurred in a county
located in this District. Dkt. No. 4. The Eastern District did not
analyze the sufficiency of the claims or the IFP Application,
leaving that review for this Court. *See id.*

On December 18, 2023, this Court issued an Order Directing
Administrative Closure With Opportunity to Comply With
Filing Fee Requirements. Dkt. No. 6. Plaintiff's IFP
application was denied as incomplete. *Id.* Plaintiff was
directed to, within 30 days of the filing date of this Order,
(1) either pay the $405.00 filing fee in full, or (2) submit a
completed and signed IFP application and a completed and
signed inmate authorization form. *Id.*

On February 2, 2024, plaintiff, who is presently confined at
Coxsackie C.F., paid the full statutory filing fee.

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Standard of Review**

Under 28 U.S.C. § 1915A, a court must review any
"complaint in a civil action in which a prisoner seeks redress
from a governmental entity or officer or employee of a
governmental entity" and must "identify cognizable claims
or dismiss the complaint, or any portion of the complaint,
if the complaint ... is frivolous, malicious, or fails to state a
claim upon which relief may be granted; or ... seeks monetary
relief from a defendant who is immune from such relief." [3]
28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115,
116 (2d Cir. 1999) (per curiam) (Section 1915A applies to
all actions brought by prisoners against government officials
even when plaintiff paid the filing fee).

[3]  To determine whether an action is frivolous, a court
must look to see whether the complaint "lacks an
arguable basis either in law or in fact." *Neitzke v.
Williams*, 490 U.S. 319, 325 (1989).

When reviewing a complaint, the court may also look to the
Federal Rules of Civil Procedure. Rule 8 of the Federal Rules
of Civil Procedure provides that a pleading that sets forth a
claim for relief shall contain "a short and plain statement of
the claim showing that the pleader is entitled to relief." Fed. R.
Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of
the claim being asserted so as to permit the adverse party the
opportunity to file a responsive answer, prepare an adequate

defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

**\*2** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.* at 679 (quoting *Fed. Rule Civ. Proc. 8(a)(2)*). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

The Court will construe the allegations in the complaint with the utmost leniency. *See, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**B. Summary of the Complaint** [4]

[4]     The complaint includes exhibits. *See* Compl. at 12-40. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

The following facts are set forth as alleged by plaintiff in his complaint.

In December 2022, defendant ORC Brandon King ("King") began to harass and threaten plaintiff. Compl. at 4. King's

harassment involved asking plaintiff to perform sexual acts, directing plaintiff "to kill himself," and threats to "murder" plaintiff's mother. *Id.* at 4-5. King and "other staff" used the outdoor public announcement system to "ask[ ] everyone in the population to murder [plaintiff]." *Id.* Plaintiff repeatedly asked King to cease "conspiration to commit murder" but King responded with racial slurs and sexually explicit language. *Id.* at 13.

On December 12, 2022, King told another inmate in the "RRU/SHU" to "hurt plaintiff badly or even murder him and plaintiff's mother[.]" Compl. at 4. King also "exposed" plaintiff's "private information to other officers" and inmates. *Id.* at 13.

Plaintiff wrote to Sergeant Cambridge ("Cambridge"), Sergeant Lewis ("Lewis"), Captain Frazier ("Frazier"), and Deputy Superintendent Mrs. Yon ("Yon"), and Senior ORC Mrs. Devlin ("Devlin") and complained about King's threats. [5] Compl. at 14. In February 2023, plaintiff met with Cambridge to discuss King's threats. *Id.* at 12. Plaintiff asked to be transferred to another facility or placed in protective custody. *Id.* Cambridge said he would "see what he can do" but plaintiff "never heard from Sgt. Cambridge[.]" *Id.*

[5]     Cambridge, Lewis, Frazier, Yon, and Devlin are not named as defendants herein.

In September 2023, plaintiff filed a grievance claiming that "staff is using the P.A. speaker system to threaten him throughout the housing units and recreation yard. Compl. at 32. Plaintiff also complained that he was placed on a suicide watch for five days after he complained to a sergeant and OMH regarding the threatening behavior. *Id.* The grievance was denied. *Id.*

Construed liberally [6], the complaint contains the following: (1) Eighth Amendment claims related to threats and verbal harassment; (2) invasion of privacy claims; and (3) First Amendment retaliation claims. *See generally* Compl. Plaintiff seeks monetary damages and injunctive relief. *See id.* at 5. For a complete statement of plaintiff's claims and the facts he relies on in support of those claims, reference is made to the complaint.

[6]     The Court is mindful of the Second Circuit's instruction that a pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. *See, e.g.*,

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

**C. Nature of Action**

**\*3** Plaintiff seeks relief pursuant Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that "[Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

**III. ANALYSIS**

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). As the Supreme Court has noted, a defendant may only be held accountable for his actions under Section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic.").

In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). This is true even for supervisory officials. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("There is no special rule for supervisor liability."). "[A] plaintiff must plead and prove 'that each Government-official defendant, [including supervisors,] through the official's own individual actions, has

violated the Constitution.' " *Id.* (quoting *Iqbal*, 556 U.S. at 676).

**A. Preliminary Matters**

**1. Eleventh Amendment**

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996). Actions for damages against a state official in his or her official capacity are essentially actions against the state. *See Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989).

Accordingly, the Eleventh Amendment bars plaintiff's Section 1983 claims for money damages against Coxsackie C.F. and defendants, in their official capacity. *See Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207*, 180 F.3d 409, 411 (2d Cir. 1999)); *see also Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012). [7]

[7]    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an

individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

### 2. Claims Against "Mental Health Department" and "Security(ies) Who Are in Charge of P.A. System on the Center and North Yard"

**\*4** Plaintiff identifies "Mental Health Department" and "Security(ies) Who Are in Charge of P.A. System on the Center and North Yard" as defendants in the list of parties. However, plaintiff cannot sue "Mental Health Department" and "Security(ies) Who Are in Charge of P.A. System on the Center and North Yard" collectively under Section 1983. *See Ferguson v. Morgan*, No. 90-CV-6318, 1991 WL 115759, at \*1 (S.D.N.Y. June 20, 1991) (holding that "Otisville Correctional Facility Medical Staff" was not suable as a group under Section 1983) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 105 (1989)). Therefore, the claims against these entities are dismissed without prejudice. The Court will permit plaintiff to amend his complaint to identify individual members or employees of the Mental Health Department or individuals responsible for the public address system in the yard whom he alleges violated his constitutional rights. *See Martin v. UConn Health Care*, No. 99-CV-2158, 2000 WL 303262, at \*1 (D. Conn. Feb. 9, 2000) (affording the plaintiff leave to file an amended complaint to identify at least one provider who had been deliberately indifferent to his medical needs); *see also Soto v. Brooklyn Corr. Fac.*, 80 F.3d 34 (2d Cir. 1996) (permitting plaintiff to file amended complaint where an inmate named only correctional facility and was not aware of the requirement that he name individuals).

### 3. Rule 10

Throughout the complaint, plaintiff refers to various individuals who are not identified in the caption, or list of parties, as defendants. Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A party not named in the caption of the complaint is not a party to the action. *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at \*2 (W.D.N.Y. Aug. 1, 2014) (holding that the failure to name the individual defendants against whom the plaintiff intends to assert claims makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").

Accordingly, plaintiff's allegations against any individual who is not named or identified in the complaint or caption, as John Doe or otherwise, are dismissed for failure to state a claim. *See Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at \*1 (W.D.N.Y. Aug. 15, 2007); *Robles v. Armstrong*, No. 3:03-CV-1634, 2006 WL 752857, at \*1 n.1 (D. Conn. Mar. 17, 2006) ("Because the John and Jane Does are not listed in the caption of the Complaint, they are not defendants and the court does not consider claims against them.").

### B. Eighth Amendment

#### 1. Harassment

Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under Section 1983. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam); *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 474 (S.D.N.Y. 1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *Rosales v. Kikendall*, 677 F.Supp.2d 643, 648 (W.D.N.Y. 2010) ("In this Circuit, allegations of verbal harassment or threats are generally an insufficient basis for an inmate's § 1983 claim."); *see also Gill v. Hoadley*, 261 F.Supp.2d 113, 129 (N.D.N.Y. 2003) ("42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse.") (citation omitted); *Ruffino v. Murphy*, No. 09-CV-1287, 2010 WL 1444562 at \*4 (D. Conn. Apr. 12, 2010) ("[D]istrict courts within the Second Circuit have held that allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under section 1983, regardless of whether the

inmate is a pretrial detainee or sentenced prisoner."). "[T]he use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983." *Baskerville v. Goord*, No. 97 Civ. 6413, 1998 WL 778396, at *7 (S.D.N.Y. Nov. 5, 1998) (citation omitted).

**\*5** Here, plaintiff claims that King harassed and verbally abused him. *See generally* Compl. However, plaintiff does not allege that he suffered any injury as a result of the alleged harassment. *Best v. City of New York*, No. 11-CV-4475, 2012 WL 5458054, at *7 (S.D.N.Y. Nov. 8, 2012) ("Fear of assault, by itself, does not constitute a sufficiently serious injury to state a claim for failure to protect"); *Williams v. United States*, No. 07-CV-3018, 2010 WL 963474, at *16 (S.D.N.Y. Feb. 25, 2010) (concluding that allegation that corrections official threatened to "teach [plaintiff] a lesson," which was "not followed by any [alleged] physical acts," was "insufficient to state a constitutional violation"), *report and recommendation adopted by* 2010 WL 963465 (S.D.N.Y. Mar. 16, 2010). Thus, as presently plead, the claims do not rise to the level of a constitutional violation.

### 2. Inciting Violence

Allegations that a correctional officer made statements intending to incite others to attack an inmate may state a claim under the Eighth Amendment. *See Phillips v. Cortland Cty. Sheriff's Dep't*, No. 5:13-CV-00955 (LEK/TWD), 2013 WL 5464908, at *4 (N.D.N.Y. Sept. 30, 2013) (citing *Young v. Coughlin*, No. 93 CIV. 0262, 1998 WL 32518, at * 7 (S.D.N.Y. Jan. 29, 1998)) (holding that correctional officers "sexually suggestive" comments to the plaintiff in the presence of large number of other inmates may state an Eighth Amendment claim if they incited other inmates to assault the plaintiff).

Here, plaintiff alleges that King violated his Eighth Amendment rights because he attempted to incite unidentified inmates to assault plaintiff. *See generally* Compl. However, plaintiff's vague and ambiguous allegations fail to allege how and when King "directed" unidentified inmates to attack plaintiff. Moreover, plaintiff does not allege that he was actually attacked as a result of King's alleged statements.

Accordingly, plaintiff's Eighth Amendment claims against King are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. Privacy Claims

"The Fourteenth Amendment's Due Process Clause protects an inmate from the unwanted disclosure of information pertaining to an inmate's health." *Davidson v. Desai*, 817 F.Supp.2d 166, 191 (W.D.N.Y. 2011) (citing *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994)). However, "the interest in the privacy of medical information will vary with the condition." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). "Confidential medical conditions are those that are 'excruciatingly private and intimate [in] nature' such as those 'likely to provoke ... an intense desire to preserve one's medical confidentiality.' " *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 64 (2d Cir. 2011) (alterations in original) (quoting *Powell*, 175 F.3d at 111). When an inmate does have a confidentiality interest in a condition, "[p]rison officials can impinge on that right only to the extent that their actions are 'reasonably related to legitimate penological interests.' " *Powell*, 175 F.3d at 112. "[T]he gratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is not reasonably related to a legitimate penological interest." *Id.*

Here, plaintiff claims King "exposed" his "private health information" but does not provide any further facts related to the information and fails to allege what medical condition, if any, this information related to. Without more, plaintiff cannot state a Fourteenth Amendment claim for disclosure of personal information. *See e.g., Davidson*, 817 F.Supp.2d at 192 (dismissing a Fourteenth Amendment claim for disclosure of medical information where the plaintiff had "not specified which of his medical conditions ... was so 'unusual' that the disclosure ... arose to a Fourteenth Amendment violation"). As a result, plaintiff's invasion of privacy claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b).

### D. Retaliation

**\*6** To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in

other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 U.S. 379, 380 (2d Cir. 2004). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

The filing of a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 Fed. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). The Second Circuit has defined "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill*, 389 F.3d at 381 (citation omitted) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.; see also Ford v. Palmer,* 539 Fed. App'x 5, 7 (2d Cir. 2013) ("The Court must apply the "objective test [for First Amendment retaliation] [...] even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."). Conduct that is de minimis does not give rise to actionable retaliation. *Dawes*, 239 F.3d at 493. What is de minimis varies according to context. *Id.* "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* at 491 (*quoting Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc) (per curiam)). If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* at 493.

A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extn.*

*of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), "the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months." *Ashok v. Barnhart*, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003).

Plaintiff's retaliation claims are dismissed for failure to state a claim. Even assuming plaintiff engaged in protected conduct, he has not identify an adverse action taken by King, the only remaining named defendant. Moreover, he has not plead facts suggesting that King was aware of plaintiff's protected speech. Indeed, the complaint lacks facts suggesting that King was personally involved in any retaliatory activity.

Accordingly, plaintiff's First Amendment retaliation claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### E. Leave to Amend

**\*7** In light of his pro se status, the Court will afford plaintiff the opportunity to file an amended complaint if he desires to proceed with this action. Any such amended complaint, which shall supersede and replace in its entirety the previous complaint filed by plaintiff, must contain a caption that clearly identifies, by name, each individual that plaintiff is suing in the present lawsuit and must bear the case number assigned to this action. The body of plaintiff's amended complaint must contain sequentially numbered paragraphs containing only one act of misconduct per paragraph. Thus, if plaintiff claims that his civil and/or constitutional rights were violated by more than one defendant, or on more than one occasion, he should include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying (i) the alleged act of misconduct; (ii) the date on which such misconduct occurred; (iii) the names of each and every individual who participated in such misconduct; (iv) where appropriate, the location where the alleged misconduct occurred; and, (v) the nexus between such misconduct and plaintiff's civil and/or constitutional rights.

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk of the Court shall amend the Docket Report pursuant to this Decision and Order;

Dadaille v. Coxsackie Correctional Facility, Slip Copy (2024)

2024 WL 1257378

**ORDERED** that, if plaintiff wishes to proceed with this action, he must file an amended complaint as set forth above **within thirty (30) days** from the date of the filing of this Decision and Order; and it is further

**ORDERED** that, if plaintiff timely files an amended complaint, this matter be returned to the Court for further review; and it is further

**ORDERED** that, if plaintiff fails to timely file an amended complaint as directed above, the Clerk shall enter judgment indicating this action is **DISMISSED without prejudice** without further order of this Court pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted and for failure to comply with this Decision and Order. In that event, the Clerk is directed to close this case; and it is further

**ORDERED** that "Security(ies) Who Are in Charge of P.A. System on the Center and North Yard" and "Mental Health Department" are **DISMISSED** as defendants herein; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules of Practice.

**All Citations**

Slip Copy, 2024 WL 1257378

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 75 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

2019 WL 294796
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

J-Quan JOHNSON, Plaintiff,

v.

The CITY OF NEW YORK; the New York City Police
Department; Police Officer Dwight Powell, Shield
Number 9038; Sgt. Vicente Perez, Shield Number 3173;
Police Officer Emmanuel Valerio, Shield Number 20335;
Police Officer Steve Tirado, Shield Number 22659;
Police Officer James Burke, Shield Number 28483;
Police Officer Gerard Staples, Shield Number 24526;
Police Officer Robert Stapleton, Shield Number 17814;
Police Officer Jose Joseph, Shield Number 14133; John
Doe New York City Police Officer Number One; John
Doe New York City Police Officer Number Two; John
Doe New York City Police Officer Number Three;
John Doe New York City Police Officer Number Four;
and John Doe New York City Police Officer Number
Five, All "John Doe" Names Being Fictitious and
Representing New York City Police Officers Whose
Actual Names Remain Unknown to Plaintiff, Defendants.

15 Civ. 6915 (ER)
|
Signed 01/23/2019

**Attorneys and Law Firms**

Brian J. Isaac, Pollack, Pollack, Isaac & De Cicco, New York,
NY, Michael Ira Braverman, Getz & Braverman, P.C., Bronx,
NY, for Plaintiff.

Alison Sue Mitchell, Evan Craig Brustein, New York City
Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

**\*1** On September 2, 2015, Plaintiff J-Quan Johnson
("Johnson") filed the instant action against the City of New
York (the "City"), the New York City Police Department
("NYPD"), and several NYPD officers (collectively with the
City and NYPD, "Defendants"), in which he alleges that
the NYPD officers assaulted and arrested him unjustifiably

at a neighborhood block party. Doc. 1. Before the Court
is Defendants' motion for partial summary judgment. Doc.
79. For the reasons stated below, Defendants' motion is
GRANTED in part and DENIED in part.

**I. BACKGROUND**

**1. Factual Background** [1]

[1]     The following facts are recounted in the light
most favorable to Johnson, the nonmovant.
*See Edelhertz v. City of Middletown*, 943 F.
Supp. 2d 388, 393 (S.D.N.Y. 2012), *aff'd*,
714 F.3d 749 (2d Cir. 2013) (per curiam).
The facts are drawn from Plaintiff's Response
to Defendants' Statement of Undisputed Facts
Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Resp."),
*see* Doc. 83; Defendants' Counterstatement to
Plaintiff's Statement of Additional Material Facts
Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1
Counterstatement"), *see* Doc. 86; and the parties'
supporting submissions—including transcripts of
the parties' deposition testimonies. References in
this Opinion to the parties' Rule 56.1 Statements
incorporate the evidentiary citations therein.

On June 7, 2014, Johnson ruptured the Achilles tendon in his
left leg while playing a pickup game of basketball. *See* Pl.'s
56.1 Resp. ¶ 2. As a result of this injury, Johnson underwent
several surgeries on his leg. *See id.* ¶¶ 3, 5; *see also* Deposition
of J-Quan Johnson ("Johnson Dep."), Doc. 83 Ex. A, at
72:10–74:16, 84:3–11.

On August 30, 2014, Johnson decided to attend a back-to-
school block party on West 164th Street, between Edgecombe
Avenue and Amsterdam Avenue, in Washington Heights,
New York. Johnson Dep. 53:23–54:13. Johnson walked to
the block party on crutches, accompanied by his mother, and
arrived at the party between 4:00 p.m. and 6:00 p.m. *Id.* at
58:9–59:9.

Roughly 10 to 20 people were still setting up for the block
party when Johnson arrived. *Id.* at 67:13–23. However, by
9:00 p.m., there were roughly 300 to 400 people in attendance.
*Id.* at 67:5–68:1. Many attendees, including Johnson, were
drinking alcohol and listening to music in the street. *Id.* at
69:1–9. Some attendees were also smoking marijuana in the
street. *Id.* at 69:11–19. Johnson, however, was not smoking.
*Id.* at 69:11–21.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 76 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)
2019 WL 294796

The block party's organizers did not have a valid permit to host the large street gathering. *Id.* at 58:4–8.

Between 8:40 p.m. and 9:00 p.m., Johnson observed NYPD officers arrive at the block party and attempt to disperse the crowd. *Id.* at 134:3–8. For at least twenty minutes, Johnson heard the officers order all partygoers to disperse from the block. Johnson, however, remained seated in a chair. *Id.* at 139:7–18. When most partygoers refused to leave, the officers returned to their cars and turned on their sirens for about two to five minutes. *Id.* at 139:14–140:7. Johnson interpreted the sirens as another attempt to disperse the crowd. *Id.* at 140:5–7. However, in response to the sirens, Johnson remained seated. *Id.* at 140:8–9. Eventually, the officers left the block. *Id.* at 139:14–140:7.

**\*2** Officers returned to the block party two to four minutes after they initially tried—and failed—to disperse the crowd. *Id.* at 142:10–16. Once again, Johnson noticed officers walking up to people and telling them to leave. *Id.* at 143:16–144:19. Yet Johnson, once again, remained seated. *Id.* at 144:24–145:5.

Johnson then witnessed "chaos" break out when an officer tried to arrest someone at the block party. *Id.* at 145:9–12, 146:4–147–9. Some partygoers started to throw glass bottles at or near the officers. *Id.* at 147:4–20, 167:3–15. Others yelled and cursed at the officers. *Id.* Johnson, for his part, remained in the same spot. *Id.* at 148:14–19. Two minutes later, a police officer approached Johnson directly and asked him to leave the scene. *Id.* at 149:1–21. Johnson told the officer that he was on crutches and therefore was waiting for the crowd to lighten before walking up the street. *Id.* at 149:14–17.

Approximately thirty seconds later, Johnson started to walk up the street. *Id.* at 150:15–23. After walking roughly two buildings' length up the street, Johnson stopped to observe officers converse with a man nearby. *Id.* at 152:25–154:7–21. During the officers' conversation with the man, the block party crowd was still "hostile," *id.* at 166:22–167:18; and people in the crowd were still yelling and cursing at the officers, *id.* at 167:16–18. While observing officers talk to the man, Johnson exclaimed aloud that the officers needed to "get a fucking break." *Id.* at 167:19–168:10.

At a certain point during the conversation between the man and the officers, one officer—Defendant Powell—ordered the man to "back up" and then pushed him. *Id.* at 165:6–16.

Falling backward, the man bumped into Johnson's leg. *Id.* Johnson then stumbled backward a few steps and exclaimed —aloud, but to no one in particular—"Oh, what the fuck." *Id.* at 168:11–23. Johnson then turned to Officer Powell and said, "Yo, watch what you doing." *Id.* at 168:11–14. Officer Powell responded, "I don't give a fuck about your foot." *Id.* at 171:5–8. The two men subsequently exchanged words when, suddenly, Officer Powell reached out with his hands and pushed Johnson's head back. *Id.* at 171:6–172:7.

Seconds later, three or four police officers, in addition to Officer Powell, jumped on Johnson. *Id.* at 172:10–19. The officers punched him repeatedly. *Id.* at 174:19–175:23. Johnson raised his hands in front of his face to protect himself from the blows. Pl.'s 56.1 Resp. ¶ 63. The officers eventually wrestled him to the ground. Johnson Dep. 178:23–25. While on the ground, the officers continued to punch him and commanded him to "stop resisting." *Id.* at 178:13–18. In response to the officers' commands, Johnson exclaimed, "I am not resisting, you all are laying on me, you got my arms. How can I resist. I am not resisting, I can't move." *Id.* at 179:23–180:2. As he lay on the ground, Johnson felt someone stomp on his left leg and at least four hits from a baton. *Id.* at 180:8–16.

The police officers eventually handcuffed Johnson. *Id.* at 194:12–15. After being handcuffed, the officers dragged Johnson by his shirt collar down the street and seated him on the ground next to an ambulance. *Id.* at 207:7–210:4. While Johnson was seated next to the ambulance, one officer walked up and punched him in the face. *Id.* at 210:22–211:6.

**\*3** Johnson was then placed in the ambulance and transported to New York Presbyterian Hospital. *See* Third Amended Compl. ¶ 43. After discharge from the hospital, Johnson was charged with the crime of Assault in the Second Degree, due to his alleged assault upon Officer Powell. *Id.* ¶ 44. Approximately 11 months later, on August 3, 2015, all charges against him were dismissed. *Id.* ¶ 45.

### 2. Procedural Background

Johnson filed the instant action on September 2, 2015. Doc. 1. He subsequently amended his complaint three times, with his Third Amended Complaint filed on November 29, 2016. Doc 36. In his Complaint, Johnson names as defendants the following: The City; NYPD; Sergeant Vicente Perez; and Officers Emmanuel Valerio, Steve Tirado, James Burke, Gerard Staples, Robert Stapleton, Jose Joseph, and Dwight Powell. Johnson asserts federal law claims against

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 77 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

the individual defendants for excessive force and a *Monell* claim against the City and NYPD. Johnson also asserts against the individual defendants claims under state law for assault, battery, and intentional infliction of emotional distress; and he asserts against the City and NYPD a claim under state law for *respondeat superior* liability.

Johnson claims that he suffered severe and permanent injuries, including the re-rupturing of his left Achilles tendon and severe emotional distress, resulting from the acts of Defendants. *See* Third Amended Compl. ¶ 46. Following extensive discovery, Defendants moved for partial summary judgment on March 26, 2018. *See* Doc. 79. Defendants, however, did not move for summary judgment with respect to Johnson's excessive force claims against Officers Powell, Staples, and Joseph.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing, e.g., *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."

*Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) ).

**\*4** Finally, "[w]hile it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citation omitted).

## III. DISCUSSION

### 1. Johnson's Claims against the NYPD

Defendants argue that Johnson's claim against the NYPD must be dismissed because the NYPD is a non-suable entity. *See* Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Defs.' Mem.") at 8–9, Doc. 82. Johnson does not oppose dismissal of his claims against the NYPD, and, in any event, the Court agrees with Defendants' argument. *See Grant v. Am. Soc'y for the Prevention of Cruelty to Animals*, 16 Civ. 2675 (ER), 2017 WL 1229737, at \*9 n.13 (S.D.N.Y. Mar. 31, 2017); N.Y. City Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."). Accordingly, Johnson's claims against the NYPD are dismissed.

### 2. Johnson's Claims for False Arrest

Defendants argue that Johnson's claims for false arrest should all be dismissed. After careful consideration of the parties' arguments, the Court agrees with Defendants.

#### A. *Legal Standard: False Arrest, Probable Cause, and Qualified Immunity*

"[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). To establish a § 1983 claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine the

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." [2] *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

[2]    "The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." *Hygh v. Jacobs*, 961 F.2d 359, 366 (internal quotations marks omitted).

Generally, confinement is "privileged" when there is probable cause to make an arrest. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). In other words, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or § 1983." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citation omitted).

Probable cause to make an arrest "exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly*, 439 F.3d at 153 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ).

**\*5** As the Second Circuit has emphasized, "probable cause is a fluid standard that does not demand hard certainties or mechanistic inquiries; nor does it demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (internal quotation marks omitted). "Rather, it requires only facts establishing the kind of fair probability on which a reasonable and prudent person, as opposed to a legal technician, would rely." *Id.* (internal quotation marks and brackets omitted). In determining whether probable cause existed to support an arrest, courts must consider the totality of the circumstances, including the facts available to the arresting officer both immediately before and at the time of arrest. *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

Even if a court concludes that an arresting officer lacked probable cause to arrest, the officer is entitled to qualified immunity if the officer establishes that "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Williams v. City of New York*, No. 17 Civ. 4391 (ER), 2018 WL 4189515, at *2 (S.D.N.Y. Aug. 31, 2018) (internal quotation marks omitted). Put differently, an officer is entitled to qualified immunity if there is "arguable probable cause," a concept that turns on whether "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well[-]established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (citation omitted).

### B. *Analysis*

Defendants argue that Johnson's claim for false arrest fails because there was probable cause to arrest him both for obstructing governmental administration ("OGA") under New York Penal Law § 195.05;[3] and for three types of disorderly conduct under New York Penal Law §§ 240.20(1), (3), and (6).[4] *See* Defs.' Mem. at 9–11. Moreover, Defendants argue that even if probable cause did not exist, *arguable* probable cause existed and, therefore, qualified immunity shields the officers from liability. *Id.* at 13–15.

[3]    § 195.05 provides, in relevant part, the following: "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05 (McKinney 1998).

[4]    Those provisions in § 240.20 provide, in relevant part, the following: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: (1) [h]e engages in fighting or in violent, tumultuous or threatening behavior; or ... (3) [i]n a public place, he uses

2019 WL 294796

abusive or obscene language, or makes an obscene gesture; or ... (6) [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law §§ 240.20(1), (3), and (6).

Naturally, Johnson disagrees with Defendants and instead claims that there are triable issues of fact as to whether probable cause existed to arrest him.

Ultimately, the Court need not answer definitively whether there was probable cause to arrest Johnson for OGA and disorderly conduct because, at minimum, there was arguable probable cause to arrest him for both offenses. Accordingly, the claims against the NYPD officers are barred by the doctrine of qualified immunity, entitling Defendants to summary judgment on these claims as a matter of law.

### i. Obstructing Governmental Administration ("OGA")

**\*6** "Under New York law, [OGA] has four elements: (1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (internal quotation marks omitted). Relevant here, "[a]n officer has probable cause to arrest for [OGA] where a person refuses to comply with an order from a police officer." *Marcavage v. City of New York*, No. 05 Civ. 4949 (RJS), 2010 WL 3910355, at \*10 (S.D.N.Y. Sept. 29, 2010) (quoting *Johnson v. City of New York*, No. 05 Civ. 7519 (PKC), 2008 WL 4450270, at \*10 (S.D.N.Y. Sept. 29, 2008) ), *aff'd*, 689 F.3d 98 (2d Cir. 2012).

In this case, Defendants contend that there was, at minimum, arguable probable cause to arrest Johnson for OGA when he failed to comply with numerous police orders to leave the block party. Defs.' Mem. at 11. The Court agrees. It is undisputed that Johnson first observed officers trying to disperse the block party crowd around 9:00 p.m., yet Johnson failed to leave at that time. *See supra* Part I.1. Indeed, Johnson testified that he remained seated at the block party throughout the approximately twenty minutes the police officers initially spent attempting to disperse the crowd. Moreover, Johnson acknowledges that he remained seated after the police officers returned to their vehicles and turned on their sirens—actions Johnson understood as further attempts to disperse the crowd. Johnson also acknowledges that he initially remained seated when the officers returned to the block party and directly asked him to leave. Under these facts, even viewing them in

a light most favorable to Johnson, no reasonable factfinder could conclude that he was compliant with the officers' lawful commands at this point in the evening.

Johnson argues, however, that there was not probable cause to arrest him for two reasons: (1) he did not "physically interfere" with the officers' performance of an official function; and (2) viewing the facts in a light most favorable to him, he was in the process of walking up the street when the officers arrested him. Pl.'s Mem. of Law in Opp. ("Pl.'s Mem.") at 11–12, Doc. 84. The Court disagrees with both arguments.

At the outset, the Court notes that Johnson is correct when he argues that an OGA arrest cannot be sustained based on a theory of *verbal* interference alone. *See Uzoukwu v. City of New York*, 805 F.3d 409, 414–15 (2d Cir. 2015). As the Second Circuit has observed, "[i]t is axiomatic that only *physical* interference is encompassed in [that] method of obstruction." *Id.* (emphasis added) (internal quotation marks, citations, and alterations omitted). That said, the physical interference requirement is construed broadly, and it is satisfied "when an individual intrudes himself into, or gets in the way of, an ongoing police activity." *Kass v. City of New York*, 864 F.3d 200, 210 (2d Cir. 2017) (brackets omitted), *cert. denied*, 138 S. Ct. 487 (2017). And here, the Court finds the physical interference requirement easily satisfied.

*Marcavage* is instructive. In that case, NYPD officers arrested two anti-abortion protestors and charged them with disorderly conduct after the protestors failed to comply with orders to move from a public sidewalk to a designated demonstration area during the 2004 Republican National Convention in New York City. 2010 WL 3910355 at \*1–3. After their charges were dismissed, the protestors sued the City for, among other claims, false arrest. *Id.* The district court granted summary judgment in favor of the City, concluding that "[p]laintiffs' repeated refusal to follow lawful dispersal orders created probable cause to arrest [p]laintiffs for [OGA] pursuant to N.Y. Penal Law § 195.05." *Id.* at \*10.

**\*7** The Second Circuit affirmed. 689 F.3d at 109–10. Importantly, while the Second Circuit noted that the plaintiffs were hostile and noncompliant toward the NYPD officers, *see id.*, its finding of probable cause did not turn on whether plaintiffs physically touched any of the officers; nor did it turn on whether plaintiffs attempted to intimidate the officers in any way. Rather, the Second Circuit found the existence of probable cause based on plaintiffs' repeated failures to comply

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 80 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

with lawful orders to disperse. *Id.*; *see also Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 544–55 (E.D.N.Y. 2015) (finding probable cause to arrest plaintiff for OGA where plaintiff refused to comply with officer's lawful order to disperse); *Johnson*, 2008 WL 4450270, at \*10 (finding probable cause to prosecute plaintiff for OGA where plaintiff ignored police orders to open the door and show his hands); *Allen v. City of New York*, 480 F. Supp. 2d 689, 715 (S.D.N.Y. 2007) (finding probable cause to arrest for OGA where inmate refused to obey correction officers' orders to move).

The facts in this case mirror those of *Marcavage* and others. On August 30, 2014, Johnson had ample time to leave the block party: He first observed police officers ordering everyone to leave the block party around 9:00 p.m., more than thirty minutes *before* his eventual arrest. And, while Johnson disputes that he cursed at any police officers directly that night, he admits that he stopped walking and remarked aloud that the officers "need[ed] to get a fucking life" *after* an officer had approached him and told him to leave for the second time. Based on these facts and the totality of circumstances—which included Johnson loitering among a crowd of partygoers that were yelling, cursing, and, at least in some instances, throwing glass bottles at officers trying to disperse an unpermitted block party—a police officer could reasonably have concluded that Johnson was refusing to comply with a lawful police order and therefore obstructing governmental administration. *See Kass*, 864 F.3d at 210.

Moreover, while Johnson testifies that he initially started to leave the block, the record is clear that he was not in the process of leaving immediately prior to his arrest. On the contrary, viewing the facts in the light most favorable to Johnson—in fact, relying *solely* on his own deposition testimony—the Court finds the following: After police officers returned to the block party, an officer directly ordered Johnson to leave. Johnson Dep. at 150:5–151:11. Johnson, however, waited roughly thirty seconds before he started to walk. *Id.* He then walked roughly two buildings away from his original spot, at which point he stopped and loitered among a hostile crowd of partygoers to watch an altercation between police officers and another man. *Id.* at 152:21–153:9. Johnson, at this point, was non-compliant with a lawful order. In addition, while still loitering, Johnson remarked aloud that the officers needed to "get a fucking life." *Id.* at 167:19–168:3. Johnson, at this point too, was non-compliant with a lawful order. Consequently, Johnson's refusal to leave the block party despite the officers' repeated attempts to disperse the crowd comfortably distinguishes this case from those in

which courts have found triable issues of fact as to whether a plaintiff was in the process of complying with police orders at the time of arrest. *See, e.g., Bryant v. Serebrenik*, No. 15 Civ. 3762 (ARR) (CLP), 2016 WL 6426372, at \*4 (E.D.N.Y. Oct. 28, 2016) (finding summary judgment unwarranted where there was a dispute as to whether plaintiffs' children were attempting to comply with officers' orders immediately prior to arrest); *Gogol v. City of New York*, No. 15 Civ. 5703 (ER), 2017 WL 3449352, at \*5 (S.D.N.Y. Aug. 10, 2017) (denying summary judgment to defendant-officer where there was a dearth of undisputed evidence demonstrating that the time between the officer's first order to leave and when plaintiff started to leave created an interference with the officer's attempts to clear the area).

**\*8** On these facts, the Court concludes that, at minimum, arguable probable cause existed to arrest Johnson for OGA, notwithstanding that Johnson started to comply with police orders before deciding to stop.[5] Consequently, Johnson's false arrest claims against Defendants are barred by the doctrine of qualified immunity and must be dismissed.

[5]    In reaching this conclusion, the Court does *not* hold that an individual's failure to comply *expeditiously* with a police officer's lawful request to disperse from the area always gives rise to arguable probable cause to arrest that individual for OGA pursuant to N.Y. Penal Law § 195.05.

#### ii. Disorderly Conduct

Defendants also argue that there was, at minimum, arguable probable cause to arrest Plaintiff for disorderly conduct, pursuant to §§ 240.20(1), (3), and (6) of New York Penal Law. The Court agrees.

The analysis here is straightforward. To prove the crime of disorderly conduct under § 240.20, the following must be established: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001). The statute sets forth seven separate descriptions of actions that constitute disorderly conduct. Relevant here, a person is guilty of disorderly conduct under § 240.20(1) when the person "engages in fighting or in violent, tumultuous or threatening

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

behavior." N.Y. Penal Law § 240.20(1) (McKinney 1965). A person is guilty under § 240.20(3) when, "[i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." *Id.* § 240.20(3). And a person is guilty under § 240.20(6) if the person "congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." *Id.* § 240.20(6). Of course, in each of these scenarios, the person must also have acted with the requisite intent—that is, intent to cause public inconvenience, annoyance, or alarm—or with recklessness as to a risk thereof.

Here, the Court easily concludes that the officers had, at minimum, arguable probable cause to arrest Johnson for disorderly conduct under § 240.20(6). [6] To violate that provision, Johnson must have (1) congregated with others in (2) a public place and (3) refused to comply with (4) a lawful police order to disperse. *Id.* Johnson—as an attendee at a block party that drew hundreds of partygoers—undoubtedly was "congregating with others" at the time of arrest, satisfying the first prong of § 240.20(6). *See People v. Carcel*, 144 N.E.2d 81, 85 (N.Y. 1957) (explaining that the phrase "congregates with others," as used in the statute, "requires at the very least three persons assembling at a given time and place."). Johnson also was out in public at the time of arrest, satisfying the second prong of § 240.20(6). And Johnson does not dispute the legality of the police officers' myriad orders to disperse from the block party. Thus, the fourth prong of § 240.20(6) is satisfied.

[6]      Because the Court concludes that there was probable cause to arrest Johnson for disorderly conduct pursuant to N.Y. Penal Law § 240.20(6), it need not consider whether there was probable cause to arrest Johnson under other provisions of the statute.

**\*9** Johnson, however, contends that there is a triable issue of fact as to whether he refused to comply with the police officers' order to disperse. The Court disagrees. As discussed above, the record shows that whereas Johnson eventually started to walk away from the block party, he stopped walking soon thereafter and was not in the process of leaving the block party at the time of his arrest. And given the size of the crowd, by failing to disperse Johnson recklessly created, at minimum, the risk of public inconvenience, annoyance, and alarm. Accordingly, an officer could reasonably have concluded that Johnson was refusing to comply with a lawful order to disperse and thus was in violation of § 240.20(6). *See*

*Caravalho v. City of New York*, No. 13 Civ. 4174 (PKC), 2016 WL 1274575, at \*7–8 (Mar. 31, 2016), *aff'd*, 732 F. App'x 18 (2018). Consequently, arguable probable cause existed to arrest him, entitling the defendant officers in this case to qualified immunity. [7]

[7]      Because the Court concludes that there was at least arguable probable cause to arrest Johnson, the Court need not consider Defendants' alternative contention that certain of the individual defendants were not "personally involved" in his arrest and thus cannot be held liable for false arrest. *See* Defs.' Mem. at 16–17.

### 3. Johnson's Claims for Excessive Force

#### A. *Legal Standard: Direct Participation and Failure to Intervene*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Cox v. Fischer*, 248 F. Supp. 3d 471, 479 (S.D.N.Y. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989) ). Where, as here, the plaintiff's excessive force claims arise from an arrest by police officers, courts should examine the reasonableness of the officers' use of force against the plaintiff's Fourth Amendment right to be free from unreasonable seizures. *Graham*, 490 U.S. at 394–95. This inquiry "require[s] a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* at 396. In undertaking such an inquiry, the Supreme Court has instructed lower courts to give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting or attempting to evade by flight." *Id.* at 396. The inquiry is objective: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. Put differently, "it is not relevant whether the officers thought the amount of force used was really necessary or were provoked to use that amount of force because of the abusive language they contend [the plaintiff] directed at them." *Brown v. City of New York*, 798 F.3d 94, 101 n.10 (2d Cir. 2015).

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 82 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Moreover, it is well settled that a defendant in a § 1983 action may not be held liable for an award of damages to a plaintiff absent "personal involvement" in the conduct resulting in a constitutional violation. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016). Personal involvement may be shown by two alternate methods. First, "[p]ersonal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.' " *Id.* (quoting *Provost*, 262 F.3d at 155).

Alternatively, personal involvement may be shown under a "failure to intervene" theory. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 559 (S.D.N.Y. 2003). Consequently, liability attaches to any police officer who was (1) present during the plaintiff's assault yet (2) failed to intervene on the plaintiff's behalf notwithstanding (3) a reasonable opportunity to do so. *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). The Second Circuit has identified several illustrative factors to consider when addressing the question whether an officer had a realistic chance to intervene, including: (1) the numbers of police officers present; (2) the officers' relative placement; (3) the environment in which the officers acted; (4) the nature of the assault; and (5) the assault's duration, which the Second Circuit noted "will always be relevant and will frequently assume great importance." *Figueroa*, 825 F.3d at 107–08 (citation omitted).

 **\*10** "The ability to proceed under the alternate theories of direct participation and failure to intervene is especially important 'where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, 'mushing' face into the ground) are likely to have prevented plaintiff from identifying which of [the] defendant officers specifically engaged in the bad acts.' " *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 622 (D. Conn. 2016) (citation omitted). At base, "[t]he essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Figueroa*, 825 F.3d at 107–08. Of course, much like proceeding under a theory of direct participation, a plaintiff proceeding under a failure-to-intervene theory must show that

the officer, at the time of his or her failure to act, observed or had reason to know that the plaintiff's constitutional rights were being violated at the hands of an official. *Mack*, 253 F. Supp. 2d at 559.

## B. *Analysis*

### i. Claims against Sergeant Perez and Officers Burke and Stapleton

Defendants argue that the excessive force claims should be dismissed summarily against Sergeant Perez and Officers Burke and Stapleton because those individuals never had physical contact with Johnson and therefore could not have directly participated in any use of force, much less excessive force, against him. Defs.' Mem. at 17–18. Moreover, Defendants contend that Johnson waived any opportunity to proceed under a failure-to-intervene theory because he failed to advance such a theory in his Third Amended Complaint. *Id.*

Johnson's response is twofold. First, he claims that there are genuine issues of material fact concerning whether Perez, Burke, and Stapleton had physical contact with him, considering all three defendants either placed themselves at the scene of his arrest and subsequent removal from the area or were identified by others as having been at the scene. Pl.'s Mem. at 16. Second, and alternatively, Johnson argues that he has properly advanced a failure-to-intervene theory of liability that survives summary judgment. *Id.* at 16–17. Below, the Court addresses each argument in turn.

To begin, the Court dismisses the notion that there are triable issues of fact as to whether Perez, Burke, or Stapleton interacted physically with Johnson. Johnson has failed to put forth *any* evidence, much less genuinely disputed evidence, tending to show that the aforementioned officers made physical contact with him. What's more, the Court concludes that Johnson has waived any right to challenge Defendants' factual assertions on this point—at least with respect to Sergeant Perez and Officer Stapleton—by failing to controvert the assertions adequately in his Response to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1. *See* Pl.'s 56.1 Resp. ¶¶ 70 (failing to controvert adequately Defendants' assertion that Officer Stapleton neither arrested Johnson nor assisted in his arrest), 85 (failing to controvert adequately Defendants' assertion that the first time Perez saw Johnson was as he was being carried to the ambulance by others), 88 (failing to controvert

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 83 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)
2019 WL 294796

adequately Defendants' contention that Perez neither saw nor interacted with Johnson after watching him be carried off to an ambulance). [8]

[8]   In answering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, litigants in this District are required by our Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support their position by citing to admissible evidence in the record. *See* Local Rule 56.1(b)–(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). This Court's Individual Practices further require the nonmovant to reproduce each entry in the movant's Rule 56.1 Statement and to set forth a response directly beneath the entry. *See* Individual Practices R. 2(C)(i).

These rules—simple to understand and to apply—are designed to assist the Court by narrowing the scope of issues to be decided in a motion for summary judgment and by identifying the facts material and admissible to that decision-making process. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."). Unfortunately, Johnson's counsel has failed to comply with these straightforward requirements.

Johnson's 56.1 Response is deficient in several significant respects. *First*, his 56.1 Response frivolously purports to deny certain factual assertions that Johnson either has admitted in sworn testimony or has otherwise relied on in his opposition papers. See, for example, paragraph 55 of his Response: In that paragraph, Johnson reproduced a 56.1 entry by Defendants that asserted both that he cursed prior to his interaction with Officer Powell and that he exclaimed that the officers needed to get a life. *See* Pl.'s 56.1 Resp. ¶ 55. Defendants cited Johnson's deposition transcript at 167:19–168:1, which plainly states as much. *Id.* Yet, remarkably, in his 56.1 Response Johnson denies that he was cursing and denies that he exclaimed that the officers needed to

get a life—a denial that that contradicts his deposition transcript. Even more remarkable is the fact that Johnson, in support of his denials, cited the *same exact transcript pages* as Defendants. See also, as another example, paragraphs 100 through 102 of Johnson's 56.1 Response: In those paragraphs, Johnson reproduced 56.1 entries by Defendants that asserted both that Officer Tirado was the person who escorted Johnson to the hospital in an ambulance, and that Johnson "has no complaints against the officer that escorted him to the hospital." *See id.* ¶¶ 101–02. In response to these entries, Johnson "admits that the above testimony was given but does not concede the truth of the testimony." Importantly, however, Johnson does not point to *any* competent evidence suggesting Officer Tirado was not the officer who accompanied him to the hospital, and *Johnson's own deposition transcript*—cited by Defendants—plainly states that Johnson has no issues with the officer who accompanied him to the hospital. *See* Johnson Dep. at 212:21–214:25. Consequently, Johnson's hesitance to admit to these assertions are as perplexing to the Court as they are troubling.

*Second*, Johnson's 56.1 Response fails to comply with Fed. R. Civ. P. 56(c) and Local Rule 56.1 in that it fails to support many of Johnson's purported denials with citations to admissible evidence. On the contrary, in response to several of Defendants' factual assertions supported by record citations, Johnson states that he "admits that the above testimony was given but does not concede the truth of the testimony," notwithstanding that (1) he provides no record citations supporting a contrary conclusion, and (2) many of Defendants' assertions are drawn from or consistent with his deposition testimony and moving papers. *See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 8 (refusing to concede that "[o]n August 30, 2014, there was a block party on West 164th Street between Amsterdam Avenue and Edgecombe Avenue, in Manhattan," while stating the same exact thing in his moving papers), 27 (refusing to concede that the crowd at the block party was hostile, cursing, and failed to disperse, notwithstanding his deposition testimony describing the crowd exactly as such), 39 (refusing to concede that bottles were being thrown at officers, notwithstanding his own deposition testimony describing the scene exactly as such), 51

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 84 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

(refusing to concede that the block party crowd was hostile and telling officers, "Fuck out of here, go parole [sic] some real crime," notwithstanding his own deposition testimony stating as much).

*Third*, and finally, Johnson's 56.1 Response improperly interjects arguments and/or immaterial facts in response to factual assertions made by Defendants and supported by the record, without specifically controverting those assertions. *See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 22, 104–05, 107, 121–22; *see also Costello v. N.Y. State Nurses Ass'n,* 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendants' Rule 56.1 Statement where plaintiff responded with conclusory assertions and legal arguments).

Such flagrant disregard of the Court's Rules cannot stand. *See Holtz,* 258 F.3d at 74 (explaining that where a 56.1 Statement includes factual citations unsupported by the record, those factual assertions should be disregarded); *Costello,* 783 F. Supp. 2d at 661 n.5 (disregarding plaintiff's responses to defendants' Rule 56.1 statement where plaintiff failed to refer to evidence in the record). "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011); *Buckman v. Calyon Sec. (USA) Inc.,* 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted"); *Geoghan v. Long Island R.R.,* No. 06 Civ. 1435 (CLP), 2009 WL 982451, at *5–6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.").

Although the Court is not required to search the record for genuine issues of material fact that Johnson's counsel failed to bring to the Court's attention, *Holtz,* 258 F.3d at 73, the net result of counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the case to ensure that his client's claims receive thorough and just consideration. Accordingly, when analyzing the instant motion, the Court has, at times, disregarded averments in Johnson's 56.1

Response that are not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments. To the extent that any assertions in Johnson's Statement of Additional Material Facts Pursuant to Local Civil Rule 56.1 are supported by admissible evidence in the record sufficient to create a triable issue of fact as to one of Defendants' factual assertions, the Court will, of course, consider such assertions. Moreover, where possible, and in the interests of justice, the Court has relied on uncited record evidence creating genuine disputes of material fact—such as uncited testimony from Johnson's deposition transcript—where relevant facts were not included in either of the parties' Rule 56.1 submissions.

In the future, it simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them. Much more is expected from an experienced member of the bar of this Court and will henceforth be *strictly* required.

**\*11** Next, the Court turns to whether excessive force claims can be sustained against Perez, Burke, and Stapleton based on a failure-to-intervene theory. At the outset, the Court dismisses Defendants' argument that Johnson has failed to advance such a theory in his complaint. Instead, the Court concludes that Johnson included in his complaint enough details of the contours of his excessive force claim to provide fair and adequate notice to Defendants. *See* Third Amended Compl. ¶¶ 22 ("At all times relevant to this Complaint, all defendants acted in concert and conspired together through both their acts and *omissions* and are jointly and severally liable for the harms caused to plaintiff." (emphasis added) ), 46 ("As a direct and proximate result of the acts and *omissions* of defendants, plaintiff sustained severe and permanent injuries" (emphasis added) ). Pleading an excessive force claim is enough; Johnson need not define with particularity at the pleading stage the exact theories of liability he will employ at trial.

Notwithstanding the propriety of advancing a failure-to-intervene theory, the Court concludes that Johnson cannot sustain his claim against Sergeant Perez on this theory because it is undisputed that Perez witnessed neither the alleged force used during Johnson's initial takedown and arrest nor the alleged punch suffered by Johnson next to the ambulance. *See* Pl.'s 56.1 Resp. ¶¶ 70, 88. Rather, the uncontroverted evidence in this case reveals that immediately

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 85 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

prior to Johnson's confrontation with Defendant Powell, Perez was "struck in the face with a bottle, fracturing two teeth;" and while Johnson was being carried away by other officers, Perez was tending to Powell, who had also been hit with a bottle. *See Id.* ¶¶ 41, 85–88.

The Court concludes, however, that summary judgment in favor of Officers Burke and Stapleton is unwarranted. Defendants have not moved for summary judgment against Officers Powell, Staples, and Joseph, appropriately conceding that there are triable issues of fact with respect to whether those officers used excessive force in effectuating Johnson's arrest. Given that the deposition testimony and video evidence proffered tend to place Burke and Stapleton within proximity of Powell, Staples, Joseph, viewing the facts in the light most favorable to Johnson, a reasonable factfinder could very well conclude that the former group of officers observed a constitutional violation initiated by the latter group; that they had time to intervene; and that they failed to do so nonetheless. *See Id.* ¶¶ 69, 72–73; Defs.' 56.1 Counterstatement ¶ 29. The cases in this district denying summary judgment on similar facts are legion. *See, e.g., Fischl v. Armitage,* 128 F.3d 50, 56–57 (2d Cir. 1997) (holding that plaintiff-inmate had produced a triable issue of material fact as to the personal involvement of defendant-officer in an unconstitutional assault by other inmates where the admissible record would permit a reasonable juror to conclude that defendant-officer had been in the vicinity of the attack, heard plaintiff's screams, yet did nothing to stop the attack); *Rivera v. Madan,* No. 10 Civ. 4136 (PGG), 2013 WL 4860116, at *10 (S.D.N.Y. Sept. 12, 2013) ("Here, it is undisputed that Officer Roberson did not use force against Plaintiff ..., but there is evidence that she was present when Officer Madan allegedly slammed Plaintiff's head into the floor, and did not intervene.... Construing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Roberson violated her duty to intervene to prevent other officers from violating Rivera's constitutional rights."); *Vesterhalt v. City of New York,* 667 F. Supp. 2d 292, 297–98 (S.D.N.Y. 2009) (denying summary judgment to defendant-officers where plaintiff testified that she could not identify which officer assaulted her but defendant-officers' testimonies revealed that they were all present during the assault, and "it is possible that all of the officers saw what happened" to her, yet failed to intervene"); *Younger v. City of New York,* 480 F. Supp. 2d 723, 731–33 (S.D.N.Y. 2007) (denying summary judgment to certain officers where record evidence tended to place the officers at the scene of plaintiff's alleged beating and the officers conceded that there

were triable disputes of fact surrounding the force used in effectuating plaintiff's arrest by others at the scene); *Usavage v. Port Auth. of New York & New Jersey,* 932 F. Supp. 2d 575, 599–600 (S.D.N.Y. 2013) ("[S]ummary judgment is inappropriate when there are genuine disputes of material fact concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." (internal quotation marks omitted) ); *Skorupski v. Cty. of Suffolk,* 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (denying summary judgment on excessive force claims to almost named defendants where "[a]ll the named defendants, with the exception of [one], ha[d] admitted being present during the arrest, and two ... admit[ted] physical contact with plaintiff"). Consequently, the excessive force claims against Officers Burke and Stapleton may proceed to trial on a failure-to-intervene theory of excessive force.

### ii. Claims against Officers Tirado and Valerio

**\*12** The Court now turns to the excessive force claims against Officers Tirado and Valerio. At the outset, the Court dismisses the excessive force claim against Officer Tirado, given that Johnson has expressly disavowed all claims against the officer who accompanied him to the hospital, and he has not produced any evidence to controvert Tirado's statements that *he* was the officer who accompanied Johnson to the hospital. *See supra* note 8. The claim against Valerio, however, requires further analysis.

With respect to Valerio, Defendants seek summary judgment on the ground that there exists a dearth of record evidence suggesting Valerio had personal involvement of any kind with the alleged acts of excessive force exacted upon Johnson. The Court disagrees. For one thing, Defendants concede that Valerio had his baton drawn while in some (albeit disputed) proximity to Johnson during Johnson's struggle and eventual arrest. Defs.' 56.1 Counterstatement ¶ 30. Defendants also concede—as they must—that Valerio, along with others, helped carry Johnson to an ambulance soon after he was handcuffed. *See id.* ¶ 28. And Johnson contends that he was punched by an unidentified officer soon after being dragged and seated on the ground next to the ambulance. Given Valerio's physical involvement with Johnson during this time and viewing the facts in a light most favorable to Johnson, a rational factfinder could conclude that Valerio helped exact excessive force upon him. Moreover, even assuming arguendo that Valerio lacked physical contact with Johnson, Valerio's proximity to Johnson both at the time of

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 86 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

his arrest and at the time he was seated by the ambulance creates an issue of triable fact as to whether Valerio failed to intervene during any of the alleged assaults.[9] That Johnson cannot identify which officers exacted excessive force against him is, therefore, of no moment. *See Jeffreys*, 275 F. Supp. 2d at 474 ("A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."); *Vesterhalt*, 667 F. Supp. 2d at 297–98; *Gonzalez*, 199 F. Supp. 3d at 622 (explaining same). Rather, it is enough that there exists admissible evidence tending to place Valerio—in addition to Officers Burke and Stapleton—near the scene of Johnson's alleged assaults.

[9]     The Court notes that while Defendants assert—and Johnson does not adequately dispute—that (1) Valerio first observed Johnson while he was already on the ground and in the process of being arrested, *see* Pl.'s 56.1 Resp. ¶ 74, and that (2) Valerio was performing crowd control while other officers arrested Johnson, *see* Pl.'s Resp. ¶ 75, neither assertion negates the genuine disputes as to (1) whether Valerio imposed excessive force upon Johnson while he was being arrested (or thereafter), and (2) whether Valerio failed to intervene after observing officers use excessive force upon Johnson. Defs.' 56.1 Counterstatement ¶¶ 28–30.

\* \* \* \* \*

In sum, the Court will grant summary judgment to Defendants as to Johnson's claims excessive force claims against Perez and Tirado, and the Court will deny summary judgment to Defendants as to Johnson's excessive force claims against Burke, Stapleton, and Valerio.

### 4. Johnson's State Law Claims

Defendants contend that Johnson's state law claims are all barred because he failed to comply with the mandatory conditions precedent to suit contained in Sections 50-e and 50-h of the New York Consolidated Laws, General Municipal Law. Below, the Court addresses each argument in turn.

#### A. Compliance with N.Y. Gen. Municipal Law § 50-e(6)

**\*13**  Defendants contend that Johnson failed to comply with the conditions precedent set forth in § 50-e of the New York's

General Municipal Law because he filed a defective notice of claim against the City. Specifically, Defendants contend that Johnson filed a notice of claim that contained: (1) the wrong address—stating that his alleged beating by police officers occurred on August 31, 2014, instead of August 30, 2014; and (2) the wrong location—stating that the alleged beating occurred in Washington Heights, New York, at or near the intersection of Edge*wood* Avenue and West 164th Street, as opposed to Edge*combe* Avenue and West 164th Street. Johnson's failure to provide the correct date and location of the alleged beating allegedly prejudiced Defendants because the defects did not enable the City to investigate Johnson's claims. Defs.' Mem. at 22–23. The Court disagrees.

It is well settled that federal courts entertaining state law claims against municipalities are obligated to apply any applicable state law notice-of-claim provisions. *See Perez v. City of New York*, 07 Civ. 10319 (RJS) (KNF), 2009 WL 1616374, at \*12 (S.D.N.Y. June 8, 2009). "Under New York law, a plaintiff must file a notice of claim before suing municipal defendants in a personal injury action." *Rentas v. Ruffin*, 816 F.3d 214, 226–27 (2d Cir. 2016). The notice must be served within 90 days after the claim arises. N.Y. Gen. Municipal Law § 50-e(1)(a) (McKinney 2013). Among other things, the notice must set forth the following: "(1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) *the time when, the place where and the manner in which the claim arose*; and (4) the items of damage or injuries claimed to have been sustained." *Id.* § 50-e(2) (emphasis added). "Notice of claim requirements are construed strictly by New York state courts," and "[f]ailure to comply with these requirements ordinarily requires dismissal for failure to state a cause of action." *Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793–94 (2d Cir. 1998) (citations omitted). That being said, "[a]t any time after the service of a notice of claim ..., a mistake, omission, irregularity or defect made in good faith ... may be corrected, supplied or disregarded, as the case may be, in the discretion of the court, provided it shall appear that the other party was not prejudiced thereby." N.Y. Gen. Municipal Law § 50-e(6).

Here, Johnson failed to adhere to the clear and unambiguous requirements of 50-e, in that he failed to provide the City with the exact date and location of his alleged beating. However, Defendants hardly lacked information sufficient to embark on an investigation of Johnson's claims. A cursory glance of a New York City map would quickly apprise a reasonable investigator that Johnson's notice of claim likely referred to the intersection between West 164th Street and Edge*combe*

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 87 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

Avenue, not Edge*wood* Avenue—especially considering that Johnson identified Washington Heights, New York, as the location of the incident. Johnson's notice also states that officers with the NYPD's 33rd Precinct attacked him, further narrowing the universe of potential incidents. The scope of any such investigation would also be limited in nature, given that Johnson provided a date close in time to the actual date of his arrest and alleged beating. Moreover, the record is devoid of evidence suggesting that Johnson's defective notice was the product of bad faith. Nor does the record evidence suggest that the City was prejudiced by Johnson's errors. Accordingly, the Court will exercise its discretion under § 50-e(6) and disregard the defects in Johnson's notice of claim.

### B. Compliance with N.Y. Gen. Municipal Law § 50-h

Defendants contend that Johnson failed to comply with § 50-h and, therefore, Johnson's claims under state law should be dismissed. The Court agrees.

**\*14** In relevant part, § 50-h(1) provides that "[w]herever a notice of claim is filed against a city, ... the city ... shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made." N.Y. Gen. Municipal Law § 50-h(1) (McKinney 2013). Going further, § 50-h(5) provides that "[w]here a demand for examination has been served[,] ... no action shall be commenced against the city ... against which the claim is made unless the claimant has duly complied with such demand for examination." The City is required to reschedule a 50-h hearing if the claimant requests an adjournment or postponement of the hearing. *Id.* However, "[s]everal courts have held ... that a plaintiff's failure to attend a [§] 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims against the City." *Duncan v. City of New York*, 11 Civ. 3901 (ENV), 2018 WL 3421312, at *3 (E.D.N.Y. July 13, 2018) (quoting *Kennedy v. Arias*, No. 12 Civ. 4166 (KPF), 2017 WL 2895991, at 13 (S.D.N.Y. July 5, 2017) ).

In this case, the City demanded a § 50-h hearing, which was originally scheduled for November 14, 2014. Pl.'s 56.1 Resp. ¶ 109. Johnson's representative requested, and the City granted, adjournments on at least two separate occasions after the original hearing date. *Id.* ¶¶ 112, 117.

Johnson's last scheduled hearing was for July 28, 2015. *Id.* ¶ 119. However, Johnson's representative called the City on July 27, 2015, and informed them that Johnson would not be appearing for the July 28 hearing. *Id.* ¶ 121. Defendants claim that Johnson's representative did not request another adjournment. Consequently, as Defendants see it, because Johnson neither appeared for his § 50-h hearing nor requested an adjournment prior to filing the instant action, Johnson failed to comply with the condition precedent to suit set forth in § 50-h(5).

Johnson, on the other hand, argues that his representative did, in fact, request an adjournment of the § 50-h hearing, and he blames the City for failing to reschedule it. Pl.'s Mem. at 20–22. In support of his position, Johnson attached to his moving papers an affidavit of Ms. Maria Ortega, a former paralegal for Johnson's counsel, who was at one time assigned to Johnson's case. *See* Doc 83-22. In her affidavit, Ms. Ortega acknowledges that she has "no independent recollection" of requesting an adjournment of the July 28 hearing. Nevertheless, she avers that, pursuant to the law firm's "set procedure," if a client, like Johnson, had a pending criminal matter, she would have requested an adjournment of the § 50-h hearing until the criminal matter concluded. She further averred that, following the criminal matter's conclusion, she would have requested that the City schedule a § 50-h hearing. She claims to have never waived a client's § 50-h hearing.

After careful consideration, the Court finds that there are quintessential factual disputes concerning whether Johnson's representative did, in fact, request an adjournment. [10] However, the Court does not find these factual disputes material. In particular, the Court finds the reasoning in *Gilliard v. City of New York* persuasive:

> Although the Second Circuit has not definitively decided the issue, courts have placed the burden on the plaintiff to resolve any discrepancies regarding the rescheduling of a 50–h Hearing in accordance with the Second Circuit's directive to construe Notice of Claim requirements "strictly." Disregarding any proffered reason is also good policy: while the City must handle the rescheduling of thousands of 50–h Hearings, a plaintiff is only concerned with her own and is in a better position to ensure that the parties are

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 88 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

on the same page. For these reasons, Plaintiff's failure to attend the 50–h Hearing—no matter the reason—is a complete bar to his state law claims against the City.

**\*15**  No. 10 Civ. 5187 (NGG), 2013 WL 521529, at \*16 (E.D.N.Y. Feb. 11, 2013) (internal citations omitted); *see also Duncan*, 2018 WL 3421312, at \*3; *Kennedy*, 2017 WL 2895901, at \*13. The logic of this approach is sound. [11] Johnson is suing the City, and Johnson is the one responsible for prosecution of this action. Accordingly, Johnson is in a better position to ensure that all conditions precedent have been met prior to filing suit. Because he has failed to adhere to this condition precedent prior to filing suit, his state law claims are dismissed.

[10]    For example, while Defendants contend that the Office of the Comptroller of the City of New York does not accept verbal requests for adjournments, *see* Defs.' Mem. at 10 n.6, it is undisputed that the City granted Johnson adjournments on two separate occasions, and there is no record evidence suggesting that the adjournments resulted from formal written requests.

[11]    The Court notes that neither federal nor New York state courts within this Circuit are consistent on this point. *Compare, e.g., Kennedy v. Arias*, No. 12 Civ. 4166 (KPF), 2017 WL 2895901, at \*13 (S.D.N.Y. July 5, 2017); *Bernoudy v. Cty. of Westchester*, 837 N.Y.S.2d 187 (App. Div. 2007) (2d Dep't) ("The Supreme Court properly granted the defendants' motion to dismiss the complaint, since the hearing pursuant to General Municipal Law § 50-h was adjourned at the plaintiff's request, and he commenced this action without rescheduling a new hearing date after the last adjournment."); *Best v. City of New York*, 468 N.Y.S.2d 7, 8 (App. Div. 1983) (1st Dep't); *with, e.g., Anderson v. Liberty Lines Transit, Inc.*, 31 N.Y.S.3d 882 (App. Div. 2016) (1st Dep't) (Liberty's motion to dismiss the complaint on the ground that plaintiff failed to attend a [§ 50-h] hearing was properly denied. The record established that Liberty granted plaintiff an adjournment of the hearing, did not set a

subsequent date, and never sought to reschedule the hearing.").

### 5. Johnson's Claim for Municipal Liability

In his Third Amended Complaint, Johnson alleges that the City is liable for his § 1983 claims for false arrest and excessive force because the City "developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons incarcerated in the custody of the [NYPD], which policies and/or customs caused the violation of [his] rights." Third Amended Compl. ¶ 54, Doc. 36. Johnson claims that "it was the policy and/or custom" of the City "to improperly or inadequately investigate complaints of people in the custody of the [NYPD], and acts of abuse, excessive force, and misconduct were instead tolerated, encouraged, and ratified by" the City. *Id.* ¶ 55.

In their motion for summary judgment, Defendants argue that Johnson's municipal liability claim is "entirely conclusory and unsupported by anything in the record." Defs.' Mem. at 20. Johnson, in response, maintains that the "[t]he record supports this claim based on the pervasive use of excessive force against the plaintiff and others on the night of August 30, 2014." Pl.'s Mem. at 19. Defendants' motion for summary judgment on this claim is granted.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, a municipality cannot be held liable for the tort of its employees based on the doctrine of *respondeat superior*. *Coon v. Town of Springfield*, 404 F.3d 683, 686–87 (2d Cir. 2005) (citing *Monell*, 436 U.S. at 694); *see also Hunter v. Town of Mocksville*, 897 F.3d 538, 553–54 (4th Cir. 2018) (explaining that "a municipality cannot be held liable *solely* because it employs a tortfeasor" (internal quotation marks and citation omitted) ). Consequently, isolated acts of excessive force by non-policymaking municipal employees are insufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. *Villante v. Dep't of Corr.*, 786 F.2d 516, 519 (2d Cir. 1986). "On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 89 of 158

Johnson v. City of New York, Not Reported in Fed. Supp. (2019)

2019 WL 294796

which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones v. Town of E. Haven,* 691 F.3d 72, 81 (2d Cir. 2012).

**\*16** Here, while Johnson contends that his municipal liability claim is "based on a policy implemented by the City," pursuant to which the City failed to investigate claims of excessive force, resulting in officers customarily using excessive force without fear of reprisal, *see* Pl.'s Mem. at 18–19, he has produced no evidence to support this assertion. Defendants' motion for summary judgment is therefore granted on this claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part. Specifically:

(1) The Court GRANTS summary judgment to Defendants on Johnson's claims against the NYPD;

(2) The Court GRANTS summary judgment to Defendants on Johnson's claims for false arrest under state and federal law;

(3) The Court GRANTS summary judgment to Defendants on Johnson's claims against Sergeant Perez and Officer Tirado for excessive force;

(4) The Court DENIES summary judgment to Defendants on Johnson's claims of excessive force against Officer Burke, Officer Stapleton, and Officer Valerio; [12]

(5) The Court GRANTS summary judgment to Defendants on Johnson's claim for municipal liability under 42 U.S.C. § 1983; and

(6) The Court GRANTS summary judgment to Defendants on Johnson's remaining claims under state law for failure to comply with conditions precedent to suit.

Defendants did not move for summary judgment with respect to Johnson's excessive force claims against Officers Powell, Staples, and Joseph. Thus, those claims will also proceed to trial.

[12]     The Court reiterates that Johnson may prove his claims against Burke and Stapleton at trial on a failure-to-intervene theory of liability only, as there is no genuine issue of fact with respect to whether those defendants exacted any force *physically* upon Johnson. *See supra* Part III.3.B.i.

The parties are directed to appear for a status conference on Tuesday, February 26, 2019, at 10:00 A.M. The Clerk of Court is respectfully directed to terminate the motion, Doc. 79.

It is SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 294796

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 90 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

2021 WL 3500163
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Antoine ROSS, Plaintiff,
v.
Captain Dion WILLIS, Correction Officer
George, Shield #732, Correction Officer
Genoves, Shield # 17683, Defendants.

16 Civ. 6704 (PAE) (KNF)
|
Signed 08/09/2021

**Attorneys and Law Firms**

Justin M Ellis, Lauren F. Dayton, Sara Ellen Margolis, MoloLamken LLP, New York, NY, for Plaintiff.

Joshua Alan Weiner, Herzfeld & Rubin, P.C., William Thomas GoslingPhilip Rudolph DePaul, Qiana Charmaine Smith, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

OPINION & ORDER

Paul A. Engelmayer, United States District Judge

**\*1** Plaintiff Antoine Ross ("Ross") brings this action under 42 U.S.C. § 1983 alleging that, while in pretrial detention on Rikers Island, defendants Captain Dion Willis ("Willis"), Correction Officer Sadoc Genoves ("Genoves"), and Correction Officer Rochaurd George ("George") violated his constitutional rights. The incident in question occurred when defendants entered Ross's cell so as to produce him for court. Willis sprayed Ross in the face with an MK-9 chemical agent, which, due to his asthma, caused him significant distress. Ross brings § 1983 claims against Willis for excessive force, against George and Genoves for failure to intervene, and against all defendants for deliberate indifference to the risk of serious injury or illness.

Defendants now move for summary judgment on all claims. For the reasons that follow, the Court denies defendants' motion as to the excessive force and failure intervene claims, which will now proceed to trial. The Court grants defendants' motion as to the deliberate indifference claims.

## I. Background

### A. Factual Background [1]

[1] This factual account draws primarily from the parties' submissions on defendants' motions for summary judgment, including the Joint Statement of Undisputed facts, Dkt. 144 ("JSF"), defendants' Local Rule 56.1 statements, Dkts. 146-2 ("Willis 56.1"), 151 ("CO 56.1"), Ross's response to Willis's Rule 56.1 statement, Dkt. 183 at 1–11 ("Ross-Willis Counter 56.1"), Ross's response to Genoves's and George's Rule 56.1 statement, Dkt. 183 at 12–18 ("Ross-CO Counter 56.1"), Ross's Rule 56.1 statement of additional relevant facts, Dkt. 183 at 19–30 ("Ross 56.1"), defendants' Rule 56.1 reply statements, Dkts. 174 ("Willis Reply 56.1"), 178 ("CO Reply 56.1"), and the declarations (with accompanying exhibits) of James Frankie, Esq., Dkts. 146-3 ("Frankie Decl."), 172 ("Frankie Reply Decl."), Joshua Weiner, Esq., Dkts. 150 ("Weiner Decl."), 177 ("Weiner Reply Decl."), and Sarah Margolis, Esq., Dkt. 184 ("Margolis Decl."). The Court also relies on a handheld video capturing some events at issue, Margolis Decl., Ex. 1 ("Video") (filed with the Court), and a joint stipulated transcript of the video, Dkt. 145 ("Video Tr.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Ross v. Willis, Not Reported in Fed. Supp. (2021)
Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 91 of 158
2021 WL 3500163

## 1. The Parties

**\*2** On June 14, 2016, Ross was a pretrial detainee at Otis Bantum Correctional Center ("OBCC") at Rikers, and was being housed in 1 West, cell 30, within OBCC. JSF ¶¶ 2–4. 1 West was designated as Enhanced Supervision Housing ("ESH"), which is used for inmates who pose a security or safety risk to other inmates. *Id.* ¶ 5; *see also* Frankie Decl., Ex. L (New York City Charter, Title 40, Board of Correction § 1-16, Enhanced Supervision Housing). Ross was formerly a member of the Bullets, a gang affiliated with the Bloods. Willis 56.1 ¶ 2; Ross-Willis Counter 56.1 ¶ 2; Ross Tr. [2] at 173. The parties dispute whether, as of June 14, 2016, Ross was still affiliated with the gang. *See* Willis 56.1 ¶ 2; Ross-Willis Counter 56.1 ¶ 2.

[2]     For simplicity, the Court collectively refers to all excerpts of Ross's deposition as "Ross Tr." *See* Frankie Decl., Ex. I; Weiner Decl., Ex. A; Margolis Decl., Ex. 2; Frankie Reply Decl., Ex. S.

Willis was appointed a Correction Officer on June 2, 2005, and was promoted to Captain on January 17, 2014. Willis 56.1 ¶ 3; Ross-Willis Counter 56.1 ¶ 3. On June 14, 2016, he was assigned to the OBCC command as intake captain. JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6. George was appointed a Correction Officer on August 27, 2009. Willis 56.1 ¶ 4; Ross-Willis Counter 56.1 ¶ 4. CO Genoves was appointed a Correction Officer on November 10, 2005. Willis 56.1 ¶ 5; Ross-Willis Counter 56.1 ¶ 5. On June 14, 2016, George and Genoves were assigned to the OBCC command as intake correction officers in OBCC. JSF ¶ 2; Willis 56.1 ¶ 6; Ross-Willis Counter 56.1 ¶ 6.

## 2. Ross's Medical History

Ross was first diagnosed with asthma as a child. JSF ¶ 6. As an adult, Ross visited the emergency room multiple times as a result of his asthma symptoms, including in May 2013, January 2015, and June 2015. *Id.* ¶ 7.

On January 29, 2016, after Ross entered DOC custody, DOC medical staff diagnosed him with "asthma with acute exacerbation" from having been exposed to a "chemical agent." *Id.* ¶ 8. Medical staff prescribed "Qvar 80 MCG/ACT Aerosol Solution," a "maintenance medication" that Ross was to take every day; Ross's medical records indicate that he was still prescribed this medication as of June 14, 2016. *Id.* ¶¶ 9–10. Ross was also prescribed an inhaler, a "rescue medication," which he was to carry with him at all times. *Id.* ¶ 10.

On April 7, 2016, DOC mental health staff diagnosed Ross with depression, and, on May 6, 2016, prescribed him Remeron, which he had previously been prescribed for depression. *Id.* ¶ 11. Between May 12, 2016 and June 14, 2016, Ross was prescribed 45 mg of Remeron, to be taken at bedtime. *Id.* Larry Blackmore ("Blackmore"), a physician's assistant at DOC, *id.* ¶ 10, testified that Remeron can cause "drowsiness, fatigue, and dizziness," *id.* ¶ 12. Ross testified that on the night of June 13, 2016, he had been given Remeron at "around sevenish, eightish" at night. *Id.* ¶ 13. Ross testified that the Remeron was given to him in the evening to help him sleep. *See* Ross Tr. at 59.

## 3. DOC Use of Force and Prisoner Production Policies

DOC has developed policies related to use by its officers of force on inmates, use of chemical agents by DOC officers on inmates, and production of inmates to court. JSF ¶ 14; Frankie Decl., Ex. A ("DOC Prisoner Prod. Dir."); *id.*, Ex. B ("DOC Chemical Agents Dir."); *id.*, Ex. C ("DOC UOF Dir."). "DOC's policies, including directives, operations orders, and teletypes, are mandatory for all DOC personnel to follow, including members of probe teams." JSF ¶ 15.

As of June 14, 2016, DOC officers were required to intervene if they saw any officer, "including a captain, violating a DOC policy." *Id.* ¶ 16. Chief Kenneth Stukes ("Stukes"), DOC's 30(b)(6) witness, testified that all DOC officers receive training on use of force, anticipated use of force events, the use of chemical agents, and how to handle an inmate who refuses to go to court. Stukes Tr. at 52–53, 124–25, 161, 224–26. [3] All three defendants received such training. *See* Ross 56.1 ¶ 24; Willis Reply 56.1 ¶ 24; CO Reply 56.1 ¶ 24.

[3]     For simplicity, the Court collectively refers to all excerpts of Stukes's deposition as "Stukes Tr." *See* Frankie Decl., Ex. F; Margolis Decl., Ex. 9.

**\*3** On the date of a scheduled court appearance, OBCC staff usually wake up the inmate between approximately 4 a.m. and 5 a.m.; the inmate is given an opportunity to gather legal papers, eat breakfast, and shower before his appearance. *See* JSF ¶ 21; Willis 56.1 ¶ 11; Ross-Willis Counter 56.1 ¶ 11; *see*

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

*also* Stukes Tr. at 50. The buses that transport inmates to the courthouse typically arrive between 6 a.m. and 7 a.m., and continue to arrive throughout the day as necessary. JSF ¶ 21. Inmates are not required to wake up for breakfast. *See* Monroe Tr. [4] at 85. When an inmate refuses to go to court, the area supervisor is supposed to first determine whether the inmate's reason for refusal is one that is "recognized by an agency." Stukes Tr. at 51; *see also* Ross 56.1 ¶ 39. [5]

[4]    For simplicity, the Court collectively refers to all excerpts of Monroe's deposition as "Monroe Tr." *See* Frankie Decl., Ex. E; Weiner Decl., Ex. E; Margolis Decl., Ex. 7; Frankie Reply Decl., Ex. T.

[5]    Willis disputes this statement on the grounds that this requirement is conditioned on the inmate's cooperation and that a probe team captain is not an area supervisor. *See* Willis Reply 56.1 ¶ 39. However, Willis's counter-statement does not include a citation to the record supporting these factual claims.

An inmate refusing to go to court is an "anticipated use of force" event. Stukes Tr. at 53; DOC UOF Dir. § IV.C.2. When there is an anticipated use of force event in which an extraction is required, the supervising captain, before using force, should attempt to contact DOC mental health personnel. Stukes Tr. at 20–26, 168–69; DOC UOF Dir. § V.A.2. "If the opportunity presents itself," supervising captains are directed to maintain dialogue with tour commanders to determine whether an inmate has a "contraindicator," such as asthma, that would preclude use of chemical agents. DOC UOF Dir. § IV.D; Stukes Tr. at 207–08 (asthma is contraindicator for use of chemical agents).

DOC policy designates use of hand-held chemical agents as a lesser degree of force than physical contact, *see* DOC Chemical Agents Dir., but it prohibits chemical agents from being used against inmates who have a contraindication to chemical agents, *see* Stukes Tr. at 22–26, 116–18, 225. Officers who carry chemical agents receive annual training on their use, *id.* at 226, 232–33; Willis received such training, Willis Tr. at 22, 24, 29, 41. Chemical agents are not supposed to be used at a distance under six feet. Stukes Tr. at 219–20.

### 4. Events of June 14, 2016

#### a. Ross's Initial Refusal to Go to Court

On June 14, 2016, Ross had a scheduled court appearance in Bronx County, New York. JSF ¶ 22; Willis 56.1 ¶ 7; Ross-Willis Counter 56.1 ¶ 7; *see also* Margolis Decl., Ex. 10 (court record from the Supreme Court of New York, Bronx County). Captain Latonia Monroe ("Monroe") testified that, that day, a correction officer informed her that Ross was refusing to go to court. JSF ¶ 23; Monroe Tr. at 74, 84. Monroe testified that, at approximately 6:40 a.m., she went to speak to Ross about why he was refusing to go to court, *see* JSF ¶ 24; Monroe Tr. at 74; Ross, however, does not recall interacting with Monroe at all that morning, *see* Ross Tr. at 55. Monroe testified that when she reached Ross's cell, she saw him lying on his bed, but could not recall in what position. JSF ¶ 25; Monroe Tr. at 77–78. She testified that she attempted to speak to him several times but that she was unable to get any information from Ross other than that he did not want to go to court. Monroe Tr. at 77–80. She eventually left Ross's cell to continue her work but testified that she made additional attempts to produce him for court. JSF ¶ 27. She also informed her tour commander of the issue. *Id.* ¶ 28; *see also* Monroe Tr. at 79, 91.

**\*4** Monroe testified that she later returned to Ross's cell to capture his refusal to go to court on video. Monroe Tr. at 79, 91. Monroe's use of force report for June 14, 2016 indicates that she returned to his cell with the camera at approximately 6:40 a.m. Frankie Decl., Ex. G ("Monroe UOF Report"). This process is called "refusal on video." Stukes Tr. at 69–70. DOC captures inmate refusals to go to court on video to help them explain to the court why the inmate did not appear. *Id.* at 70. Monroe testified that Ross was not physically aggressive when she interacted with him and that she did not feel threatened by him. Monroe Tr. at 94–95.

#### b. Probe Team and Pepper Spray

At approximately 7 a.m., an OBCC "probe team"—consisting of five officers, Willis, George, Genoves, and two non-party officers, Jordan and Phillips—arrived at Ross's cell to produce him for court. JSF ¶¶ 29, 31. A probe team consists of one captain and four officers at most. *Id.* ¶ 30.

How the probe team came to be called to Ross's cell is in dispute. Monroe testified that her tour commander, Assistant Deputy Warden Sharma Dunbar ("Dunbar"), activated an institutional alarm and dispatched the probe team, but she

**Ross v. Willis, Not Reported in Fed. Supp. (2021)**
Case 5:24-cv-01391-BKS-MJK   Document 5   Filed 12/11/24   Page 93 of 158
2021 WL 3500163

could not recall whether Dunbar did so before or after speaking to Monroe; Monroe testified that Dunbar could have been watching the situation unfold on the surveillance cameras. Monroe Tr. at 95, 97. Willis and Genoves testified that the probe team was called in response to an alarm. *See* Willis Tr. [6] at 74; Genoves Tr. [7] at 69–70. George did not recall hearing an alarm himself but testified that he might have heard from Willis that there was an alarm. George Tr. [8] at 64–65. However, per DOC policy, an extraction team, rather than a probe team, should have been assembled to address the situation. *See* Stukes Tr. at 257–58. An extraction is a planned event, *id.* at 168, one that a probe team could not execute without assembling an extraction team, *id.* at 130. In such an event, Stukes testified, it was the captain's job to contact mental health personnel and medical personnel to request contraindicators, *id.* at 168–69. [9]

[6]   For simplicity, the Court collectively refers to all excerpts of Willis's deposition as "Willis Tr." *See* Frankie Decl., Ex. H; Weiner Decl., Ex. D; Margolis Decl., Ex. 3; Frankie Reply Decl., Ex. R; Weiner Reply Decl., Ex. N.

[7]   For simplicity, the Court collectively refers to all excerpts of Genoves's deposition as "Genoves Tr." *See* Weiner Decl., Ex. C; Margolis Decl., Ex. 4; Frankie Reply Decl., Ex. Q.

[8]   For simplicity, the Court collectively refers to all excerpts of George's deposition as "George Tr." *See* Weiner Decl., Ex. B; Margolis Decl., Ex. 5.

[9]   Willis argues that this statements conflicts with the DOC's UOD Directive, but does not point to specific contradictions in the directive. *See* Willis Reply 56.1 ¶ 32.

The probe team wore "protective vests, helmets, and gas masks." JSF ¶ 33. Willis wore a white helmet and a vest numbered 064; Genoves wore a vest numbered 028; and George wore a vest numbered 026. *Id.* Phillips operated a handheld video camera and captured some video and audio of the events at issue. *See* JSF ¶ 32; *see also* Video. However, due to Phillips's position relative to Ross's cell, much of the video is obscured by probe team officers, and some of the audio is unintelligible. *See* Video; Video Tr.

When the probe team arrived at Ross's cell, Willis, George, and Genoves entered; Jordan stood inside the cell near the doorway, and Phillips stood in the back with the video camera.

JSF ¶ 34; Video. Ross was lying face-down on his bed. JSF ¶ 35; Willis Tr. at 81. Ross testified that he was awoken when the officers entered his cell. Ross Tr. at 55, 63. Willis and George told Ross that they needed to take him out of the cell for his court appearance. *See* JSF ¶ 37; Video at 0:31–0:56; Video Tr. at 0:31–0:56. Ross replied that he was "going to sleep" and told the officers "do not touch me bro, do not touch me, bro." Video at 0:59–1:03; Video Tr. at 0:59–1:03. Willis again told Ross that he needed to leave the cell. Video Tr. at 1:03–1:05. Willis told someone on the probe team to "grab him." *Id.* at 1:06–1:10.

**\*5** Either George or Genoves (or both) attempted to grab Ross's arm to place him in handcuffs. JSF ¶ 40. Ross again told the officer not to touch him. *Id.*; Video Tr. at 1:05. Ross testified that he was trying to tell the officers that because he had been given a sedative, he was unable to get up. Ross Tr. at 57, 101, 118. He further testified that although he understood that he could not refuse to go to court, he did not intend to refuse to go at all; rather, his sedative prevented him from getting up. *See id.* at 207. On the video, Ross can be heard saying, "Grabbing me ... grabbin' my arm while I'm on drugs, boy.... What's wrong with you, boy? Is you crazy? ... What's wrong with you, son?" Video at 1:10–1:14; Video Tr. at 1:10–1:14.

The parties dispute whether, during this time, Ross resisted the officers' attempts to handcuff him. Ross recalled that someone was tugging on his arm, but he did not remember whether he pulled his arm away. Ross Tr. at 101–03. Willis testified that after instructing staff to grab Ross's arms, Ross pulled his arm away. Willis Tr. at 89.

Willis then told Ross that he "need[ed] to take [Ross] out or [he was] gonna spray [Ross]." Video Tr. at 1:14–1:21. Willis told Ross he was going to give him "one opportunity." *Id.*; JSF ¶ 41. Ross asked, "Spray me for what?" Video Tr. at 1:22–1:23. Willis told him it was "[f]or [Ross] to come out." *Id.* at 1:24–1:25. George and Genoves testified that they heard Willis tell Ross he was going to spray him if Ross did not comply. JSF ¶ 42. George testified that at this time, he was not certain that Willis actually would spray Ross, because sometimes inmates comply after being warned that they may be sprayed, and sometimes they do not. George Tr. at 146–47.

Ross then stated: "Y'all niggas is crazy son. Y'all niggas is crazy." Video at 1:26–1:30. Approximately one second later, Willis sprayed Ross once in the face with MK-9 handheld chemical agent ("pepper spray" or "OC spray"). *Id.*

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

at 1:30–1:31; JSF ¶ 44. Willis told the other officers to "[c]uff him," Video Tr. at 1:32. George handcuffed Ross using flex cuffs, JSF ¶ 45.

Willis testified that he did not consider Ross's refusal to go to court an "emergency." Willis Tr. at 86. He further testified that he did not at any point think that Ross was a threat to himself, other inmates, Willis himself, or other members of the probe team, *id.* at 130, and that he "did not spray [Ross] because he was a threat," *id.* at 169. However, Willis did testify that, in general, he views all inmates as threats, in particular when responding to an area as an alarm supervisor. *Id.* at 85. George did not consider Ross a threat to himself, but testified that he did not know whether Ross was a threat to others. George Tr. at 114–15, 122–23. Genoves testified that he felt Ross was "somewhat of a threat" in the sense that he did not know what Ross's "intentions" were in allegedly failing to comply with the officers' orders. Genoves Tr. at 88–89. However, although he "did not want to get hurt," Genoves testified that he would "not ... say threatened personally," *id.* at 89, and he did not feel that Ross was a threat to other inmates or himself, *id.* at 91, 120. When asked whether Willis sprayed Ross "even though [Ross] was not a threat," Genoves answered, "Correct." *Id.* at 123.

Approximately 25 seconds after Willis sprayed him, Ross told the officers he was asthmatic. Video Tr. at 1:58; JSF ¶ 46. All three defendants testified that they had not been aware of Ross's medical history or his history of asthma. JSF ¶ 36. Probe teams are not generally informed about patients' medical histories or conditions, *see* Stukes Tr. at 158–59, but captains can request, and in non-emergency anticipated-use-of-force scenarios should request, contraindicators to chemical agents, *see id.* at 24, 116–18, 168–69. Ross testified that it "slipped [his] mind" to tell the officers that he was asthmatic before being sprayed because he "was just more worried about the fact that [the officers were] spraying him ...." Ross Tr. at 185.

 **\*6** The probe team escorted Ross out of his cell toward the intake area. JSF ¶ 47; Video at 2:30–5:43. On the video, Ross can be heard gasping for air. Video at 2:31–3:31. While walking down a halfway, led by officers, Ross told the officers, "I can't breathe. I can't breathe." *Id.* at 3:44–49; JSF ¶ 48. Approximately 20 seconds later, Ross again told the officers he could not breathe. Video at 4:08; Video Tr. at 4:08; JSF ¶ 49.

The officers then lifted Ross, put him on a gurney, and wheeled him the rest of the way to the intake area. Video at 4:11–5:43; JSF ¶¶ 50–51. Ross waited face-down on the gurney for several minutes while the probe team obtained the keys to the decontamination shower. JSF ¶¶ 52–53; Video at 5:44–7:22. Ross testified that during this time, he experienced symptoms similar to those he has experience during asthma attacks, including trouble breathing, tightness in his chest, and pain. Ross Tr. at 70–71, 116. The video reflects that, less than a minute after arriving in the intake area, Ross began shaking and coughing. Video at 6:15. Phillips then told the officers to turn Ross on his side. *Id.* at 6:30–6:34; Video Tr. at 6:30–6:34.

At 7:22 of the video, the probe team obtained the keys to the decontamination shower. Video at 7:22; JSF ¶ 52. Ross was gasping and screaming as he was taken to the decontamination shower. Video at 7:22–8:18. Genoves and Jordan lifted Ross off the gurney and put him in the shower. JSF ¶ 54. Genoves then cut off Ross's flex cuffs and told him to walk to the back of the shower and push the button to turn the shower on. *Id.* ¶ 55; Video at 9:01–9:21. Ross testified that although the decontamination shower did not eliminate all effects of the OC spray, it did help with the most "extreme effects"; he then told an officer that he felt "relieved" and "would like to see medical." Ross Tr. at 75–76.

### c. Ross's Medical Treatment and Injuries

At approximately 10:20 a.m., Ross was seen at the medical clinic by DOC physician's assistant Larry Blackmore ("Blackmore"). JSF ¶ 57; *see also* Margolis Decl., Ex. 11 ("Ross Injury Report"). The injury report indicates that Ross presented to the clinic in "no distress," that no chemical agent was present, and that "no injury [was] noted." Ross Injury Report; JSF ¶ 58. Ross testified that he did not receive treatment at the medical clinic, although Blackmore examined him. Ross Tr. at 82–83; Ross Injury Report ("No treatment indicated. Patient education on injury given.").

Ross testified that he continues to experience emotional distress as a result of this incident, which has contributed to his depression. Ross Tr. at 119, 121; 203.

After his examination at the medical clinic, Ross was taken to his scheduled court appearance. JSF ¶ 60.

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

### 5. DOC Investigation of Probe Team's Actions

Although a report created by Stukes and Dunbar concluded that "[f]orce was required and unavoidable," Frankie Decl., Ex. M, DOC conducted a separate investigation into the events of June 14, 2016, *see* Ross 56.1 ¶ 105; Willis Reply 56.1 ¶ 105; CO Reply 56.1 ¶ 105; *see also* Margolis Decl., Ex. 14 ("Longi Report"). Willis was interviewed as a part of the investigation. JSF ¶ 62. The investigation concluded that Willis was aware that this was a use of force scenario and that he "violated the anticipated UOF directive by not assembling a proper extraction team, not notifying mental health services and never requesting contra indicators from the on duty tour commander for Inmate Ross prior to utilizing chemical agents." Longi Report at 8. The investigation also concluded that Ross's asthma diagnosis "would have prevented Captain Willis from being able to use chemical agents as a means to gain compliance from Ross." *Id.*

**\*7** Through a negotiated plea agreement, Captain Willis pled to charges that he violated the DOC's UOF Directive and chemical agents policy. *See* Margolis Decl., Ex. 16.

### B. Procedural History

On August 25, 2016, Ross, proceeding *pro se*, filed the complaint naming New York City, Captain Willis, and three John Doe officers as defendants. Dkt. 2. On May 11, 2017, the Court directed the New York City Law Department to give Ross the identities of the John Doe defendants. Dkt. 12. On June 2, 2017, Ross filed an amended complaint including three John Doe defendants. Dkt. 14. On June 26, 2017, the Court referred the case to Magistrate Judge Fox for general pretrial supervision. Dkt. 20. The Court also ordered Ross to file a second amended complaint naming the John Doe defendants. Dkt. 21.

On August 24, 2017, Judge Fox granted the City's motion to stay the case pending a DOC investigation of Ross's allegations. Dkt. 28. On November 1, 2017, Ross filed a second amended complaint which named the individual officers. Dkt. 34. On November 14, 2017, the City filed a motion to dismiss Ross's claims against it. Dkts. 35–36. On December 28, 2017, Ross filed a third amended complaint, Dkt. 39, and on January 5, 2018, a fourth amended complaint, Dkt. 40.

On November 14, 2018, the Court directed defendants to inform the Court whether, in light of the fourth amended complaint, they intended to rely on their original motion to dismiss, and to notify the Court if there was a reason the stay should not be lifted. Dkt. 44. On November 20, 2018, the City informed the Court that it intended to rely on its original motion to dismiss, Dkt. 45; the Court lifted the stay, Dkt. 47. The Court referred the pending motion to dismiss to Judge Fox for a report and recommendation. Dkt. 46.

Ross opposed the City's motion to dismiss through the series of letters dated December 3, 2018, Dkt. 51, December 17, 2018, Dkt. 49, and December 22, 2018, Dkt. 50. On March 11, 2019, Judge Fox issued the Report, recommending that the Court grant the motion to dismiss. Dkt. 52. After receiving no objections, the Court adopted the Report and dismissed all claims against the City. Dkt. 54.

On April 1, 2019, Willis answered the fourth amended complaint, including a cross-claim against the City for indemnification, alleging that any injuries to Ross had been caused by the wrongdoing or negligence of the City and its agents. Dkt. 58. On April 3, 2019, Ross filed the fifth amended complaint. Dkt. 59.

On April 15, 2019, Ross filed an application for the Court to request pro bono counsel. Dkt. 60. The same day, the City answered Willis's cross-claim. Dkt. 62. On April 17, 2019, the City moved to dismiss the fifth amended complaint, Dkts. 63–65.

On April 29, 2021, Ross filed objections to the Report, Dkt. 67, and on May 7, 2019, wrote a letter to the Court explaining why he had not been able to object on time, Dkt. 69, and filed a motion seeking "reinstatement" of his case, Dkts. 71–72. On May 9, 2021, this Court construing Ross's objections as a motion for reconsideration, denied Ross's motion. Dkt. 73.

On September 23, 2019, Judge Fox granted Ross's application for pro bono counsel. Dkt. 78. On September 27, 2019, Willis answered the Fifth Amended Complaint, Dkt. 79, and on October 3, 2019, George and Genoves answered, Dkt. 82.

**\*8** On February 11, 2020, pro bono counsel appeared on Ross's behalf. Dkts. 107–09. Following the close of discovery, which Judge Fox continued to supervise, the remaining defendants—Willis, George, and Genoves—filed letters indicating that they intended to move for summary judgment. Dkts. 134–35. On November 3, 2020, Ross filed

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

letters indicating that he would oppose both motions. Dkts. 137–38.

On November 23, 2020, the Court held a pre-motion conference. On December 10, 2020, the parties filed the JSF and the joint stipulated transcript of the video taken on June 14, 2016. Video Tr. On December 21, 2020, Willis filed a motion for summary judgment. Dkt. 146, 146-1 ("Willis Mem."). On December 24, 2020, George and Genoves filed a motion for summary judgment. Dkts. 149, 152 ("CO Mem."). On January 14, 2021, Ross filed a consolidated opposition to the motions. Dkt. 157. On January 29, 2021, the Court ordered that Ross re-file his opposition and supporting documents without redactions, except as to Willis's disciplinary history. Dkt. 170; *see also* Dkt. 182 ("Ross Opp'n"). On January 30, 2021, Willis filed a reply, Dkt. 171 ("Willis Reply"), and on February 1, 2021, George and Genoves filed a reply, Dkt. 176 ("CO Reply"). On February 4, 2021, counsel for Ross filed a corrected declaration that included pages inadvertently omitted from the original declaration. Margolis Decl.

## II. Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

Ross brings three sets of claims under § 1983: (1) an excessive force claim against Willis; (2) a failure to intervene claim against George and Genoves; and (3) a claim for deliberate indifference against all three officers.

### A. Excessive Force

**\*9** Willis moves for summary judgment on the claim against him for using excessive force.

### 1. Legal Standards

#### a. Objectively Unreasonable Force

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]" *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). Excessive force claims under the Eighth and Fourteenth Amendments are subject to different standards. In contrast to such claims brought under the Eighth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). [10]

10      The Second Circuit previously required pretrial detainees asserting excessive force claims "satisfy

Ross v. Willis, Not Reported in Fed. Supp. (2021)
Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 97 of 158
2021 WL 3500163

two requirements: the 'subjective requirement' that a defendant had a 'sufficiently culpable state of mind' and the 'objective' requirement that the 'deprivation alleged is objectively sufficiently serious or harmful enough.' " *Carmona v. City of New York*, No. 13 Civ. 3273 (WHP), 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting *Walsh*, 194 F.3d at 49–50). However, in *Kingsley*, the Supreme Court removed the subjective component for pretrial detainees. 576 U.S. at 396–97.

Whether the force used was objectively unreasonable "turns on the facts and circumstances of each particular case," and is to be evaluated "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397 (cleaned up). The Supreme Court has identified a number of non-exclusive factors that bear on the reasonableness of force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* Consistent with the "fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Because running a prison "is an inordinately difficult undertaking," *Kingsley*, 576 U.S. at 399 (cleaned up), courts must "afford prison officials some latitude to make 'good-faith effort[s] to maintain or restore discipline,' " *Taylor v. Nieves*, No. 17 Civ. 7360 (AJN), 2020 WL 7028907, at *2 (S.D.N.Y. Nov. 30, 2020) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)). And "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights." *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (cleaned up).

### b. Qualified Immunity

**\*10** Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S.

658, 664 (2012). Its purpose is to "give government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (cleaned up).

A constitutional right was clearly established if, at the time of the officer's conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted). Although a "case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The clearly established right "must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right as "right to be free of excessive force" is "far too general." *Id.* "Even if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Summary judgment should be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ] could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (cleaned up).

Because qualified immunity is an affirmative defense, defendants bear the burden of proof. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

### 2. Application

"The use of pepper spray 'constitutes a significant degree of force' and can in certain cases form the basis of a

Ross v. Willis, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 98 of 158

2021 WL 3500163

constitutional violation." *Quinones v. Rollison*, No. 18 Civ. 1170 (AJN), 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010)); *see also Tracy*, 623 F.3d at 98 ("Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects[.]"). Here, viewing the evidence in the light most favorable to Ross, a reasonable factfinder could conclude that Willis's use of pepper spray was objectively unreasonable and hence an excessive use of force.

First, there is no genuine dispute that Ross did not present a threat to the probe team, other inmates, or even himself. All three officers testified that they did not personally feel threatened by Ross, *see* Willis Tr. at 130; George Tr. at 114–15, 122–23; Genoves Tr. at 89; all three further testified that he was not a threat to himself, *see* Willis Tr. at 130; George Tr. at 114; Genoves Tr. at 120; Willis and Genoves testified that he was not a threat to the other probe team members, *see* Willis Tr. at 130; Genoves at 120; and Willis and Genoves testified that Ross was not a threat to other inmates, *see* Willis Tr. at 130; Genoves Tr. at 91.

 **\*11**  To be sure, notwithstanding this testimony, Willis also testified that generically he views all inmates, particularly those in ESH, as threats. *See* Willis Mem. at 16; Willis Tr. at 85 (Willis views all inmates as threats, particularly when responding to an alarm). And Genoves testified that Ross was "somewhat of a threat" because he "did not know [Ross's] intentions." CO Mem. at 3; *see also id.* at 11 (arguing that the "need to use force was high as [Ross], a maximum security inmate, repeatedly refused verbal orders ... then escalated his resistance"). But these generalized arguments reach too far. To find that Ross present an imminent threat to officers solely because of his status as an ESH detainee "would place few restrictions on officers' treatment of individuals with extensive disciplinary records" or those in ESH. *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 255 (2d Cir. 2020).

In any event, the officers' testimony makes clear that, whatever concerns they generically have as to detainees in the ESH, these played no role in the decision here. Willis, who made the decision to use the pepper spray, unequivocally testified that he did not spray Ross based on the view that Ross posed a threat, *see* Willis Tr. at 169, and that he never viewed Ross a threat to himself or others:

> Q: At any point during the incident was Mr. Ross a threat?
>
> A: No.

> Q: Did you feel he was a threat to the other members of the probe team?
>
> A: No.

> Q: Did you feel he was a threat to himself?
>
> A: No.

> Q: Did you feel he was a threat to other inmates?
>
> A: No.

Willis Tr. at 130. Genoves also testified multiple times to the same effect:

> Q: At this point [when Ross said "don't touch me bro"] did you think he was a physical threat to you?
>
> A: No.

> Q: Did you think he was a physical threat to the other members of the probe team?
>
> A: No....

> Q: Was he a physical threat to himself?
>
> A: No....

> Q: ... And so Captain Willis talked to Mr. Ross for about a minute and four seconds before he sprayed Mr. Ross with a chemical agent, correct?
>
> A: Correct.

> Q: And that was even though he was not a threat, correct?
>
> A: Correct.

Genoves Tr. at 120, 123 (objections omitted).

Second, there is a genuine dispute as to whether and to what degree Ross resisted the probe team's one or more attempts to handcuff him. The only evidence to which defendants point in support of their argument that Ross actively resisted being handcuffed is Willis's testimony that, at one point, he instructed the probe team to grab Ross's arms, and Ross "pulled away and said don't fucking touch me." Willis Tr. at 89. [11] Ross, for his part, testified that although he remembers that someone from the probe team touched him, he cannot remember whether he pulled his arm away. Ross Tr. at 101–03. Defendants are correct that, in general, a party's inability

Ross v. Willis, Not Reported in Fed. Supp. (2021)

Case 5:24-cv-01391-BKS-MJK Document 5 Filed 12/11/24 Page 99 of 158

2021 WL 3500163

to recall certain events is not sufficient to raise a genuine dispute of fact. *See Creighton v. City of New York*, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at \*40 (S.D.N.Y. Feb. 14, 2017); *Faruki v. City of New York*, No. 10 Civ. 9614 (LAP), 2012 WL 1085533, at \*5 (S.D.N.Y. Mar. 30, 2012). But that principle does not carry the day here. Ross attests that he had been given medication by DOC at night in part to help him sleep, *see* JSF ¶ 13; Ross Tr. at 59, which appears to have affected his ability to stay alert during his encounter with defendants. And jury could credit that pepper spray was used on Ross—as is undisputed—while choosing to disbelieve Willis's uncorroborated description of Ross's as having pulled his arm away. In any event, as Ross notes, even if it were undisputed that Ross had "pulled away" a single time when officer(s) grabbed him, a reasonable jury could conclude that that was not an act of or signifying actively resistance. *See Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) (denying summary judgment on excessive force claim where plaintiff refused to put her hands behind her back to be handcuffed because this "non-threatening form of resistance" was "only one factor to be considered"). Moreover, as the video reflects, Ross told the officers prior to the application of peppers spray that he was "on drugs." Video Tr. at 1:10–1:11. A jury could infer that a reasonable officer would have understood that Ross might be inhibited in his ability to comply with the officers' commands.

[11]     Willis asserts that it is undisputed that Ross pulled away multiple times, *see* Willis 56.1 ¶ 28 ("Members of the probe team took hold of Inmate Ross' wrist in an effort to handcuff him, but each time Ross pulled away ...."), but that is not supported by the citation to Willis's deposition, *see* Willis Tr. at 89.

**\*12** Although not themselves accused of using excessive force, George and Genoves make arguments bearing on this claim, in light of the derivative claims (for deliberate indifference and failure to intervene) brought against them. The cases on which they rely, however, are factually inapposite. In *Frost*, the Second Circuit upheld a grant of summary judgment to the defense on an excessive force claim in which the plaintiff "resisted the officers and tried to prevent them from entering the area where he was located by holding the door shut with his arm." 980 F.3d at 256. In *Berman v. Williams*, No. 17 Civ. 2757 (JGK), 2019 WL 4450810 (S.D.N.Y. Sept. 17, 2019), the use of pepper spray was found objectively reasonable because the plaintiff's refusal to comply with orders to remove his clothes and his "continual[ ]" physical resistance presented a security risk.

*Id.* at \*6–7. And in *Vazquez v. Spear*, No. 12 Civ. 6883 (VB), 2014 WL 3887880 (S.D.N.Y. Aug. 5, 2014), the plaintiff, who was in the inmate waiting room awaiting a court appearance, physically resisted being handcuffed by crouching down, and continued to resist officers' attempts to handcuff him. *Id.* at \*4. [12] The plaintiff in each of these three cases thus physically resisted the officers and presented a greater security risk to them than did Ross. That is clearly so if one credits Ross's factual account, as required here. Even crediting the officers' accounts, the plaintiff-inmate's acts of resistance in *Frost, Berman*, and *Vasquez* exceeded that here.

[12]     Importantly, *Vazquez* was decided before to the Supreme Court's decision in *Kingsley* eliminating the subjective prong of the excessive force standard. It thus relied on the fact that the officers' use of pepper spray had not been "malicious and sadistic" or in "bad faith." 2014 WL 3887880, at \*4.

The video does not alter this outcome. Defendants depict the video as making clear that Ross was actively, physically resisting. *See* Willis Reply at 3; CO Reply at 9–10. Not so. It is undisputed that, prior to the use of pepper spray, one or more of the officers touched Ross once, in response to which he told the officers not to touch him. *See* Willis Tr. at 89; Ross Tr. at 101 (conceding that one or more officers must have touched him). It is further undisputed, and the audio component on the video reflects, that Ross told the officers multiple times not to touch him. *See* Video Tr. at 0:59–1:05. But Ross's actions during this period are all but fully obscured on the video by the probe team. Although the video thus does not preclude the possibility that the obscured Ross resisted in some fashion, there is no footage of Ross resisting once, let alone multiple times. And the audio evidence is as compatible with Ross's explanation that he was using loud words alone to induce the officers to ease up—to explain that he was sedated, Ross Tr. at 101–03—as it is with defendants' narrative that Ross resisted attempts to handcuff him.

Third, the distance from which the OC spray was used on Ross may enhance his claim of excessive force. *See Tracy*, 623 F.3d at 98 (denying summary judgment in part based on factual dispute about distance from which the pepper spray was deployed). Here, the parties dispute the distance between Willis and Ross at the moment Ross sprayed Willis. Willis testified that he was about six feet from Ross, *see* Willis Tr. at 151, but Monroe testified that there were only three to four feet between the door and Ross's bed, *see* Monroe Tr. at

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 100 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

79, appearing to narrow the potential space between them by several feet.

Fourth, at summary judgment, Ross's injuries are sufficient to sustain an excessive force claim. Defendants argue that because Ross did not sustain more serious injuries, his excessive force claim must fail. *See* Willis Mem. at 14; CO Mem. at 12–13. But the case law cautions wariness about granting summary judgment on this basis, on the ground that, if injuries of "limited duration" were enough to defeat an excessive force claim, "police and corrections officers would essentially be able to utilize pepper spray and similar chemical agents with impunity." *Lewis v. Clarkstown Police Dep't*, No. 11 Civ. 2487 (ER), 2014 WL 1364934, at *6 (S.D.N.Y. Mar. 31, 2014), *adhered to on reconsideration*, No. 11 Civ. 2487 (ER), 2014 WL 6883468 (S.D.N.Y. Dec. 8, 2014). Critical here, a plaintiff need not have sought medical attention to support an excessive force claim. *See Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff did not require substantial medical treatment at the hospital following the incident does not necessarily mean that [defendant] is entitled to summary judgment."). And "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). Here, on the video, Ross can be heard gasping for air, *see* Video at 2:31–3:31, and stating multiple times that he could not breathe, Video Tr. at 3:44–49, 4:08. He also testified that he experienced symptoms akin to those in an asthma attack. *See* Ross Tr. at 70–71, 116. That Ross was relieved by the decontamination shower and that his medical report showed, several hours later, that he was no longer in distress does not entitle defendants to summary judgment. *See Lewis*, 2014 WL 1364934, at *6.

**\*13** Accordingly, the undisputed facts, coupled with genuine issues of material fact, preclude granting Willis summary judgment on Ross's excessive force claim against him. *See Tracy*, 623 F.3d at 98 ("[A] reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force[.]"); *Lewis*, 2014 WL 1364934, at *6 (S.D.N.Y. Mar. 31, 2014) (denying summary judgment where the parties disputed what triggered the plaintiff's behavior in the holding cell and the amount of pepper spray used).

Nor, viewing the undisputed facts in the light most favorable to Ross, is Willis entitled to summary judgment on the basis of qualified immunity. Willis notes case law holding that, as of 2020, it had not been "clearly established that pepper spraying an uncooperative inmate is unlawful." *Ismael v. Charles*, No. 18 Civ. 3957 (GHW), 2020 WL 4003291, at *11 (S.D.N.Y. July 15, 2020). Accordingly, he argues, this right necessarily had not been clearly established as of June 14, 2016, the date of the incident. *See* Willis Mem. at 12. That argument, however, presupposes, factually, that prior to being sprayed, Ross was behaving "uncooperative[ly]," as addressed in *Ismael*. There, although the inmate was not "physically resist[ing] or threaten[ing] any of the officers," *Ismael*, 2020 WL 4003291, at *11, he refused to enter an isolation cell after having been ordered to do so, *see id.* at *1–2 (explaining that officers needed to secure Ismael to enable them to respond to a simultaneous, independent institutional alarm). By contrast, here Ross was secured in his cell, lying face down, threatening no one, and, on his version of events, not defying the officers at all, [13] and, as Willis acknowledges, the need to remove Ross from his cell for his court appearance was not an "emergency." Willis Tr. at 86.

[13]    George and Genoves argue that the fact that no officer thought Ross was a threat is irrelevant to the qualified immunity analysis because, after *Kingsley*, the operative test is objective, not subjective. *See* CO Reply at 10 n.9. But that no defendant found Ross threatening is germane to whether Ross was not resisting, which is germane to whether Willis, in spraying Ross, acted in a fashion that violated a clearly established right.

George and Genoves argue that there is "no Supreme Court or Second Circuit case law clearly establishing that a corrections officer who deploys a single, short, two-second burst of chemical agent on an unrestrained asthmatic inmate when the inmate physically resisted and repeatedly refused to comply with legitimate orders to be produced to court is objectively unreasonable." CO Mem. at 23. But even accepting this extremely narrow formulation of the right, the Court has found genuine issues of fact as to whether Ross did pull his arm away a single time, and if so, whether Ross was physically resisting. And, with the exception of *Ismael*, addressed above, each case in which pepper spraying was held objectively reasonable to which defendants point involved physical resistance, *see Frost*, 2019 WL 4512620, at *2 (S.D.N.Y. Sept. 18, 2019) (plaintiff "continue[d] physically to resist" throughout the encounter); *Vazquez*, 2014 WL 3887880, at *4 (inmate physically resisted being handcuffed by crouching down, and continued to resist

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 101 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

officers' attempts to handcuff him), or an individual suspected of a violent crime, *see Scoma v. City of New York*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 230295, at \*12 (E.D.N.Y. Jan. 22, 2021) (officers entitled to qualified immunity for pepper spraying an "unrestrained individual actively resisting arrest for domestic violence, where the officers reasonably believed that such individual was dangerous"), *report and recommendation adopted*, No. 16 Civ. 6693 (KAM) (SJB), 2021 WL 1784385 (E.D.N.Y. May 4, 2021). *Brown v. City of New York*, 862 F.3d 182 (2d Cir. 2017), in which the Second Circuit found that the officers were entitled to qualified immunity for their use of physical force and repeated use of pepper spray, comes closer, but still involves an unrestrained arrestee who refused, even after being knocked to the ground, to offer her hands for handcuffing. *Id.* at 189.

 **\*14** By contrast, it was well-established as of June 2016 that "no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5; *see also id.* (it is well-established "that the use of entirely gratuitous force is unreasonable and therefore excessive"). Although Ross was unrestrained and an inmate, he was confined to his cell, lying face-down and, crediting Ross's version of events, passive and unable to comply with the officers' commands. And there are factual disputes that bear on whether Willis's use of force was gratuitous here, including whether he reasonably should have appreciated that Ross was drugged and unable to assist in being handcuffed or comply with the directive to leave to go to court, and whether Ross resisted the officers.

Instructively, a court in this District in *Lewis* found that factual disputes about the cause of plaintiff's disruptive behavior in the holding cell and the amount of OC gel used precluded summary judgment on qualified immunity grounds. *See* 2014 WL 1364934, at \*10. Defendants argue that *Lewis* is distinct because the plaintiff was "confined to his cell," while Ross was "actively resisting, making threats, flouting commands, and was unrestrained." CO Reply at 12–13. But Ross was similarly confined to his cell, and defendants say-so in their memorandum of law notwithstanding, there is no evidence, let alone undisputed evidence that Ross was "making threats" of any kind, and the video does not reveal any such defiance. *See* Video Tr. at 0:37–1:30. In such circumstances, as *Ismael* recognized, courts in this District have denied motions for summary judgment where "a jury could find, in accordance with [p]laintiff's version of the events, that it was unreasonable for [defendant] to have used pepper spray

on [p]laintiff while [p]laintiff was locked inside of his cell and neither physically resisting [defendant] nor posing an immediate threat." *Wiggan v. NYC Dep't of Correction*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456, at \*2 (S.D.N.Y. Sept. 16, 2014) (adopting report and recommendation in its entirety); *Wiggan*, No. 12 Civ. 1405 (GBD) (HBP), Dkt. 46 (S.D.N.Y. Aug. 21, 2014) ("The decisions that have considered whether the use of pepper spray ... on incarcerated individuals can constitute excessive force have [led] to mixed results.... [But] the cases seem to turn on whether the pepper spray ... was used ... to cause an inmate to cease engaging in dangerous or disruptive conduct." (collecting cases)), *report and recommendation adopted*, No. 12 Civ. 1405 (GBD) (HBP), 2014 WL 4631456 (S.D.N.Y. Sept. 16, 2014); *see also Ismael*, 2020 WL 4003291, at \*11 n.8 (although district court opinions cannot create "clearly established" law, they may be "relevant to the qualified immunity analysis if they signal that preexisting law Supreme Court or Second Circuit cases foreshadowed a ruling on an issue").

To be sure, the availability of qualified immunity remains an open issue in this case. At trial, Willis will be at liberty to ask that, in the event of a plaintiff's verdict, the jury make factual findings germane to the existence of qualified immunity (*e.g.*, whether Ross resisted and, if so, in what manner), so as to enable a determination on a clear factual record as to whether the facts justified Willis's use of a chemical agent. *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) (where factual disputes preclude "early disposition of the [qualified immunity] defense, the jury should decide these issues on special interrogatories"); *see also Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

## B. Failure to Intervene

George and Genoves next pursue summary judgment on Ross's § 1983 claim against them for failure to intervene to stop Willis from engaging in excessive force towards him.

### 1. Legal Standards

 **\*15** An officer can be held liable under § 1983 for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 102 of 158
Ross v. Willis, Not Reported in Fed. Supp. (2021)
2021 WL 3500163

A plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation. *Wieder v. City of New York*, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims are properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."). "[F]or liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

### 2. Application

Because the Court has denied summary judgment as to the underlying excessive force claim, George and Genoves are not entitled to summary judgment on the basis that there was no underlying constitutional violation. However, George and Genoves may still be entitled to summary judgment if (1) they did not have reason to know that Willis would use force, or (2) there was no realistic opportunity for them to intervene to prevent Willis's deployment of the pepper spray.

Whether the officer had a realistic chance to intervene "is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (cleaned up). "[T]he question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). The duration of the allegedly unconstitutional conduct "will always be relevant and will frequently assume great importance." *Id.*

The audio of the video reveals that Willis's pepper-spraying of Ross lasted, at most, two seconds. *See* Video at 1:30–1:31. The short duration of the spraying suggests that, once Willis started spraying Ross, George or Genoves would not have had a realistic opportunity to intervene to curb the spraying. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (officers did not have realistic opportunity to intervene where three blows were struck in rapid succession). And Ross does not argue otherwise. Rather, he contends that George and Genoves had approximately 10 seconds between the point at which Willis warned Ross that he would be sprayed if he did not leave his cell and the point at which Willis began to spray. Ross Opp'n at 44–46. For their part, George and Genoves argue that they did not have reason to know that Willis would

use force, and, in any event, that they believed, mistakenly but in good faith, that Willis would not do so, entitling them to qualified immunity. *See* CO Mem. at 7–9; CO Reply at 5–8.

Although these arguments have potential to prevail at trial, defendants have not carried their burden on summary judgment. As Ross notes, there are a number of undisputed facts from which a reasonable jury could—but would not be required to—conclude that George and Genoves should have known that Willis was going to use allegedly excessive force.

At the outset, as the video shows, George and Genoves were positioned close to Willis and to Ross's bed. Willis testified that either George or Genoves obeyed his order to grab Ross, Willis Tr. at 89. This suggests that the officers were close enough to be able to communicate with one another. Accordingly, a reasonable juror could conclude that George or Genoves were in easy reach of Willis and physically capable of stopping him from spraying Ross.

**\*16** The focus of George and Genoves's argument is instead that they did not have reason to know in advance that Willis would spray Ross. *See* CO Mem. at 6–8; CO Reply at 5. Willis issued a warning that if Ross did not leave his cell, force would be used, thus conditioning the use of force on Ross's continued non-compliance. George and Genoves argue thus they are the prototypical officers who did not have "reason to know that [excessive force] [would] be used." *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). It is also possible, they note, that Willis might have reconsidered the use of force. They point to this testimony from George:

> Q: Did you have any reason to think that Captain Willis was not going to follow through on using the chemical agent?
>
> A: Sometimes— ... sometimes—sometimes an officer says I'm—I'm a spray you, and the inmate complies, he don't spray him, so it's 50/50 in a situation like that.
>
> Q: But if—if Mr. Ross didn't comply, did you have any reason to think that Captain Willis wasn't actually going to use the chemical agent?
>
> A: I don't—I mean, can you say that one more time?
>
> Q: Yeah. In the moment when you were inside the cell with Mr. Ross and you heard Captain Willis say I'm going to spray you if you don't comply, did you have any reason to think that Captain Willis would not actually use the spray if Mr. Ross didn't comply?

Case 5:24-cv-01391-BKS-MJK   Document 5   Filed 12/11/24   Page 103 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

A: Yes, because sometimes they don't use the spray and they just say I'm going to use spray and then the inmate do comply.

Q: But I'm asking you for the situation when the inmate doesn't comply. In that situation, do they follow through and use the spray?

A: It depends on the person. Sometimes they do, sometimes they don't.

George Tr. at 146–47. On this basis, George and Genoves argue that, notwithstanding Willis's explicit advance warning that he would use force if Ross did not leave his cell, it was possible that Willis would decide not to do so, and thus they could not have known that he would use force. They note that had Ross complied, or had Willis abandoned his stated intention to use force, force would not have been used.

Defendants do not, however, point to any authority that makes it a condition for liability for failure to intervene in advance to stop a constitutional violation that the defendant have been certain (here, the use of unjustified force) would occur. For this thesis, defendants cite only one case, *Henry v. Dinelle*, No. 10 Civ. 0456 (GTS) (DEP), 2011 WL 5975027 (N.D.N.Y. Nov. 29, 2011). There, an inmate was punched and kicked by officers while leaving the infirmary. *Id.* at *1. Although few factual details are recounted, the *Henry* court explained that "Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by [a defendant]) that [one of the defendants] punched him one time with a 'closed fist' in the side of his nose, causing him to immediately fall to the ground." *Id.* at *9. Accordingly, the court concluded, "a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in [defendant's] position to expect." *Id.* [14] But *Henry*, by its terms, does not require complete certainty that excessive force would be used; it merely held that, on the facts, it was "too uncertain" to anticipate a fellow officer's use of force to hold the accompanying officers liable for failure to intervene. Here, in contrast, Willis's words to Ross set out a one-factor precondition for the use of the pepper spray: that Ross fail to leave his cell. A reasonable juror could conclude that, with Ross remaining stationary if not immobile, George and Genoves had ample notice that Willis —if not stopped by his fellow officers—would pepper-spray Ross, as he had promised.

[14]  Ross notes that in *Henry*, the docket reflects that the plaintiff testified that the defendant officer told him, "We're going to give you one more chance. You're not listening. We're going to f *** you up." Ross Opp'n at 43 (quoting *Henry*, No. 10 Civ. 0456, Dkt. 24-4 at 97–99 (N.D.N.Y. Dec. 21, 2010).

**\*17**  Defendants next argue that Ross has not pointed to any precedent that holds that a 10-second window is sufficient to give an officer a realistic opportunity to intervene. CO Reply at 6. But that is a factual question—and a distinctly case-specific one at that. Indeed, the Second Circuit has rejected a rule holding that a span of fewer than 30 seconds does not give officers a realistic opportunity to intervene. *See Figueroa, 825 F.3d at 107* ("But this does not permit distillation of a hard-and-fast temporal cutoff of the kind relied on by the District Court."). Here, on their summary judgment motion, the burden is on George and Genoves to demonstrate that the evidence would not permit a rational trier of fact to find that 10 seconds notice gave them sufficient opportunity to intervene. They have not done so. On the contrary, the video, showing the close proximity of these two officers to Willis, would give a jury a solid factual basis on which to find a realistic opportunity—on recognizing that Ross, if still in bed, would imminently be pepper-sprayed—to intervene.

Accordingly, the Court denies George and Genoves's motion for summary judgment on Ross's failure-to-intervene claim. [15]

[15]  Ross argues, in the alternative, that a reasonable jury could find George and Genoves liable for direct participation in the use of excessive force. *See* Ross Opp'n at 47. "It is axiomatic that claims under § 1983 for use of excessive force or failure to intervene require personal involvement to trigger liability." *Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020) (summary order). A plaintiff can establish personal involvement either through direct participation or failure to intervene. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004).

Ross, however, has not pointed to any facts supporting that George or Genoves directly participated in Willis's use of pepper spray. Ross notes that the officers stood at the threshold of his cell as Willis engaged with Ross, and did not notify medical or mental health services before or during the spraying. *See* Ross Opp'n at 48. But that

Case 5:24-cv-01391-BKS-MJK Document 5 Filed 12/11/24 Page 104 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

conduct does not establish direct participation. *Cf. Terebesi, 764 F.3d at 236 n.19* (officer could be held liable as a direct participant despite not throwing grenades into a house, where he "broke a window at the rear of the house and separated the curtains in order to allow the other officers to toss in their grenades"). To the extent Ross would premise § 1983 liability on the part of George and Genoves based on direct participation, as opposed to a failure to intervene, the record does not make such claims viable.

### C. Deliberate Indifference

All three defendants, finally, move for summary judgment on Ross's claims of deliberate indifference.

### 1. Legal Standards

It is well settled that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983." *Estelle v. Gamble, 429 U.S. 97, 105 (1976).* To establish such a claim, a plaintiff must show, first, that the injury or illness constituted a "serious medical condition." *Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).* A "serious medical condition" is generally understood to be "one that may produce death, degeneration, or extreme pain." *Holmes v. City of New York, No. 17 Civ. 3874 (WHP), 2018 WL 4211311, at \*6 (S.D.N.Y. Sept. 4, 2018).* Next, the plaintiff must demonstrate that the defendant acted with deliberate indifference towards that medical condition, so as either to cause it or expose the plaintiff to risk from it. *Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003).* To establish deliberate indifference under the Fourteenth Amendment,

> The plaintiff must show only that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety ....

*D.K. by L.K. v. Teams, 260 F. Supp. 3d 334, 354–55 (S.D.N.Y. 2017)* (quoting *Darnell v. Pinerio, 849 F.3d 17, 35 (2d Cir. 2017)*).

**\*18** Evidence of a defendant's "mere negligence is insufficient" for a plaintiff to succeed on a deliberate indifference claim. *House v. City of New York, 2020 WL 6891830 (PAE),* at \*14 (S.D.N.Y. Nov. 24, 2020). And the determinations about "[w]hether the [defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Washington v. O'Mahony, No. 16 Civ. 9546 (ER), 2020 WL 1285851, at \*5 (S.D.N.Y. Mar. 18, 2020)* (citing *Farmer v. Brennan, 511 U.S. 825, 842 (1994)*).

Importantly, these elements differ from deliberate indifference claims arising under the Eighth Amendment. The Second Circuit, in *Darnell, supra,* held that it is no longer required that a plaintiff bringing a claim based on the Fourteenth Amendment establish the officer's subjective intent. *849 F.3d at 35* (citing *Kingsley,* and holding that "the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.").

### 2. Application

Viewing the facts in the light most favorable to him, Ross has not raised a genuine dispute as to whether Willis's actions with respect to his medical history were anything worse than negligent. It is undisputed that Willis was unaware of Ross's medical history or history of asthma. JSF ¶ 36. And probe teams are generally not informed about patients' medical conditions. *See* Stukes Tr. at 158–59.

Furthermore, Ross admitted that it "slipped [his] mind" to inform Willis and the rest of the probe team, before he was pepper-sprayed, that he was asthmatic. Ross Tr. at 185. Rather, as the video reflects, Ross first told Willis and the probe team that he was asthmatic approximately 25 seconds after being sprayed. Video Tr. at 1:58; JSF ¶ 46. Although captains like Willis can request and in non-emergency anticipated-use-of-force scenarios should request, contraindicators to chemical agents, Stukes Tr. at 24, 116–18, 168–69, and although Willis should have requested

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 105 of 158

Ross v. Willis, Not Reported in Fed. Supp. (2021)

2021 WL 3500163

contraindicators before spraying Ross, Ross has not alleged any facts to suggest that Willis's actions rise to the necessary level of objective recklessness.

Ross also fails to adduce evidence permitting the conclusion that Willis knew or should have known that deploying pepper spray to Ross's face risked imposing a "serious medical condition." Once Willis's unawareness of Ross's medical condition is taken into account, the case law and the facts disfavor this claim. Although there is "no 'static test' to determine whether a deprivation [or medical condition] is sufficiently serious," *McNair v. Ponte*, No. 16 Civ. 1722 (LAP), 2019 WL 1428349, at *12 (S.D.N.Y. Mar. 29, 2019), "courts within this Circuit have previously found that the temporary discomfort caused by pepper spray or mace does not constitute a 'sufficiently serious' injury" within the meaning of deliberate indifference, *Lewis*, 2014 WL 1364934, at *7 (citations omitted); *Johnson v. Schiff*, No. 17 Civ. 8000 (KMK), 2019 WL 4688542, at *14 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (If a plaintiff "does not allege facts suggesting that he suffered permanent effects or serious injury from [ ] pepper spray," then he has failed to allege any factual dispute regarding a "serious medical condition" produced by the deploying of the pepper spray.). Indeed, in *Lewis*, where the record supported that the defendant knew of the plaintiff's asthma, the court dismissed a deliberate indifference claim predicated solely on the use of OC gel because being asthmatic was not, by itself, a sufficiently serious condition. 2014 WL 1364934, at *7; *see also Patterson v. Lilley*, No. 02 Civ. 6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003) ("Being an asthmatic ... is not a condition ... that is severe or 'sufficiently serious.' "); *Paschal-Barros v. Balatka*, No. 18 Civ. 2021 (VLB), 2020 WL 5230994, at *5 (D. Conn. Sept. 1, 2020) ("Courts within the Second Circuit have held that the fact that an inmate is asthmatic does not, by definition, constitute a serious medical need.") (collecting cases)).[16] The Court in *Lewis*, however, sustained the plaintiff's deliberate indifference claim based on his suffering an asthma attack in the defendant's presence because there were "genuine issues of material fact as to whether Plaintiff actually was experiencing an asthma attack while in pretrial detention" and at the time the gel was deployed. 2014 WL 1364934, at *7; *see also Patterson*, 2003 WL 21507345, at *4 ("The existence of the condition is distinct from the situation in which an inmate is suffering an actual attack.").

[16]    The claims in *Patterson* and *Paschal-Barros* were brought under the Eighth Amendment, and the claim in *Lewis* was brought under the Fourteenth Amendment before the decision in *Darnell*. But the standards for a "serious medical condition" are the same under the two amendments, and *Darnell* did not disturb this aspect of the analysis.

**\*19** Here, as noted, Ross has not pointed to any evidence that he was exhibiting any asthma symptoms at the time the spray was deployed or that he, by then, had informed the officers of his asthma or breathing troubles. It is clear that being pepper sprayed in the face caused Ross great deal discomfort and pain. *See* Video at 2:31–3:31 (showing Ross began gasping for air as he was escorted from his cell); *id.* at 3:44–49, 4:08 (Ross telling officers, "I can't breathe. I can't breathe."); Ross Tr. at 70–71, 116 (Ross testifying that his symptoms were similar to those he experiences during an attack); JSF ¶¶ 50–51 (Ross had to be lifted onto a gurney and wheeled to intake); Video at 6:15 (showing Ross shaking and coughing on gurney in intake area). Had the officers thereafter denied Ross adequate care in response to these exhibited symptoms, or deployed the agent after Ross began to manifest them, Ross would have a viable basis to claim that Willis's spraying occurred in the face of a known sufficiently serious condition. But Ross does not point to such evidence. *See* Ross Opp'n at 32–36. Accordingly, his deliberate indifference claim against Willis based on the deployment of the pepper spray must be dismissed.

In any event, Willis would be entitled to qualified immunity because his conduct with respect to ascertaining Willis's medical condition did not violate a clearly established statutory or constitutional right. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Ross's theory is that "a reasonable officer should have known about Mr. Ross's medical condition before using MK-9 on him" because "DOC policies ... required officers to check an inmate's contraindications prior to deploying chemical agent in non-emergency anticipated-use-of-force scenarios." Ross Opp'n at 35. Ross's claim thus effectively treats the DOC policies as coextensive with his § 1983 claim for deliberate indifference, such that failure to comply with the policy establishes the requisite knowledge on Willis's part. And because Willis failed to comply with the policies and thereby was unaware of Ross's particular medical vulnerabilities, Ross argues, his decision to pepper spray Ross was objectively reckless and a violation of Ross's clearly established statutory or constitutional rights. *Id.*

The DOC policies on which this argument rests, however, do not provide Ross with a clearly established statutory or

**Ross v. Willis, Not Reported in Fed. Supp. (2021)**

Case 5:24-cv-01391-BKS-MJK  Document 5  Filed 12/11/24  Page 106 of 158

2021 WL 3500163

constitutional right. *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) ("[A] prison regulation primarily designed to guide correctional officials in the administration of a prison" is "not designed to confer rights on inmates."). And Ross has not cited a clearly established constitutional or statutory right to have an officer in the circumstances presented ascertain the inmate's medical profile before commencing pepper-spraying. Thus, once the DOC policies are put aside, Willis is entitled to qualified immunity on this claim. *See Quinones*, 2020 WL 6420181, at *5 (quoting *Wesby*, 138 S. Ct. at 589).

It follows that the deliberate indifference claims against George and Genoves, whether based on a theory of direct participation or a theory of failure to intervene to prevent a § 1983 violation by Willis, [17] also fail. Ross has not adduced evidence that either of these officers, any more than Willis, knew of Ross's medical condition prior to Willis's pepper-spraying. [18]

[17]    *See Thawney v. City of New York*, No. 17 Civ. 1881 (PAE), 2018 WL 4935844, at *4 (S.D.N.Y. Oct. 11, 2018) ("It is well established that an officer acts with deliberate indifference if he is aware of an attack, has an opportunity to protect the inmate, and does not intervene."); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect

the inmate without risk to himself, yet fails to intervene." (cleaned up)).

[18]    In light of this ruling, the Court has no occasion to entertain defendants' belated argument that Ross's *pro se* complaint should not be read to encompass a deliberate indifference claim. *See* Willis Mem. at 22; CO Mem. at 19.

## CONCLUSION

**\*20**  For the foregoing reasons, the Court denies defendants' motion for summary judgment on Ross's excessive force and failure to intervene claims, and grants defendant's motion as to the deliberate indifference claims. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 146 and 149.

Barring settlement, the case will now proceed to a jury trial. Counsel are directed promptly to meet and confer to discuss potential settlement. If a stipulation of discontinuance has not by then been submitted, the parties are directed, by four weeks from this decision, to submit a joint pretrial order, consistent with the Court's Individual Rules.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2021 WL 3500163

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2024 Thomson Reuters. No claim to original U.S. Government Works.   17

Arminio v. Holder, Not Reported in Fed. Supp. (2019)
2019 WL 176804
Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 107 of 158

2019 WL 176804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Thomas ARMINIO, Plaintiff,
v.
Lysonia HOLDER, Defendant.

No. 15 Civ. 5812 (NSR)
|
Signed 01/11/2019

**Attorneys and Law Firms**

James Michael Lenihan, Lenihan & Associates, LLC, White Plains, NY, for Plaintiff.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendant.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Thomas Arminio brings this action against Defendant Lysonia Holder. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201 and compensatory and punitive damages for violations of his civil rights under 42 U.S.C. § 1983. Plaintiff's Amended Complaint asserts claims of excessive force and failure to intervene to prevent the alleged use of excessive force against Defendant Holder under the Fourth Amendment of the United States Constitution.

Presently before this Court is Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the motion for summary judgment is GRANTED.

**BACKGROUND**

The following facts are drawn from the parties' 56.1 submissions and the record, and they are undisputed unless otherwise noted.

On July 27, 2012, Plaintiff Thomas Arminio was involved in a motor vehicle accident at the Route 202 Hess gas station in Cortland, New York. (Pl.'s 56.1 ¶ 3, ECF No. 45.) Defendant

Holder arrived at the scene and directed Plaintiff and the other individual involved in the accident, Alison Johnson, to park towards the west side of the gas station. (*Id.* ¶ 5.) Defendant separated Plaintiff and Ms. Johnson while she processed paperwork from the accident. (*Id.* ¶ 6.) While Defendant was in her vehicle working on paperwork from the accident, Plaintiff approached her to request that she "hurry up this process and get [him] out of here." (*Id.* ¶ 8); (Arminio Dep. 129:18 – 21.) When walking back to his vehicle after speaking with Defendant, Plaintiff either fell or sat down on the ground briefly because he felt unwell. [1] (Pl.'s 56.1 ¶ 10.) Defendant observed Plaintiff's behavior and called for backup and medical assistance for Plaintiff. (*Id.* ¶ 12.) Troopers Zerrle and Fontanelli, both male, were among the responding emergency personnel. (*Id.* ¶ 14.) At some point, Trooper Fontanelli observed a knife in the front console area of Plaintiff's vehicle and communicated this information to Defendant and Trooper Zerrle. (*Id.* ¶ 15 – 17); (Arminio Dep. 83:2 – 84:12.)

[1] Plaintiff states that he "sat down on the ground next to his car for a second to collect himself and got up and got back in his car." (Pl.'s 56.1 ¶ 10.) From Defendant's perspective, Plaintiff fell when he was walking back from her car. (Def.'s 56.1 ¶ 10, ECF No. 39.)

After Defendant called for backup, Plaintiff's son, Thomas Arminio, Jr., arrived at the scene. (*Id.* ¶ 18.) Defendant stepped several yards away from Plaintiff and Plaintiff's vehicle in order to accompany Plaintiff's son to his vehicle so she could verify the validity of his driver's license. (*Id.* ¶¶ 19, 30.) Troopers Zerrle and Fontanelli remained with Plaintiff who was still in his vehicle. (*Id.* ¶ 20.) At some point, Plaintiff chose to exit his vehicle, and Troopers Zerrle and Fontanelli began approaching Plaintiff. (*Id.* ¶ 22.) Plaintiff then "quickly attempted to re-enter his vehicle." (*Id.* ¶ 23.) One of the troopers grabbed Plaintiff and attempted to pull him out of his vehicle. (*Id.* ¶ 25.) Plaintiff resisted the troopers and attempted to grab onto the vehicle's door handle and steering wheel. (*Id.* ¶ 26.) Troopers removed Plaintiff from his vehicle after a few seconds and the troopers took Plaintiff towards the back of Plaintiff's vehicle. (*Id.* ¶¶ 26 – 27.) Within a second of reaching the back of the car, Plaintiff and the troopers "ended up on the ground." (*Id.* ¶¶ 28 – 29.) During these incidents, Defendant was still several yards away with Plaintiff's son. (*Id.* ¶ 30.) At some point, Defendant approached the Plaintiff and the troopers. (Arminio Jr. ("Junior") Dep. 59:11 – 14); (Holder Dep. 181:2 – 6.) Plaintiff was handcuffed and the

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 108 of 158

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

troopers then placed Plaintiff in a sitting position. (*Id.* ¶¶ 33, 35.) From the time Plaintiff was "placed on the ground until the handcuffs were applied took a matter of seconds." (*Id.* ¶ 34.) Plaintiff began to complain that his left arm was hurt or broken, and he was transported to a local hospital for treatment. (*Id.* ¶¶ 36, 39.) After an inventory search, two knives were discovered in Plaintiff's car. (*Id.* ¶ 44.) A blood test performed at the hospital later that day revealed that there was THC or cannabinoids substances in Plaintiff's system. (*Id.* ¶ 43.)

**\*2** On January 20, 2016, Defendant moved to dismiss Plaintiff's Amended Complaint. (ECF No. 14.) The Court granted the motion to dismiss Plaintiff's claims under the New York Constitution for lack of subject matter jurisdiction and dismissed Plaintiff's claims against two John Doe defendants as barred by the statute of limitations. *Arminio v. Holder*, No. 15-CV-5812(NSR), 2016 WL 4154893, at *1 n.1, 8 (S.D.N.Y. 2016). However, Plaintiff's § 1983 claims against Defendant survived the motion to dismiss. *Id.* at *8.

### LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] ... affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence [in] support" of such a contention. Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)* (quotations and citations omitted).

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a motion for summary judgment should fail. *Id.* at 258. Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quotations and citations omitted). The party asserting that a fact is genuinely disputed must support

their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotations and citations omitted). Similarly, "a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ) (noting that such affidavits "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"). But the mere fact that a non-movant's factual allegations in opposition are "self-serving" does not automatically render them insufficient to defeat summary judgment. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). Instead, summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," where "that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**\*3** In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. Anderson, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. If the Court finds that one party to a case has "no real support for its version of the facts," a motion for summary judgment should be granted. *Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962).

### DISCUSSION

#### I. Compliance with local rules

In her reply in further support of the motion for summary judgment, Defendant argues that her motion should be deemed unopposed because Plaintiff failed to comply with local rules and the rules of this Court. Specifically, Plaintiff did not serve a memorandum of law in opposition but only a declaration in opposition and Plaintiff submitted entire

Case 5:24-cv-01391-BKS-MJK   Document 5   Filed 12/11/24   Page 109 of 158

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

transcripts from depositions taken in this case. Loc. Civ. R. 7.1(b); Individual Practices R. 3(G)(iv). District courts have broad discretion to decide whether to penalize a party for failure to comply with local rules. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 – 74 (2d Cir. 2001). If a court elects to disregard Plaintiff's submissions for lack of compliance with its local rules, the court must still determine whether Defendant has met the burden of establishing the absence of any genuine issue of material fact. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 453 (S.D.N.Y. 2005).

While parties' compliance with the local rules is an important part of ensuring the efficient operation of the courts, the resolution of genuine disputes on their merits where possible is also significant. *Holford USA Ltd., Inc. v. Harvey*, 169 F.R.D. 41, 44 (S.D.N.Y. 1996) (citing *Traguth v. Zuck*, 710 F.2d 90, 94 (2d Cir. 1983) ). Parties depend on the court's careful consideration of each side of a case and on their counsel to comply with all procedural rules, including the local rules. Here, the violations of the local rules, while inconvenient, are not so grave as to prevent the Court from fully addressing both sides of a summary judgment analysis. Therefore, to avoid penalizing Plaintiff for the mistakes of his counsel, the court will consider Plaintiff's submissions. *Lorillard Tobacco Co.*, 378 F. Supp. 2d at 453 ("This Court endeavors to avoid penalizing parties harshly for the procedural errors of their attorneys; therefore, we will overlook the deficiencies of defendants' submission in opposition to the present motion.").

## II. Excessive force claims

Defendant asserts that she is entitled to summary judgment because there are no genuine disputes of material fact, and there is no evidence that Defendant used excessive force or failed to intervene in the use of excessive force by the troopers.

When considering excessive force claims under the Fourth Amendment, courts must "examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). Courts then "consider the *facts and circumstances* of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.*

In arguing that Defendant should be granted summary judgment for the excessive force and failure to intervene claims, Defendant asserts that she had no personal involvement in any use of force against Plaintiff. It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ). "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Russo v. DeMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) ).

### A. Direct participation

**\*4** Here, the excessive force occurred when the troopers extracted Plaintiff from his vehicle, brought him to the ground, and handcuffed him, which resulted in Plaintiff's broken arm. It is undisputed that Defendant did not participate in removing Plaintiff from the car or bringing him to the ground. (Arminio Dep. 203:12 – 17, 204:14 – 24); (Holder Dep. 177:9 – 12, 182:23 – 24, 183:1 – 8.) In fact, Defendant was with Plaintiff's son, yards away from Plaintiff's car. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27, ECF No. 41-1.) Once Plaintiff was on the ground, his "face was looking down into the ground" and he didn't "know who was doing what." (Arminio Dep. 250:4 – 9.) Plaintiff testified that at some point, Defendant rushed over to assist the troopers and that all three individuals, the troopers and Defendant, were on top of him when he was handcuffed, but Plaintiff could not identify the handcuffing officer, nor could Plaintiff testify as to what particular act Defendant undertook such that she applied excessive force upon Plaintiff (Arminio Dep. 203:18 – 22, 204:4 – 13, 248:13 – 25.) From the evidence in the record, no jury could reasonably conclude that Defendant handcuffed the Plaintiff or otherwise personally used excessive force against Plaintiff.

"[A]n arrestee's 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims.' " *Shankle v. Andreone*, No.06-CV-487(NG)(LB), 2009 WL 3111761, at \*5 (E.D.N.Y. Sept. 25, 2009) (quoting *Davis v. Callaway*, No. 05-CV-00127, 2007 WL 1079988, at \*8 (D. Conn. April 9, 2007) ); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) ("A plaintiff need not establish

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

who, among a group of officers, directly participated in the attack and who failed to intervene."). This is particularly true where, as here, the officers' alleged actions would have prevented the plaintiff from identifying which of the officers specifically engaged in the bad acts. *Shankle*, 2009 WL 3111761, at *5 (citing *Davis*, 2007 WL 1079988, at *9). In those cases, the burden shifts to each defendant to disprove his or her involvement. *Universal Calvary Church v. City of New York*, 99-CV-4606(RPP), 2000 WL 1538019, *63 (S.D.N.Y. Oct. 17, 2000). "To shift this burden, however, plaintiff must demonstrate first that *each* of the defendants acted tortiously." *Paul v. City of Rochester*, 452 F. Supp. 2d 223, 228 (W.D.N.Y. 2006). In *Paul*, the plaintiff brought a § 1983 action against several police officers for injuries he sustained during a search. The officers ordered the plaintiff to lie on his stomach, then one officer handcuffed his hands behind his back and then stepped on his knee and back. *Id.* at 227. While the conduct described by the plaintiff was objectively unreasonable, the court granted summary judgment for the defendants in part because the plaintiff could not show that each of the defendants acted tortiously. *Id.* at 227 – 28. The court granted summary judgment for similar reasons in *Hunter v. County of Orleans*. No. 12-CV-6173, 2013 WL 6081761, at *8 – 10 (W.D.N.Y. Nov. 19, 2013). In *Hunter*, the plaintiff alleged that four officers used excessive force when they pushed the front door of her residence open so hard that the door slammed into her and pushed her across the room and into the refrigerator. *Id.* at *1. The court granted summary judgment for the defendants because the plaintiff could not identify who pushed open the door, and "the evidentiary proof before the Court on this motion does not show that each defendant acted tortiously." *Id.* at *8.

Here, similar to *Paul* and *Hunter*, there is no evidence that Defendant used excessive force or otherwise acted unlawfully. Plaintiff himself states that he "got [his] arm broken and ... the crap beat [sic] out of [him] by "two cops," which indicates that only two out of the three involved officers acted tortiously. (Arminio Dep. 197:5 – 14.) Neither Plaintiff nor any other witness can identify who handcuffed Plaintiff or identify any use of excessive force or other tortious action by Defendant. (*Id.* 250:2 – 9; 252:18 – 24, 253:2 – 18); (Junior Dep. 64:9 – 12); (Holder Dep. 177:7 – 16); (Jackson Decl. ¶¶ 13 – 14, ECF No. 41-3); (Fontanelli Decl. ¶ 23, ECF No. 41-2.) [2] Plaintiff's son testified that a male officer, not Defendant, had his knee in Plaintiff's back and another officer twisted Plaintiff's arm to put on the handcuffs. (Junior Dep. 65:11 – 25, 66:2 – 7.) He did not recall what Defendant did when she went to assist the troopers after Plaintiff was on

the ground, and he also could not recall which officer placed the handcuffs on the Plaintiff. (*Id.* 63:20 – 24, 64:9 – 12.) Defendant, however, offers testimony from three individuals that a male officer handcuffed Plaintiff. [3] (Fontanelli Decl. ¶ 23); (Holder Dep. 177:7 – 16); (Loprieno Decl. ¶ 13, ECF No. 41-4.)

2       At most, Plaintiff testifies that Defendant "jumped on the pile after [they] were already down on the ground" and that he knows that Defendant joined the troopers because he felt her weight. (Arminio Dep. 204:17 – 24.) However, this alleged use of force is not objectively unreasonable in light of the circumstances, and based on the evidence no reasonable jury could conclude that Defendant simply decided to join the troopers in beating Plaintiff. See *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). At the time the troopers took Plaintiff to the ground, Defendant was yards away from Plaintiff with his son. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27.) Defendant knew that Plaintiff had at least one knife in his vehicle, and she saw the troopers struggling with Plaintiff right outside of his vehicle. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Holder Decl. ¶ 143:1 – 24.) It is objectively reasonable for an officer to intervene if she has reason to believe that an individual has a weapon. *Garcia v. Greco*, No. 05-CV-9587, 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010) (granting summary judgment because the defendant's use of force against the plaintiff, hitting the plaintiff with fists and radios, was objectively reasonable due to the defendant's "interest in preventing the escape of a gun-wielding fugitive, as well as his interest in the safety of his fellow officers"); *Hardy v. Plante*, No. 06-CV-687(LEK)(RFT), 2009 WL 249787, *6 – 7 (N.D.N.Y. Feb. 3, 2009) (holding that the defendants' use of a taser was objectively reasonable as a matter of law because the defendants had reason to believe that the plaintiff had a knife and because the plaintiff was struggling with the officers); *see also Salim v. Pronlx*, 93 F.3d 86, 92 (2d Cir. 1996) (holding that an officer who shot an individual during a struggle over the officer's weapon was entitled to qualified immunity in an excessive force action).

Case 5:24-cv-01391-BKS-MJK Document 5 Filed 12/11/24 Page 111 of 158

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

3    Plaintiff's son could not identify the gender or identity of the individual who handcuffed Plaintiff. (Junior Dep. 65:11 – 25,66:2 – 7.)

**\*5** Despite Plaintiff's speculative assertions, the record is devoid of any evidence from which a reasonable factfinder could find that Defendant used excessive force against Plaintiff. New York law enforcement officers, such as Defendant, have a sacred duty to uphold United States and New York law, and allegations of excessive force, so excessive as to break a plaintiff's arm, by an officer must be taken seriously. *See* N.Y. Const. art. XIII. However, where there is no evidence from which a reasonable jury could determine that an officer used excessive force, summary judgment must be granted on that claim. Here, at most, the evidence shows that Defendant joined the troopers once he was already on the ground.[4] (Junior Dep. 58:10 – 24, 59:2 – 20); (Holder Dep. 181:15 – 24.) This is insufficient to support a claim for excessive force.[5] Accordingly, Defendant's motion for summary judgment on Plaintiff's excessive force claim is granted. *See, e.g., Coleman v. Hauck*, No. 09–CV–1391(GTS)(GHL), 2012 WL 4480684, at \*9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied). *Konovalchuk v. Cerminaro*, 11-CV-1344(MAD/CFH), 2014 WL 272428, at \*14 (N.D.N.Y. Jan. 24, 2014) (granting summary judgment because the plaintiff's claim that the defendant participated in an assault was "speculative and conclusory" compared to the defendant's testimony that he was not present for the assault).

4    Parties dispute whether Defendant "jumped" onto the troopers and Plaintiff while they were on the ground. However, this is not a genuine dispute because no reasonable factfinder would find Plaintiff's account to be credible. *See Chapel Park Villa, Ltd. v. Travelers Ins. Co., Inc.*, 02-CV-407F, 2006 WL 2827867, at \*8 (W.D.N.Y. Sept. 29, 2006) (holding that no reasonable juror could find the plaintiff's account credible because the plaintiff's testimony was contradicted by other testimony and because there was no other direct evidence on the record to support the plaintiff's account). Plaintiff testifies that Defendant jumped on him, but he did not see her approaching him; he only felt

additional weight. (Arminio Dep. 204:17 – 24.) Plaintiff's son at one point referred to Defendant jumping on the troopers and Plaintiff, but when asked specifically what Defendant did when she arrived at the Plaintiff and troopers, he said, "I don't recall" and he was unable to provide any other details about her actions or movements. (Junior Dep. 63:14 – 24, 64:2 – 12.) Three other witnesses, not including Defendant, testified that Defendant never placed her hands on Plaintiff. (Loprieno Decl. ¶ 13); (Jackson Decl. ¶ 16.); (Fontanelli Decl. ¶ 26.) Because Plaintiff's version of events is only supported by his testimony and no other evidence on the record and is directly contradicted by testimony from three other individuals not including Defendant, no reasonable jury could decide that Plaintiff jumped on Defendant. There is no genuine dispute of material fact.

5    *See* n.2.

### *B. Failure to intercede*

Summary judgment must also be granted on Plaintiff's failure to intercede claim. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). For an officer to be held liable, she must have (1) actual knowledge of the use of excessive force by other officers, (2) had a realistic opportunity to intercede and prevent the harm from occurring, and (3) intentionally refused or failed to take reasonable measures to stop the use of excessive force. *Cicio v. Lamora*, No. 08-CV-431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Haralambous v. Hubbs*, No. 13-CV-1916(JCH), 2015 WL 3444328, at \*3 (D. Conn. May 28, 2015). Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable. *See Simon v. City of New York*, No. 09–CV–1302(ENV)(RER), 2011 WL 317975, at \*12 (E.D.N.Y. Jan. 3, 2011) (citing *Morgan v. County of Nassau*, 720 F. Supp. 2d 229, 240 (E.D.N.Y. 2010) ). Defendant argues that judgment should be granted in her favor as a matter of law because

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 112 of 158

Arminio v. Holder, Not Reported in Fed. Supp. (2019)

2019 WL 176804

she neither had actual knowledge that the troopers were using excessive force nor a realistic opportunity to intervene had she known that the troopers were using excessive force.

**\*6** As discussed above, the alleged excessive force occurred when Plaintiff was removed from the car, taken to the ground, and handcuffed. The parties do not dispute that Defendant and the troopers knew that Plaintiff had a knife and a tool resembling a knife in plain view in his car. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Pl.'s 56.1 ¶ 17.) They also do not dispute that Defendant was with Plaintiff's son and yards away from Plaintiff and Plaintiff's vehicle when the troopers removed Plaintiff from his car and brought him to the ground. (Junior Dep. 52:17 – 18, 58:17 – 19, 67:6 – 15); (Holder Decl. ¶ 27.) However, there is scant evidence from which a reasonable jury could find that Defendant, who was verifying Plaintiff's son's license, actually observed the alleged use of excessive force as they happened. (Arminio Dep. 179:15 – 25, 181:3 – 11.) Rather, it appears that Defendant merely observed that the troopers were physically struggling with an individual who had access to a knife and intervened to secure the safety of the scene. (Arminio Dep. 84:6 – 24, 85:14 – 16); (Junior Dep. 58:10 – 24, 59:2 – 20); (Holder Dep. 143:1 – 11, 167:6 – 18.) "Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference [to taking reasonable steps to intervene] sufficient to support liability for failure to intervene." *Demosthene v. City of New York*, No. 14-CV-816(SJ)(VMS), 2015 WL 5093116, at \*10 (E.D.N.Y. June 26, 2015) (internal quotation marks omitted) (quoting *Cicio v. Lamora*, No. 08-CV-431(GLS)(DEP), 2010 WL 1063875, at \*8 (N.D.N.Y. Feb. 24, 2010) ).

Assuming Defendant had actual knowledge of the use of excessive force, there is still no evidence to support a failure to intercede claim because there is no genuine dispute that the evidence shows that the alleged excessive force happened too quickly to allow Defendant a meaningful opportunity to intervene. Plaintiff's son testified that Defendant was behind him when he saw the troopers pull Plaintiff from the car, and that she had not made it to the troopers where Plaintiff was taken down. (Junior Dep. 59:6 – 18.) Both of those events happened in less than a handful of seconds. (*Id.* 57:3 – 4); (Arminio Dep. 194:15 – 25, 195:1 – 6); (Holder Decl. ¶ 35). Plaintiff's son testified that "it all happens so fast. I don't remember exactly who was where and doing what." (Junior Dep. 51:6 – 8.) Plaintiff also testified, "This happened so fast. So many things were going on at the same time." (Arminio Dep. 199:23 – 25, 200:2.) By the time Defendant approached the troopers and Plaintiff, they were essentially a pile on the

ground, and the handcuffing took place seconds after Plaintiff and the troopers were on the ground. (Arminio Dep. 204:17 – 24.) While officers must intervene when they see that other officers are using excessive force, *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), intervention takes time. On some occasions, as in this case, the seconds it takes for excessive force to occur are not enough to provide an officer with a realistic opportunity to intervene. The evidence shows that the events here occurred in such rapid succession, no reasonable jury could infer that Defendant could have intervened in sufficient time to prevent Plaintiff's injuries. *See Raffaele v. City of New York*, 242 F. Supp. 3d 152, 158, 161 (E.D.N.Y. 2017) (dismissing the plaintiff's failure to intercede claim because the three-second duration of the alleged excessive force was not sufficient time to intercede); *Haralambous*, 2015 WL 3444328, at \*5 (granting summary judgment for the defendants because, although they were at the scene when the alleged abuses occurred, no reasonable jury could infer that they had sufficient time to prevent another officer from pulling the plaintiff up from the ground by his handcuffs); *Wright v. City of Waterbury*, 07-CV-306(CFD), 2011 WL 1106217, at \*6 (D. Conn. Mar. 23, 2011) (granting summary judgment for the defendant on the plaintiff's claim that he failed to intervene in a beating because, although he was close to the assault, the blows were struck in such rapid succession that Plaintiff had no meaningful opportunity to intercede). [6]

[6]    Because Defendant's motion for summary judgment is granted, the Court will not address Defendant's qualified immunity argument. However, had Defendant not otherwise been entitled to summary judgment for other reasons, she would have been granted qualified immunity. *See Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

## CONCLUSION

**\*7** For the foregoing reasons, Defendant Holder's motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 38 and to close the case.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2019 WL 176804

**Arminio v. Holder, Not Reported in Fed. Supp. (2019)**
Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 113 of 158
2019 WL 176804

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 114 of 158
Sachs v. Cantwell, Not Reported in F.Supp.2d (2012)
2012 WL 3822220

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by   Boccio v. Costco Wholesale Corporation,   E.D.N.Y.,
March 30, 2022

2012 WL 3822220
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jennifer SACHS, Plaintiff,
v.
William CANTWELL, et al., Defendants.

No. 10 Civ. 1663(JPO).
|
Sept. 4, 2012.

*MEMORANDUM OPINION AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** Plaintiff Jennifer Sachs ("Plaintiff") filed this lawsuit asserting various claims arising out of an incident that occurred in March 2009 at the bar of Wollensky's Grill in Manhattan. Plaintiff brings suit against the City of New York, Police Officer William Cantwell, Police Officer Joseph Musa, Police Officer Alexandra Paquette, and John Doe Police Officers # 1–3 (collectively, the "City Defendants"); and against Patrick Ford, Aaron Sagendorf, John Doe # 4 (referred to by the parties as "Mike"), Smith & Wollensky Operating Corporation ("S & W Operating"), and Fourth Wall Restaurants, LLC ("Fourth Wall") (collectively, the "Private Defendants").

Plaintiff asserts the following claims against the City Defendants: constitutional claims under 28 U.S.C. § 1983 against all of the City Defendants for false arrest, malicious prosecution, and excessive use of force in violation of her constitutional rights; state law assault and battery claims against Officer Musa for using excessive force during Plaintiff's arrest; state law false arrest claims against Officer Cantwell, Officer Musa, and John Doe Officers # 1–3; state law malicious prosecution claims against all of the Defendant Police Officers; and a *Monell* claim against the City of New York.

Plaintiff asserts the following claims against the Private Defendants: assault and battery claims against Defendants

Sagendorf, John Doe # 4 ("Mike"), S & W Operating, and Fourth Wall; malicious prosecution claims against all of the Private Defendants; and negligent retention claims against S & W Operating and Fourth Wall.

The City Defendants and the Private Defendants have each collectively moved for summary judgment on all claims against them. (Dkt.Nos.88, 94.)

Plaintiff has moved for sanctions based on the alleged spoliation of evidence on the part of the Private Defendants and City Defendants Officers Cantwell, Musa, and Paquette. (Dkt. No. 77.) Both sets of defendants have opposed her motion.

For the reasons set forth below, the Court denies Plaintiff's motion for spoliation of evidence sanctions. The Court denies summary judgment on Plaintiff's assault and battery and excessive use of force claims against City Defendant Officer Musa (both under state law and under § 1983) and Plaintiff's state law assault and battery claims against Private Defendants Sagendorf, S & W Operating, and Fourth Wall. The Court dismisses the claims against John Doe Officers # 1–3 and against John Doe # 4. The Court grants summary judgment to the defendants on all other claims.

## I. Background

### A. Facts [1]

[1]     The following facts are drawn from the parties' statements of undisputed facts and other submissions filed in connection with the motions for summary judgment.

The case before the Court stems from an altercation that occurred on the night of March 2–3, 2009 at Wollensky's Grill ("Wollensky's"), located at East 49th Street and Third Avenue, New York, New York. (Complaint, Dkt. No. 1, ("Compl.") at 1.) That evening, Plaintiff Jennifer Sachs was a patron of the bar at Wollensky's. (Private Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 100, ("Private Defs. 56 .1 Stmt.") ¶ 4.) Defendant Smith & Wollensky Operating Corporation ("S & W Operating") owns Wollensky's and Defendant Fourth Wall Restaurants, LLC ("Fourth Wall") manages and employs those who work there. Defendant Aaron Sagendorf was employed by Fourth Wall as a manager at Wollensky's and Defendant Patrick Ford was employed by Fourth Wall as a bartender at Wollensky's. (*Id.* at ¶¶ 2–3.)

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 115 of 158
Sachs v. Cantwell, Not Reported in F.Supp.2d (2012)

2012 WL 3822220

**\*2** The exact relationship among Wollensky's, S & W Operating, Fourth Wall, and the Private Defendant employees is unclear from the record. The Private Defendants contend that S & W Operating "does not employ or supervise" Sagendorf or Ford, and that they are employed only by Fourth Wall. (*Id.*¶ 1.) However, there is no dispute that Fourth Wall is S & W Operating's agent for the purposes of running Wollensky's.

### 1. The Dispute Between Plaintiff and Defendant Ford

Sachs arrived at the bar at about 12:30 a.m. on March 3, 2009. While at the bar, Ford served Sachs one or two glasses of wine. Sachs asserts that she had nothing else to drink that night besides the two glasses of wine. (Declaration of Steve Stavridis in Support of Motion for Summary Judgment ("Stavridis Dec."), Ex. K, Deposition of Jennifer Sachs, Dkt. No. 92, ("Sachs Dep.") at 160.) Sachs claims that the altercation began when Ford propositioned her, and she refused. (Compl.¶¶ 24–26.) Ford asserts that the altercation began when he cut her off from further drinking. (Affidavit of John Mulcahy in Support of Motion for Summary Judgment, Dkt. No. 95 ("Mulcahy Aff."), Ex. F ("Ford Dep.") at 26.) Neither side disputes that just before 1:30 a.m., Plaintiff angrily threw a glass water pitcher at Ford, which subsequently broke into pieces behind the bar.[2] (City Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, Dkt. No. 91, ("City Defs. 56.1 Stmt.") ¶¶ 10–11.) Ford contends that the pitcher hit him in the side of the head and bounced off, but Plaintiff disputes that the pitcher ever hit Ford. (Ford Dep. at 26, 29; Plaintiff's Rule 56.1 Statement in Opposition to City of New York et al. Motion to Dismiss, Dkt. No. 112, ("Pl. 56.1 Resp.—City Defs.") ¶¶ 10–11.)

[2]      In a later submission to the Court after the motions were fully briefed, Plaintiff denied for the first time that she threw a pitcher at all, and stated that "S & W doesn't even serve pitchers to its [ ] patrons." (Dkt. No. 134 at 26.) However, the Court does not find this (unsworn) statement credible or supported by the evidence in the record.

The parties disagree sharply as to what happened next.

### 2. The Dispute Between Plaintiff and Defendant Sagendorf

#### a. Plaintiff's Version

Plaintiff alleges that after throwing the pitcher, she walked to the door of Wollensky's and opened it. At that point, Sagendorf and a patron named "Mike"[3] grabbed her and pulled her back inside the vestibule of the restaurant. She claims that they then pushed, pulled, and scratched her and slammed down her hand when she used her cell phone to dial 911. Plaintiff successfully dialed 911 shortly after 1:30 a.m. Plaintiff claims that at that point either Sagendorf or Mike knocked Plaintiff on the head, throwing her to the ground, where she blacked out. At around 1:34 a.m., Sachs alleges that she lay on the ground in the vestibule while Mike punched her hand and shouted "you fucking Jew" at her. (Compl.¶ 32.)

[3]      Plaintiff claims that "Mike" is the name of the bar patron who assaulted her, and believes that Wollensky's or its employees know who he is or have information that could help identify him. Sagendorf asserts that he does not know the patron. Plaintiff asserts that in the tape of her 911 call, she can hear Sagendorf shouting "Mike! Mike! Stay on your knees!" (Plaintiff's Memorandum in Support of Motion for Spoliation of Evidence, Dkt. No. 78 ("Pl.Spol.Mem."), Ex. L, Jennifer Sachs Affidavit.)

#### b. The Private Defendants' Version

The Private Defendants present a very different description of the course of events. Sagendorf asserts that after hearing the pitcher break, he turned to find Plaintiff raising her wine glass as if to throw it at Ford. (Stavridis Dec., Ex. M ("Sagendorf Dep."), at 33.) Sagendorf approached Plaintiff, asked her to leave, and held her by the shoulder to escort her to the vestibule exit. Sagendorf asserts that, once in the vestibule, Plaintiff began assaulting him by striking him in the face with her open hand and kicking him in the groin. (Sagendorf Dep. at 34–38.) To avoid being kicked, Sagendorf contends that he grabbed Plaintiff's kicking leg, at which time Plaintiff fell to the ground. Sagendorf then used his knee to pin her to the ground. (*Id.* at 38–39.)

**\*3** Police recordings show that at approximately 1:32 a.m., while on the ground being pinned down by Sagendorf, Plaintiff called 911. (Sagendorf Dep. at 39; City Defs. 56.1 Stmt. ¶ 5.) Sagendorf directed Ford also to call 911. According to the police records, Ford's call came in at 1:33 a.m.[4] (City Defs. 56.1 Stmt. ¶ 5.) Sagendorf asserts that after the call, he let Plaintiff stand up, but that when she tried to kick him again, he again caught her leg, causing

her to fall. He pinned her down the final time by sitting on her legs. (Sagendorf Dep. at 40.) At that time, Sagendorf says that a male patron entered the vestibule and helped him subdue Plaintiff by holding her wrists. (*Id.* at 47–48, 62–63.) Sagendorf admits that, in the course of restraining Plaintiff, he heard the patron call Sachs "a fucking Jew" more than once. Sagendorf states that he told the patron to leave at that point. (*Id.* at 92–94.) Sagendorf restrained Plaintiff until the police arrived.

4    In a subsequent submission to the Court, Plaintiff goes to great lengths to argue that the 911 calls were made at slightly different times. (*See* Dkt. No. 134.) The Court does not find Plaintiff's arguments persuasive, and, in any event, the precise order and timing of the phone calls is not material to the Court's analysis of the viability of Plaintiff's claims in light of the evidence in the record.

### 3. The Dispute Between Plaintiff and the Defendant Police Officers

The parties agree that as a result of the 911 calls, at around 1:34 a.m., Officers Cantwell, Paquette and Musa received a radio dispatch reporting a dispute in progress at Wollensky's. (Stavridis Dec., Ex. N, Declaration of William Cantwell ("Cantwell Dec."), ¶ 4; City Defs. 56.1 Stmt. ¶ 5.) Officer Cantwell arrived a minute or two before Officers Musa and Paquette, who arrived on the scene at approximately 1:35 a.m. (City Defs. 56.1 Stmt. ¶¶ 5, 7, 8; Stavridis Dec., Ex. N, Declaration of Alexandra Paquette ("Paquette Dec."), ¶ 5.) Plaintiff's recollection of her interactions with the officers sharply differs from the account of the City Defendants.

### a. Plaintiff's Version

Plaintiff alleges that around 1:35 a.m., Officer Cantwell and three other John Doe officers arrived and witnessed Mike beating her and calling her "a fucking Jew." (Compl.¶ 33.) Plaintiff contends that these officers did not intervene or speak to her at all. (*Id.*) When officers Musa and Paquette arrived a minute later, Plaintiff contends that they saw Mike and Sagendorf still on top of her. (Sachs Dep. at 147.) Plaintiff claims that upon Officer Cantwell's order to "book her," Officer Musa handcuffed Plaintiff's already-injured hands and wrists. (Compl.¶¶ 34–36.) Plaintiff alleges that Musa then took her outside Wollensky's, where she asked why she was being arrested. Musa told her to "shut up" and kicked the back of her knee to the ground, breaking her knee, and kicked her head. Plaintiff claims that she then blacked out again. (Compl.

¶¶ 37–38; Sachs Dep. at 153–157 .) She claims that when she regained consciousness at around 2:00 a.m., she was being taken into the Bellevue Hospital emergency room. (Compl. ¶ 40; Sachs Dep. at 158–160.)

### b. The Defendant Police Officers' Version

In contrast, Officer Cantwell contends that when he arrived, he saw Plaintiff on the ground being restrained by Sagendorf. It is undisputed that Sagendorf informed Cantwell that Plaintiff became rowdy after being cut off by the bartender and that he was trying to restrain her because she had become violent. (Sagendorf Dep. at 86; Cantwell Dec. ¶ 5.) Officers Musa and Paquette arrived moments later. Cantwell spent about ten minutes interviewing Ford, Sagendorf, and at least three patrons about the incident, and transferred his notes to Paquette. (Cantwell Dec. ¶ 7.) Cantwell's interviews with the patrons substantiated the descriptions of the events given by Ford and Sagendorf. (Paquette Dec. ¶ 8.) Cantwell then left the premises.

**\*4** Officers Musa and Paquette both spoke with Plaintiff and determined based on her belligerent demeanor and slurred speech that she was intoxicated. (Paquette Dec. ¶ 9; Stavridis Dec. Ex. N, Declaration of Joseph Musa ("Musa Dec."), ¶ 6.) The officers spoke with Ford and witnessed the broken glass from the pitcher. They also spoke with Sagendorf and observed a red mark on his face, which he stated was caused by Plaintiff's striking him. (Paquette Dec. ¶¶ 6–7; Musa Dec. ¶ 5.) Plaintiff told the officers that the staff and patrons had attacked her and called her a Jew. (Musa Dec. ¶ 6; Paquette Dec. ¶ 9.) The officers state that they observed no signs of assault on Plaintiff except that she complained that her left hand hurt, and that they could not ascertain a reason that the staff and patrons would have assaulted her. (*Id.*)

At around 1:55 a.m., Defendants Musa and Paquette made the decision to arrest Plaintiff. (City Defs. 56.1 Stmt. ¶ 19.) They placed her in handcuffs and escorted her to the police vehicle. Officers Musa and Paquette contend that, along the way, Plaintiff began screaming and kicking, making it necessary for each officer to restrain her by holding her arms on either side as they walked. (Paquette Dec. ¶ 11; Musa Dec. ¶ 8.) Officers Musa and Paquette assert that Plaintiff did not complain of tight handcuffs at any time. (Musa Dec. ¶ 8.) After placing Plaintiff in the vehicle, the two officers assert that Plaintiff attempted to kick out the rear windows. (Musa Dec. ¶ 9; Paquette Dec. ¶ 12.) Plaintiff was then transported to the police precinct for processing. (Paquette Dec. ¶ 12.) When Plaintiff complained of pain

in her left fingers, Paquette requested emergency medical services ("EMS") personnel to come to the precinct. EMS then transported Plaintiff to Bellevue Hospital at about 2:34 a.m. (Paquette Dec. ¶¶ 13–14.) After being dischargd from Bellevue Hospital at 4:30 a.m., Sachs was taken back to the precinct for arrest processing. (Paquette Dec. ¶ 15.)

### 4. The Hospital Visits

It is undisputed that on the night of the incident, Sachs was transported to Bellevue Hospital, where she was examined and treated for swelling and abrasions on her left hand. (Compl. ¶ 40; Sachs Dep. at 158–160; Paquette Dec. ¶¶ 13–14; Stavridis Dec. Ex. H.)

The day after the incident, March 4, 2009, Sachs went to Lenox Hill Hospital, where she was treated for a fractured patella. (Stavridis Dec., Ex. I.) However, the City Defendants' purported medical expert examined Plaintiff's medical record and formed a different medical opinion. Defendants' expert found that Sachs exhibited no signs of trauma to her kneecap and that the x-rays in fact reflect that the problems with her patella were congenital. (See Stavridis Dec., Ex. J, Expert Report by Dr. Ramesh Gidumal.)

### B. Procedural History

#### 1. Criminal Court Action

On the same day as her arrest, March 3, 2009, Jennifer Sachs was arraigned in New York City Criminal Court and charged with assault in the third degree and disorderly conduct. (Private Defs. 56.1 Stmt. ¶ 6.) Two days after the incident, Sagendorf went to the District Attorney's office, where he read the complaint and signed a supporting deposition. (Defendants' Memorandum in Opposition to Motion for Spoliation of Evidence, Dkt. No. 81 ("Private Defs. Spol. Opp."), Ex. G.)

**\*5** Both charges against Plaintiff were dismissed on August 24, 2009 pursuant to New York Criminal Procedure Law § 30.30, which mandates that the prosecutor be ready for trial in a class A misdemeanor case within 90 days of the commencement of the action. (Private Defs. 56.1 Stmt. ¶ 7)

#### 2. State Court Action

On March 10, 2009, Plaintiff filed in New York State Supreme Court a Request for Judicial Intervention, seeking an Order to show cause to obtain pre-action discovery.

Specifically, she sought an order directing Respondents Smith & Wollensky Restaurant/Wollensky's Grill and The Smith & Wollensky Restaurant Group, Inc. to "produce for inspection and copying any and all surveillance tapes and/or video tapes prepared in the regular course of business regarding the events" of the night of March 2–3 "in order to preserve evidence, to prevent spoliation, and in order to identify the appropriate individuals in order that petitioner might be able to prepare a proper caption in the event of litigation herein." (Pl.Spol.Mem., Ex. B.) The court issued an order to show cause why it should not order the respondents to produce these materials. (Id., Ex. A.) Sometime thereafter (although the record is not clear when) an attorney for the respondents submitted an affirmation in response to the order to show cause stating that "[t]he respondent has no opposition to the order sought by the petitioner regarding the preservation of any video from the security surveillance cameras ... assuming that any such video was in fact recorded on the day and at the time of the incident in question and, if any, was maintained as of March 17, 2009, the date that the Order to Show Cause was served upon the respondent." (Id., Ex. C.)

The court entered an order "on default" on July 16, 2009. (Id., Ex. F.) That order provided that the respondents should preserve "any and all surveillance tapes and/or videotapes" pertaining to the incident, as well as "any and all accident, incident reports, or other records identifying the individuals involved in the assault ... and any witnesses thereto .... " (Id.) On July 28, 2009, the parties entered into a stipulation stating that Smith & Wollensky Restaurant Group, Inc. would respond to the order within thirty days of the stipulation, and "as to those items where respondent is unable to comply, [would] submit an affidavit from an individual with knowledge to that effect." (Id., Ex. H.)

Sometime after September 2, 2009, the respondents submitted a "Response" to the Supreme Court's order, stating, *inter alia:* "INCIDENT REPORT—There is no report prepared in the ordinary course of business ... regarding the incident involving Jennifer Sachs." (Private Defs. Spol. Opp., Ex. K.) Sagendorf also submitted an affidavit stating that an electrical problem on the evening of March 2–3, 2009 rendered the security cameras inoperative, and that no video footage of the incident was available. He also described in general terms the patrons of Wollensky's that evening, but stated that the respondents "do[ ] not have any record which would reveal their names or addresses." (Id., Ex. L.)

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 118 of 158
Sachs v. Cantwell, Not Reported in F.Supp.2d (2012)
2012 WL 3822220

### 3. Current Action

**\*6** Plaintiff filed the instant lawsuit on March 2, 2010, bringing various claims against the City Defendants and the Private Defendants related to the March 3, 2009 incident. The case was initially assigned to Judge Richard Sullivan. Pursuant to Judge Sullivan's August 17, 2011 Order, discovery in this matter closed on October 28, 2011. (*See* Dkt. No. 60.) On October 14, 2011, the case was reassigned to the undersigned pursuant to this District's Rules for the Division of Business Among District Judges governing the reassignment of cases to new district judges. (Dkt. No. 68.)

On November 28, 2011, Plaintiff moved for spoliation of evidence sanctions against the Private Defendants and Officers Cantwell, Musa, and Paquette. (Dkt. No. 77.) On December 16, 2011, the Private Defendants opposed Plaintiff's motion for spoliation of evidence sanctions. (Dkt. No. 81.)

The Private Defendants moved for summary judgment on all four claims against them on January 11, 2012. (Dkt. No. 94.)

The City Defendants moved for summary judgment on all six claims against them on January 9, 2012 (Dkt. No. 88), and filed their opposition to Plaintiff's motion for spoliation of evidence sanctions on January 11, 2012 (Dkt. No. 98.)

After the instant motions were fully briefed, Plaintiff's attorney moved to withdraw as counsel. The Court granted that motion on July 12, 2012. (Dkt. No. 128.)

Proceeding *pro se,* Plaintiff contacted the Court and requested permission to submit additional documents and evidence that she was not able to submit in connection with the motions due to what she claimed were conflicts between her and her attorney. In an effort to ensure that the Court's decision was based on as complete a record as possible, the Court granted Plaintiff permission to submit this material. On August 1, 2012, Plaintiff submitted a variety of addenda to her submissions in connection with the motion, including unsworn addenda to her Rule 56.1 statements that did not contain references to any evidence in the record. She raised new allegations for the first time in these submissions, including, for example, that she did not throw a glass pitcher at Ford, because Wollensky's does not serve pitchers to its patrons.

The Court does not find that Plaintiff's new allegations are credible or are supported by the record. In addition, the

new argumentation and unsworn testimony go beyond the additional "documents and evidence" that the Court granted Plaintiff permission to file. (Dkt. No. 128.) In any event, the Court has reviewed the Plaintiff's additional submission and has considered it for what it is worth on these motions.

## II. Motion for Spoliation Sanctions

Plaintiff has moved for spoliation sanctions against Private Defendants S & W Operating, Fourth Wall, Sagendorf, and Ford for destroying receipts, invoices, reservation logs, and surveillance videotapes; and against City Defendants Officers Cantwell, Musa, and Paquette for failing to secure the surveillance videotape at the scene. Plaintiff requests that the Court strike any and all claims or defenses that would have been resolved by the destroyed evidence, deny summary judgment as to any and all claims that would be affected by the existence of the tapes as to the Private Defendants and the City Defendants, include an adverse inference jury instruction, assess attorney's fees, expenses, and costs, and order a default judgment against the Private Defendants, along with any other relief the Court may deem proper.

### A. Applicable Law

**\*7** A federal district court may sanction a party for spoliation of evidence in violation of a court order under Fed.R.Civ.P. 37(b). *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988). Even absent violation of a court order, a district court may sanction a party for spoliation of evidence in the exercise of the court's "inherent power to control litigation." *West,* 167 F.3d at 779.

Whether the court sanctions a party for violation of a court order or as part of its inherent power to control litigation, a party seeking sanctions for the spoliation of evidence must establish three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Zubulake v. UBS Warbug LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004) (citations omitted). The obligation to preserve evidence arises "where a party is on notice that litigation is likely to be commenced." *Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.,* No. 93 Civ. 2914, 2002 WL 1203836, at \*13 (S.D.N.Y. June 4, 2002) (citation and quotation marks omitted). A defendant destroys evidence

with a culpable state of mind when the defendant destroys it negligently, intentionally, or willfully. *Zubulake,* 229 F.R.D. at 431. When the destruction is negligent, the defendant must prove that the evidence was relevant and favorable to the party seeking the sanctions. *Id.* In contrast, when evidence is destroyed intentionally or willfully, that fact alone is sufficient to demonstrate relevance and favorability. *Id.* at 430–31.

Additionally, "for sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed." Farella v. City of New York,* No. 05 Civ. 5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007). Although there is not a well-established standard of proof for a finding that the "destroyed evidence" existed, courts routinely have declined to infer that evidence existed when presented with only circumstantial supporting evidence. Specifically with regard to video recordings, courts have found that the mere presence of a video camera does not establish that the camera was in place to record at the time, nor does its presence establish that any recording was made at the time of the incident. *See Mohammed v. Delta Air Lines, Inc.,* No. 08 Civ. 1405, 2011 WL 5553827, at *7 (E.D.N.Y. June 8, 2011); *United States v. Perez–Velazquez,* 488 F.Supp.2d 82, 85 (D.P.R.2007) ("[T]here has been no spoliation of evidence, as there is no proof that the surveillance camera found in Pérez' apartment was connected to a recording device."); *Kreyn v. Gateway Target* No. CV–05–3175, 2006 WL 3732463, at *2 (E.D.N.Y. Dec. 17, 2006) ("As to the videotapes, the defendant flatly asserts that the stationery aisle of the defendant's premises [was] not videotaped on the day of the accident.... The testimony by one of the defendant's employees that there were videotape cameras throughout the store does not establish that there was a videotape camera at the stationery aisle and that it was operating at the time of the accident such that a videotape was ever made, much less destroyed.").

## B. Application of Law to Facts

### 1. The Private Defendants

**\*8** Plaintiff argues that Private Defendants S & W Operating, Fourth Wall, Sagendorf and Ford (1) destroyed or lost material evidence, specifically video surveillance tapes, as well as credit card receipts, invoices, and reservation logs that may help identify witnesses to the incident, and (2) did so in violation of a state court order to preserve the evidence.

Plaintiff's argument refers to the New York Supreme Court order issued on July 16, 2009 by Justice Richard Braun.[5] The order, issued to respondents Smith & Wollensky Restaurant and The Smith & Wollensky Restaurant Group, Inc., provided that the respondents should preserve "all surveillance tapes and/or videotapes" pertaining to the incident as well as "any accident, incident reports, or other records identifying the individuals involved in the assault ... and any witnesses thereto ...." (Pl.Spol.Mem., Ex. F.)

[5]     Plaintiff asserts that the state court entered "a default judgment" against the defendants in the state court action. (Pl. Spol. Mem. at 2.) Plaintiff's characterization of the state court action is inaccurate. The state court entered its order to preserve evidence on default because Defendants did not show cause as to why the Court should not enter the order. (Pl.Spol.Mem., Ex. F.)

### a. The Video Surveillance Tape

Plaintiff argues that the Private Defendants were once in possession of a video surveillance tape of the altercation in the vestibule and intentionally destroyed it. Plaintiff contends that, if produced, the tape would have corroborated her version of the events. As evidence of its existence, Plaintiff submits a handwritten note by police at the scene that there was "video available." (*Id.,* Ex. M.) Plaintiff also submits an unsworn letter from one of her lawyers stating that she visited Wollensky's after the incident and saw a video camera pointing at the vestibule, where some of the events took place. (*Id.,* Ex. E.)

For their part, the Private Defendants submit evidence that a power failure prevented their surveillance system from making any recordings during the time of the altercation. In a sworn affidavit, Sagendorf explains that "[t]here was a loss of power or a 'brownout' in the Grill during the evening of March 2, 2009. I became aware of this event because the lights dimmed and then returned to normal. Later, I saw ConEd workers working in the street nearby. Unbeknownst to me, the server for the surveillance cameras shut down in the brownout and did not reboot until our technology manager arrived for work the next morning." (Private Defs. Spol. Opp., Ex. C ¶¶ 10–11.) The Private Defendants also submit sworn statements from the Technology Manager for Fourth Wall that the cameras were non-functional and did not record any tape from approximately 11:30 p.m. on March 2, 2009 to 8:30 a.m. on March 3, 2009. (*Id.,* Ex. B.) This testimony is accompanied by corroborating print-

outs from the surveillance system's server activity logs. (*Id.,* Ex. B1–B2.) Additionally, Sagendorf testifies that had the surveillance system been operational, no video would have been made of the incident, as "both cameras were aimed at the bar and the area behind the bar." (*Id.,* Exhibit C, ¶ 8.)

Plaintiff asks the Court to reject the Private Defendants' "power failure" explanation on the ground that it is incredible. [6] However, the Private Defendants have submitted sworn testimony and evidence to support that testimony, while Plaintiff has submitted no evidence that would call the defendants' explanation into question. First, the fact that a camera might currently point at the vestibule of Wollensky's, per Plaintiff's lawyer's observations, does not mandate a conclusion that the camera was present at the time of the incident. Second, even assuming that a camera was pointed toward the vestibule at the time of the incident, Plaintiff has not presented evidence that the camera was attached to a functioning recording device or that a recording was actually created. Based on the evidence before it, the Court cannot infer that a surveillance video ever existed, let alone was destroyed.

[6]   As part of this theory, Plaintiff claims that Sagendorf admitted in his deposition that there was "a 'backup' system in place for the recorder should a catastrophe occur." (Pl. Spol. Mem. at 5.) Plaintiff mischaracterizes Sagendorf's testimony. The exchange during the deposition went as follows:

Q: "So, what type of camera is it?"

A: "Video camera."

Q: "With tape or—"

A: "I believe they have DVD hard drive backup." (Private Defs. Spol. Opp., Ex. N, at 56.) Defendants explain that "[i]n other words, Sagendorf said he believed that images were recorded (when the recording system was in operation) on a 'DVD hard drive back-up.' He said nothing about a 'backup system' that existed in case 'a catastrophe should occur.' " (Private Defs. Spol. Opp. at 7.) Roger McDyer, the technology manager, confirms that there was no separate back-up system. (*Id.,* Ex. B.) This explanation is consistent with a plain reading of Sagendorf's deposition testimony.

Plaintiff also points out that Defendants have submitted testimony and evidence that is contradictory in other minor respects. It is true that at various points, Defendants have asserted that

video surveillance tape is generally kept for one versus two weeks or described the electrical failure as a "brown out" or "power surge." Defendants have also asserted that there was no camera pointed toward the vestibule, which is contrary to Plaintiff's lawyer's direct observations. These contradictions do not, however, prove that there was in fact a camera pointed toward the vestibule that evening, nor do the contradictions prove that a functioning recording device was hooked up to the camera.

**\*9**  Accordingly, because Plaintiff has not established that the tape existed, the Court denies Plaintiff's motion for spoliation sanctions for destruction of a video surveillance tape.

**b. The Paper Evidence**

Plaintiff also moves for spoliation sanctions pertaining to certain paper evidence, specifically credit card receipts from the night of March 2–3, 2009 and other documents that may have helped to identify third party witnesses to the incident.

The Court was initially not satisfied with the Private Defendants' response to the motion for sanctions with regard to this evidence. Accordingly, the Court convened telephone conferences with the parties on August 7 and 15, 2012, to address whether the receipts for that evening ever existed, and if so, whether they had been produced, or were destroyed or otherwise unavailable.

At the telephone conference on August 15, 2012, counsel for the Private Defendants stated that she had located the credit card receipts from March 2 and 3, 2009 and had produced them to Plaintiff. Plaintiff stated that the receipts did not identify any witnesses to the incident that she did not already know about.

Thus, although the severely late production of this evidence is not excusable, Plaintiff was not harmed by it.

Accordingly, sanctions for spoliation of evidence are not appropriate with regard to this evidence.

**2. The City Defendants**

Plaintiff has moved for spoliation sanctions against City Defendants Officer Cantwell, Officer Musa, and Officer Paquette, arguing that they were alerted to the existence of the surveillance tapes while at the scene, and then intentionally

2012 WL 3822220

or negligently violated their duty to view and/or to secure the security tape. The City Defendants oppose Plaintiff's motion.

Because Plaintiff has not demonstrated that this evidence ever existed in the first instance, the City Defendants could not have had an obligation to view the tape or secure it. In any event, even assuming the tape existed, spoliation sanctions are applicable only when a party loses or destroys evidence, not when he or she fails to collect it. *Carroll v. City of New York,* 287 A.D.2d 430, 730 N.Y.S.2d 548, 550 (2d Dep't 2001) (stating that police's alleged failure to collect evidence at the scene of an accident could not be the basis for spoliation sanctions). Therefore, the Court denies Plaintiff's motion for spoliation sanctions against the City Defendants.

### III. Summary Judgment Standard

A motion for summary judgment may not be granted unless all of the submissions taken together show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010). "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *Celotex,* 477 U.S. at 323. In opposing a motion for summary judgment, the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998), or on mere denials or unsupported alternative explanations of its conduct. *See SEC v. Grotto,* No. 05 Civ. 5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006). Rather, the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986).

**\*10** In deciding a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (citation and quotation marks omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is

improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

### IV. City Defendants' Motion for Summary Judgment

Plaintiff asserts claims against the City Defendants under both state law and the Constitution. The standards for establishing Plaintiff's state law claims against the City Defendants significantly overlap with the standards for establishing the equivalent claims as constitutional violations under Section 1983. *See, e.g., Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir.2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred."); *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." (internal citations omitted)); *Cunningham v. United States,* 472 F.Supp.2d 366, 383 (E.D.N.Y.2007) ("Once it has been determined that there was probable cause for arrest, the question [whether a police officer can be liable for assault and battery in the course of effecting an arrest] becomes whether the force used to effectuate the arrest was excessive." (citation omitted)). Thus, the Court analyzes both sets of claims simultaneously, noting where there are any differences between the two types of claims.

#### A. Claims Against John Does # 1–3

The Court dismisses John Doe Police Officers # 1–3 from the case without prejudice for failure to prosecute, as Plaintiff did not identify the John Doe Defendants by the end of discovery. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York,* No. 07 Civ.2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (citing *Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005)).

#### B. False Arrest Claim

Plaintiff brings both state law and constitutional claims for false arrest against Officers Cantwell and Musa. Cantwell and Musa move for summary judgment.

2012 WL 3822220

### 1. Applicable Law

To succeed on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged ." *Jocks v. Tavernier,* 316 F.3d 128, 134–35 (2d Cir.2003) (citation and quotation marks omitted). Whether a claim is brought under New York law or § 1983, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ...." *Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999) (quoting *Weyant,* 101 F.3d at 852).

**\*11** Probable cause "is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). An officer has probable cause to arrest when he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 152 (quoting *Weyant,* 101 F.3d at 852); *see also United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987). The Second Circuit has held that it is "well-established" that a law enforcement officer has probable cause to arrest if he has "received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (citation and quotation marks omitted); *accord Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006).

The refusal of police officers to investigate exculpatory statements made by the arrestee before arresting that person based on probable cause does not defeat probable cause to arrest. *See id.* at 395–96; *see also Torchinsky v. Siwinski,* 942 F.2d 257, 264 (4th Cir.1991); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995); *Grant v. City of New York,* 848 F.Supp. 1131, 1135 (S.D.N.Y.1994); *Steiner v. City of New York,* 920 F.Supp. 333, 338 (E.D.N.Y.1996). The function of law enforcement officers is to "apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Crowley,* 460 F.3d at 396 (quoting *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989)) (internal quotation marks omitted). Police officers who have probable cause to arrest "have no duty to investigate an exculpatory statement of the accused," nor are they "required to adjudicate disputed issues of fact on the spot." *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 135 (E.D.N.Y.1998). If probable cause exists, a police officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) (citing *Baker v. McCollan,* 443 U.S. 137, 145–46 (1979)).

### 2. Application of Law to Facts

Under New York Penal Law, a person is guilty of assault in the third degree when "[w]ith intent to cause physical injury to another person, [s]he causes such injury to such person or to a third person ...." N.Y. Penal Law § 120.00(1). A person is guilty of disorderly conduct when, "with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof ... [sh]e engages in fighting or in violent, tumultuous or threating behavior ...." N.Y. Penal Law § 240.20(1).

The following facts are undisputed: (1) Ford told the officers that Plaintiff had hit his head with a glass pitcher after he cut her off and Plaintiff had assaulted Sagendorf by kicking him and slapping him; (2) Sagendorf told the officers that Plaintiff had slapped and kicked him; (3) Officer Cantwell confirmed the reports of the employees by interviewing patrons who backed up the employees' version of the events; (4) Officers Musa and Paquette witnessed the broken glass on the bar floor from the broken water pitcher; (5) Officers Musa and Paquette directly observed the red mark on Sagendorf's face, which Sagendorf indicated was a result of Plaintiff's slapping him; and (6) Plaintiff's speech was slurred in the presence of the officers.

**\*12** Taken together, these facts were sufficient to establish beyond genuine dispute probable cause to believe that Plaintiff had committed the crimes of assault and disorderly conduct. The officers received testimony from purported victims of Plaintiff's alleged conduct. The officers then corroborated those statements by interviewing other witnesses and investigating the physical evidence at the scene.

Plaintiff argues that the police officers did not have probable cause because when they arrived, Plaintiff was being beaten by Sagendorf and "Mike." (Sachs Dep. at 147.) Even construing the facts in the light most favorable to the plaintiff, and assuming *arguendo* that the police officers did observe Mike and Sagendorf punching Plaintiff,[7] there was still probable cause to arrest her. At most, seeing Mike and Sagendorf beating Plaintiff may have provided the officers with probable cause to arrest Mike and Sagendorf as well.

2012 WL 3822220

However, probable cause to arrest other people involved in the dispute does not undermine the probable cause to arrest Plaintiff, where, as here, probable cause to arrest is independently supported. Once an officer has probable cause to arrest a person suspected of wrongdoing, the officer is not required to explore "every theoretically plausible claim of innocence before making [the] arrest." *Ricciuti,* 124 F.3d at 129.

7    Although Plaintiff alleges in her complaint that Cantwell observed Mike actually punching Plaintiff and yelling at her, she does not put any evidence in the record to support this allegation. (*See* Compl. ¶¶ 32–33.)

Because a finding of probable cause for arrest is a complete bar to a false arrest claim, the Court grants summary judgment for the City Defendants on Plaintiff's false arrest claim. [8]

8    Defendants also argue that Officers Musa and Paquette are entitled to qualified immunity because they can show "arguable probable cause." "[I]n the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Martinez,* 202 F.3d at 634; *see also Robison v. Via,* 821 F.2d 913, 921 (2d. Cir.1987) (holding that qualified immunity is warranted if officers of reasonable competence could disagree on whether the probable cause test was met). Because the Court has found that the officers arresting Plaintiff had objective probable cause, *a fortiori,* the officers also had "arguable probable cause," and are entitled to qualified immunity on this claim.

### B. Malicious Prosecution Claim

Plaintiff alleges that Officer Cantwell, Officer Paquette and Officer Musa are liable for malicious prosecution under state law and § 1983. The City Defendants move for summary judgment dismissing these claims.

### 1. Applicable Law

To succeed on a malicious prosecution claim, a plaintiff must show: "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Rohman v. New York City Transit*

*Auth.,* 215 F.3d 208, 215 (2d Cir.2000) (citation and quotation marks omitted); *see also DiBlasio v. City of New York,* 102 F.3d 654, 657 (2d Cir.1996) (citing *Heck v. Humphrey,* 512 U.S. 477 (1994)). "In order to allege a cause of action for malicious prosecution under § 1983, [Plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman,* 215 F.3d at 215 (citing *Murphy v. Lynn,* 118 F.3d 938, 944–46 (2d Cir.1997)).

"Once probable cause to arrest is established, a claim for malicious prosecution is barred unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause." *Smith v. City of New York,* No. 04 Civ. 3286, 2010 WL 3397683, at *9 (S.D.N.Y. Aug. 27, 2010) (citation and quotation marks omitted). The Second Circuit has noted that "even when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (citation and quotation marks omitted). Probable cause dissipates when "the groundless nature of the charges [are] made apparent by the discovery of some intervening fact." *Id.*

### 2. Application of Law to Facts

**\*13**   There is no dispute that the City Defendants initiated a prosecution against Plaintiff, or that the prosecution was terminated in her favor. Nevertheless, the Court grants summary judgment because the Defendant Police Officers had probable cause to arrest Plaintiff for the crimes charged and Plaintiff has not pointed to an intervening fact that would make the allegedly groundless nature of the assault and disorderly conduct charges apparent. Because Plaintiff's claim fails on this prong, the Court need not address whether the City Defendants acted with malice or whether there was a sufficient post-arraignment liberty restraint.

Plaintiff argues that the officers should have been alerted to the groundless nature of the assault and disorderly conduct charges when hospital staff noted that Plaintiff appeared alert, not intoxicated. However, probable cause to charge a person with assault or disorderly conduct does not turn on whether the prosecuted person was sober or intoxicated at the time of his or her arrest. *See* N.Y. Penal Law §§ 120.00, 240.20. Thus, Plaintiff's alleged sobriety at the time of the incident does not undermine the probable cause to arrest her, nor does it reveal that the charges of assault and disorderly conduct

2012 WL 3822220

were groundless. The officers still had probable cause to prosecute Plaintiff based on the statements made by alleged victims Ford and Sagendorf and the evidence observed at the scene. One of the alleged victims, Sagendorf, also submitted a supporting deposition after Plaintiff was arraigned on the charges. (City Defs. 56.1 Stmt. ¶ 23.) Because there is no evidence of an intervening fact that would make the charges groundless, the Court concludes that there is no genuine issue as to the Defendant Police Officers' probable cause to prosecute Plaintiff for the alleged crimes. Accordingly, the Court grants the City Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim.

### C. Assault and Battery / Excessive Force Claims

Plaintiff asserts claims for assault and battery against Officer Musa based on his alleged use of excessive force in arresting Plaintiff by kicking her knee, breaking her knee, throwing her to the ground, and kicking her head. Plaintiff also alleges a "tight handcuffs" claim of excessive use of force against Officer Musa. The City Defendants move for summary judgment on these claims.

### 1. Applicable Law

Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993). "Under New York Penal Law § 35.30, an officer 'may use physical force when and to the extent [she or] he reasonably believes such to be necessary to effect the arrest.' " *Lederman v. Adams,* 45 F.Supp.2d 259, 268 (S.D.N.Y.1999). Thus, "[o]nce it has been determined that there was probable cause for arrest, the question before the court becomes whether the force used to effectuate the arrest was excessive." *Cunningham,* 472 F.Supp.2d at 383 (citations omitted). "If the force used against plaintiff was more than necessary under all the circumstances, then plaintiff is entitled to recover." *Id.* (citations omitted).

**\*14** Plaintiff also alleges that her Fourth Amendment rights were violated by Officer Musa's excessive use of force in effecting her arrest. "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court

has instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)). In evaluating reasonableness, the court is to "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999) (citing *Graham,* 490 U.S. at 396). "Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable." *Washpon v. Parr,* 561 F.Supp.2d 394, 406 (S.D.N.Y.2008) (citation and quotation marks omitted). "A *de minimis* use of force will rarely suffice to state a Constitutional claim." *Id.* at 407 (quoting *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)).

Courts apply a separate standard to claims for excessive force in the use of handcuffs. While handcuffs must be reasonably tight to be effective, handcuffs that are overly tight may constitute an excessive use of force on the part of the officer using them. *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008). "[I]n evaluating the reasonableness of handcuffing, a court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists.*" *Id.* (quoting *Esmont v. City of New York,* 371 F.Supp.2d 202, 215 (E.D.N.Y.2005)) (emphasis in original). The last factor is particularly important. While the application of tight handcuffs alone can give rise to a cause of action under § 1983, "the plaintiffs must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable." *Vogeler v. Colbath,* No. 04 Civ. 6071, 2005 WL 2482549, at \*9 (S.D.N.Y. Oct. 6, 2005) (citing *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990) (excessive force claim proper when tight handcuffing lead to bloody wrist and scarring)). Among courts in this circuit, there is "consensus" that "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch,* 567 F.Supp.2d at 468–69 (citing *inter alia Bratton v. New York State Div. of Parole,* No. 05 Civ. 950, 2008 WL 1766744, at \*9–10 (N.D.N.Y. Apr. 14, 2008) (concluding that the plaintiff did not meet the injury requirement even though the plaintiff had submitted county jail medical records showing he experienced swelling and bruising of

the wrists lasting three weeks as a result of handcuffing); *Hamlett v. Town of Greenburgh,* No. 05 Civ. 3215, 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) (concluding that "brief numbness" resulting from handcuffing does not meet the injury requirement); *Golio v. City of White Plains,* 459 F.Supp.2d 259, 265 (S.D.N.Y.2006) (denying summary judgment to defendants because plaintiff alleged swelling apparent to the naked eye and lasting nerve damage as a result of the cuffing); *Vogeler,* 2005 WL 2482549, at *9–10 (dismissing claim where plaintiffs failed to establish "any measurable harm" from the handcuffing); *Wilder v. Vill. of Amityville,* 288 F.Supp.2d 341, 344 (E.D.N.Y.2003) ( "Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of objective excess that reasonable police officers would consider to be unlawful conduct in an arrest situation. Plaintiff's claim of excessive force fails.")).

### 2. Application of Law to Facts

#### a. Excessive Force in Performing the Arrest

 **\*15**  It is apparent from the record that there are genuine issues of material fact precluding summary judgment on Plaintiff's excessive force claim. Plaintiff alleges that she was not resisting arrest, and that Officer Musa "kicked the back of her knee, breaking it, and then threw her to the ground and kicked her head." (Compl.¶ 116.) Plaintiff also submits hospital records for treatment of injuries she allegedly suffered during the incident.

The City Defendants submit testimony that Plaintiff violently resisted arrest, and Officers Musa and Paquette deny that either of them, at any time, struck, kicked, or punched Plaintiff. They also argue that the hospital records contain contradictions, and submit a purported expert report stating that the knee treatment was a result of a congenital defect, and not due to the injury. Finally, the City Defendants argue that Plaintiff has contradicted herself in her allegations and testimony, pointing out that in an affidavit filed in connection with the state court action to preserve evidence, Plaintiff appeared to suggest that her knee injuries were caused by the alleged assault by Sagendorf and "Mike." (*See* Stavridis Dec., Ex. O.)

The Court finds that the potential inconsistencies in the medical records are insufficient to eliminate any genuine issue of fact as to whether Plaintiff was seriously injured as a result of Officer Musa's actions during her arrest. In addition, although Plaintiff's affidavit in the state action states that she was assaulted by a patron and employee of Wollensky's, and

that she was injured "[a]s a result of this occurrence," this statement is not inconsistent with her contention that she was also injured by Officer Musa.

Ultimately there is a dearth of evidence in the record that would conclusively establish exactly how much force was used and whether that force was objectively reasonable. The ultimate determination will depend in large part on the credibility of the witnesses. However, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York,* 426 F.3d 549, 553–54 (2d Cir.2005) (citing *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996)).

#### b. Excessive Force in Handcuffing

Even if the Court accepts for purposes of this motion that Plaintiff's handcuffs were unreasonably tight, Plaintiff cannot succeed on her claim because she has not alleged or shown that she suffered some sort of injury as a result of the handcuffing. Plaintiff avers that the tightness of the handcuffs caused swelling of her wrists so that her wrists remained swollen twenty-four hours later. (Sachs Dep. at 167.) Nonetheless, Plaintiff does not show that she sought medical attention for the injury to her wrists any time after the incident, even though she was taken by EMS to Bellevue Hospital the night of the incident, and visited Lenox Hill Hospital for knee pain the day after. (*See* Declaration of Scott Turner in Opposition to City of NY's Motion to Dismiss, Dkt. No. 107, Exs. 1–2.) Twenty-four hour swelling of the wrists does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs. Thus, the Court grants summary judgment to Defendant Musa on Plaintiff's tight handcuffs claim against him.

### D. "Failure to Train" *Monell* Claim

 **\*16**  Plaintiff asserts a municipal liability claim against the City of New York under *Monell v. Department of Social Services,* 436 U.S. 658, 690–91 (1978), and 42 U.S.C. § 1983. Plaintiff alleges that the City of New York maintained "customs, policies, and practices regarding the supervision and/or training of NYPD officers that led to deprivations of Plaintiff's rights under the ... United States Constitution." (Compl.¶ 165.)

#### 1. Applicable Law

2012 WL 3822220

To bring a general *Monell* claim, "[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 824, 824 n.8 (1985) (plurality opinion)). "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008) (citing *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997)).

A plaintiff may also bring a municipal liability claim under *Monell* where a government's failure to adequately train and supervise employees results in a constitutional violation and reflects a "deliberate indifference" to the constitutional rights of those with whom the employees will come into contact. *City of Canton v. Harris,* 489 U.S. 378, 388–89 (1989); *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992); *Richardson v. City of New York,* No. 04 Civ. 05314, 2006 WL 3771115, at *5 (S.D.N .Y. Dec. 21, 2006).

There are four requirements that a plaintiff must meet in order to survive summary judgment on a failure to train *Monell* claim. "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation.... Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker,* 974 F.2d at 297–98; *see also Richardson,* 2006 WL 3771115, at *5. Finally, "at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* at *5 (citation and internal quotation marks omitted).

### 2. Application of Law to Facts

Plaintiff's *Monell* claim fails as a matter of law. While Plaintiff has alleged in her complaint in general terms that the City of New York maintained policies or customs that led to the deprivation of her civil and constitutional rights, Plaintiff has not put into the record any evidence to support her claim.

As the City Defendants point out, Plaintiff has not identified specifically the custom, policy, or practice that led to the deprivation of her civil rights, nor has she adduced any evidence to establish a link between a policy or practice and the alleged deprivation of her civil or constitutional rights. Furthermore, Plaintiff has not offered any evidence as to any of the prongs of her more specific failure to train claim. Accordingly, the Court grants summary judgment to the City of New York on Plaintiff's *Monell* claim.

### V. Private Defendants' Motion for Summary Judgment

#### A. Plaintiff's Claims Against John Doe # 4 ("Mike")

**\*17** Plaintiff has brought malicious prosecution, assault, and battery claims against John Doe # 4, to whom the parties refer as "Mike." However, "Mike" has never been positively identified or served. Accordingly, the Court dismisses without prejudice Plaintiff's claims against John Doe # 4 for the same reasons that it has dismissed Plaintiff's claims against John Doe Officers # 1–3.

#### B. Assault and Battery Claims

The Private Defendants have moved for summary judgment on Plaintiff's assault and battery claims against Defendant Sagendorf and against Defendants S & W Operating and Fourth Wall vicariously.

#### 1. Plaintiff's Claims Against Sagendorf

As explained previously, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993).

There is ample evidence in the record demonstrating that there are genuine disputes of material fact as to precisely what happened at Wollensky's on the night of the incident. The two sides offer sharply differing characterizations of the events that led up to the incident, and what exactly happened during the incident. With very little objective evidence in the record to substantiate one side's story over the other, resolving these disputes will depend in large part on the credibility of the witnesses. Thus, this question is one for the jury, and cannot be resolved on summary judgment. *Jeffreys,* 426 F.3d at 553–54.

**2. Vicarious Liability Claims Against S & W Operating and Fourth Wall**

Plaintiff asserts vicarious liability claims against S & W Operating and Fourth Wall for Defendant Sagendorf's alleged assault and battery of Plaintiff. Defendants have moved for summary judgment, arguing (1) that S & W Operating is merely the owner of Wollensky's Grill and does not "employ" Sagendorf for purposes of vicarious liability, and (2) that Fourth Wall, though admittedly Sagendorf's employer, cannot be held liable for any tortious actions taken by Sagendorf because he was acting outside the scope of his employment.

**a. Applicable Law**

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley,* 537 U.S. 280, 285 (2003) (citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment.")). Under New York law, "an employer may be vicariously liable for an intentional tort committed by an employee if the employee was acting within the scope of employment at the time the tort was committed." *Dean v. City of Buffalo,* 579 F.Supp.2d 391, 410–411 (W.D.N.Y.2008) (citing *inter alia Riviello v. Waldron,* 47 N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d 1278, 1281 (1979)); *see also Adams v. New York City Transit Auth.,* 88 N.Y.2d 116, 643 N.Y.S.2d 511, 666 N.E.2d 216, 218 (1996) ("[A]s a general rule, employers are held vicariously liable for their employees' torts only to the extent that the underlying acts were within the scope of employment."). There can be no vicarious liability where the employee or agent committed the tort "solely for personal motives unrelated to the furtherance of the employer's business." *Dean,* 579 F.Supp.2d at 410–11 (quoting *Vega v. Northland Mktg. Corp.,* 289 A.D.2d 565, 566, 735 N.Y.S.2d 213, 214 (2d Dep't 2001)) (internal quotation marks omitted); *see also Vega v. Fox,* 457 F.Supp.2d 172, 184 (S.D.N.Y.2006) (holding that courts should look to whether "employee was engaged in the furtherance of the employer's enterprise at the time of the employee's wrongdoing, and the employer was or could have been exercising some control over the employee's activities" (quoting *Longin v. Kelly,* 8275 F.Supp. 196, 201–02 (S.D.N.Y.1995)). In considering whether a particular act falls within an employee's scope of employment, New York courts look to five factors:

**\*18** [1] the connection between the time, place and occasion for the act, [2] the history of the relationship between employer and employee as spelled out in actual practice, [3] whether the act is one commonly done by such an employee, [4] the extent of departure from normal methods of performance; [5] and whether the specific act was one that the employer could reasonably have anticipated.

*Haybeck v. Prodigy Services Co.,* 944 F.Supp. 326, 329 (S.D.N.Y.1996) (quoting *Riviello,* 47 N.Y.2d 297, 418 N.Y.S.2d 300, 391 N.E.2d at 1281). New York courts "generally place greater emphasis" on the last factor. *Adorno v. Corr. Services Corp.,* 312 F.Supp.2d 505, 517 (S.D.N.Y.2004). In determining whether one is an employee (whose acts can be the basis for vicarious liability) or an independent contractor (whose acts cannot), the critical factor is the degree of the employer's "[c]ontrol of the method and means by which the work is to be done." *Gitchell v. Corby,* 64 A.D.3d 1163, 881 N.Y.S.2d 783, 785 (2009) (quoting *Gfeller v. Russo,* 45 A.D.3d 1301, 846 N.Y.S.2d 501, 502 (4th Dep't 2007)) (internal quotation marks omitted).

**b. Application of Law to Facts**

There is a genuine issue of fact as to whether Sagendorf was acting within the scope of his duties in allegedly assaulting and battering Plaintiff. The Private Defendants contend that Sagendorf could not have been acting within the scope of his employment by touching Plaintiff in any way, as Sagendorf was employed only "as a manager, not as a bouncer or security guard." (Private Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 96, ("Private Defs. Mem.) at 12–13; *see also* Mulcahy Aff., Ex. L, Dkt. No. 96, ("Hart Affidavit") ¶ 8.) But there can be little doubt that Sagendorf approached Plaintiff in his capacity as manager of Wollensky's to escort her out of the bar, and that such actions are ones that the employer of the manager of a bar should reasonably anticipate. Plaintiff points out that Sagendorf testified in his deposition that he had to deal with unruly customers from time to time. (*See* Sagendorf Dep. at 13, 14, 21.) The New York Court of Appeals has specifically held that the assault of an unruly patron by a bartender to

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 128 of 158
Sachs v. Cantwell, Not Reported in F.Supp.2d (2012)
2012 WL 3822220

protect his employer's property and to maintain order on the premises was within the scope of his employment. *Sims v. Bergamo,* 3 N.Y.2d 531, 169 N.Y.S.2d 449, 147 N.E.2d 1, 2–3 (1957). Whether Sagendorf's actions at some point crossed the line beyond the boundaries of his employment duties is not a fact that can be resolved as a matter of law on this record.

Disputes of fact also preclude summary judgment on the vicarious liability of S & W Operating. Although Sagendorf was not employed by S & W Operating, it is well settled that "[v]icarious liability may be based on proof of an agency relationship." *Teer v. Queens–Long Island Med. Grp., P.C.,* 303 A.D.2d 488, 755 N.Y.S.2d 430, 432 (2d Dep't 2003). Drawing inferences in the non-moving party's favor, as the Court must, it is reasonable to infer from the evidence in the record that S & W Operating did have a significant degree of control over how its agent, Fourth Wall, managed the restaurants that it owned. Accordingly, the Court cannot conclude as a matter of law that S & W Operating is not liable for the actions of the employees of Wollensky's.

### C. Malicious Prosecution Claim

**\*19** Plaintiff asserts a malicious prosecution claim against Defendants Sagendorf, Ford, S & W Operating, and Fourth Wall Restaurants. The Private Defendants move for summary judgment on this claim.

#### 1. Applicable Law

As stated above, in order to bring a malicious prosecution claim, a plaintiff must prove, *inter alia,* that the defendant "initiated" a prosecution against the plaintiff. *Rohman,* 215 F.3d at 215. In this context, "initiation" is a term of art. *Id.* at 217. As New York courts have recognized, it is well settled that "a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." *Dikler v. City of New York,* No. 07 Civ. 5984, 2009 WL 1562846, at \*2 (S.D.N.Y. May 26, 2009) (quoting *Du Chateau v. Metro–North Commuter R.R. Co.,* 253 A.D.2d 128, 688 N.Y.S.2d 12, 15 (1st Dep't 1999)). A plaintiff may defeat the "presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding," by showing that "the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Espada v. Schneider,* 522 F.Supp.2d

544, 553 (S.D.N.Y.2007) (citation omitted). New York courts have explained that "[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." *Mesiti v. Wegman,* 307 A.D.2d 339, 340, 763 N.Y.S.2d 67, 69 (2d Dep't 2003) (citation and quotation marks omitted); *see also Maskantz v. Hayes,* 39 A.D.3d 211, 832 N.Y.S.2d 566, 569 (1st Dep't 2007) ("A malicious prosecution defendant must do more than merely report a crime to police and cooperate in its prosecution ....").

#### 2. Application of Law to Facts

It is undisputed that Ford's involvement with the authorities consisted of calling 911 to report that Plaintiff had thrown a water pitcher and answering the police officers' questions when they arrived. Ford did not go to the police station, district attorney's office, or to court and did not affirmatively induce any officer or prosecutor to act to the point that the officer was not acting of his or her own volition. Though Sagendorf reported his version of the events to the police and signed a deposition supporting the Criminal Court complaint against Plaintiff, this also falls short of "showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." *Mesiti,* 307 A.D.2d 339, 763 N.Y.S.2d at 69. There is no evidence that Defendants S & W Operating and Fourth Wall took part in any aspect of initating the prosecution against Plaintiff beyond the fact that Fourth Wall employees called 911 and made reports to the police. Accordingly, because Plaintiff has not established a genuine issue as to any of the Private Defendants' having "initiated" a prosecution against her, summary judgment is granted to the Private Defendants on Plaintiff's malicious prosecution claim.

### D. Negligent Retention

**\*20** Finally, Plaintiff brings a negligent retention claim against S & W Operating and Fourth Wall for the alleged negligent retention of Aaron Sagendorf as an employee.

#### 1. Applicable Law

To maintain a claim of negligent retention, "in addition to the standard elements of negligence," a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises

2012 WL 3822220

or with the employer's chattels ." *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A .D.2d 159, 354 N.Y.S.2d 791, 793 (2d Dep't 1997)) (internal citations omitted). For example, in *Ehrens,* the Defendant asserted that it was "unaware that [the employee] had ever engaged in, or been accused of engaging in" the type of conduct which caused the injury—sexual misconduct. *Id.* The Second Circuit found that the district court had properly awarded summary judgment when the plaintiff "failed to counter [the defendant's] assertion with admissible evidence from which a reasonable juror could infer that the defendants, at any time prior to the relevant incident, knew or should have known of [the employee's] propensity to assault minors or otherwise to engage in inappropriate sexual conduct." *Id.*

### 2. Application of Law to Facts

In the complaint, Plaintiff alleges that S & W Operating and Fourth Wall had notice of Sagendorf's alleged propensity to violence because Sagendorf (1) had a "propensity for aggressive conduct towards patrons"; (2) had a "tendency to act violently towards patrons"; and (3) had "acted violently towards patrons on prior occasions." (Compl.¶¶ 231–33.) However, Plaintiff has failed to adduce any evidence to support this claim. Plaintiff asserts that Sagendorf had acted inappropriately toward her on a previous occasion, but Plaintiff does not contend that the incident was a violent one in any traditional sense. (Mulcahy Aff., Ex. M ("Sachs Dep. II"), at 277–78 (stating that Sagendorf once rubbed against her breasts inappropriately and "tried to make it look like it was an accident").) To the contrary, Plaintiff was asked in her deposition whether she could tell of "any violent acts towards patrons that she knows of" that were committed by Sagendorf. She replied, "No, I can't.... No, I can't do that at this time, no." (Sachs Dep. II at 290.)

Defendants, for their part, put in evidence that they were not, and are not, aware of any violent incidents involving Sagendorf. Thomas Hart, the general manager of both Wollensky's and Smith & Wollensky's Restaurant for 27 years, averred that "Sagendorf has never been disciplined or reprimanded for any sort of violent, aggressive, anti-social or

other inappropriate behavior toward patrons or anyone else while on the job." (Hart Affidavit ¶ 9.) Sagendorf, in his affidavit, confirms this. (Mulcahy Aff., Ex. D ¶ 10.)

**\*21** Because Plaintiff has failed to show any genuine dispute that Defendants knew or should have known of Sagendorf's propensity to engage in violent conduct, Plaintiff's negligent retention claim fails. The Court thus grants summary judgment to the Private Defendants on this claim.

### VI. Conclusion

For the foregoing reasons, Plaintiff's motion for spoliation sanctions is DENIED.

The Court dismisses the John Doe Defendants # 1–4 from the case, as they were not identified before the close of discovery.

The City Defendants' motion for summary judgment on Plaintiff's state law and § 1983 claims of false arrest, malicious prosecution, and excessive use of force in handcuffing Plaintiff is GRANTED. The City Defendants' motion for summary judgment on Plaintiff's *Monell* claim is GRANTED. The City Defendants' motion for summary judgment on Plaintiff's claims that Defendant Musa used excessive force in effecting her arrest is DENIED.

The Private Defendants' motion for summary judgment on Plaintiff's malicious prosecution and negligent retention claims is GRANTED. The Private Defendants' motion for summary judgment on Plaintiff's assault and battery claims against Sagendorf, S & W Operating, and Fourth Wall is DENIED.

The Clerk of Court is directed to close the motions at docket numbers 77, 88 and 94.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3822220

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Stefanopoulos v. City of New York, E.D.N.Y., February 28, 2005

2000 WL 516682
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Juan GONZALEZ Plaintiff,

v.

THE CITY OF NEW YORK, New York City Police
Department, and P.O. Joseph Ryder, Defendants.

No. 98-CV-3084.
|
March 7, 2000.

*MEMORANDUM AND ORDER*

GLASSER, J.

**\*1** This is a civil rights action brought by plaintiff Juan Gonzalez ("Gonzalez") pursuant to 42 U.S.C. § 1983 against defendant Police Officer Joseph Ryder ("Ryder"). Gonzalez has also brought pendent state law claims for false arrest, false imprisonment, assault, and battery against Officer Ryder and the City of New York (the "City"). The Police Department of the City of New York was dismissed from this action on August 18, 1999 and plaintiff has withdrawn his *Monell* claims against the City. Defendants now move for summary judgment. For the reasons stated below, that motion is granted in part and denied in part.

*BACKGROUND*

In the afternoon on May 4, 1997, plaintiff was driving on Coney Island Avenue in Brooklyn, New York. Plaintiff was pulled over by Police Officers Ryder and Stevens because his car had a heavy tinted plastic covering over his rear taillights, which is a violation of the New York Vehicle and Traffic Law. According to plaintiff, he was not informed of the reason he was stopped, nor was he issued a summons or a ticket. Officer Stevens asked plaintiff for his driver's licence, car registration, and insurance card and he produced a temporary license that had expired in 1991. Officer Ryder checked the status of plaintiff's driver's license and discovered that it

was suspended. Gonzalez was then arrested for operating a vehicle with a suspended license. Plaintiff claims that he was "dragged to the front of the police vehicle, slammed against the hood of the vehicle and forcibly handcuffed by P.O. Ryder ... then thrown in the back of the police vehicle." Pl. Mem. at 2. At no time did plaintiff resist the arrest.

Initially, plaintiff was rear-handcuffed. Shortly thereafter, plaintiff complained that the handcuffs hurt his wrists. According to Officers Ryder and Stevens, plaintiff's handcuffs were adjusted so that his hands were in front of him to relieve his discomfort. Ryder Dep at 38; Stevens Dep at 47-48. Plaintiff denies this took place. He maintains that until he was processed, which was a couple of hours after his arrest, he remained rear-handcuffed. Gonzalez 50-H Tr. at 54. Plaintiff asserts that during that time, he continued to complain about his wrists, but the officers refused to loosen the handcuffs. Gonzalez EBT Tr. at 62.

Plaintiff also alleges that when police could not start his car, he "was dragged out of the police vehicle and placed in his car [and after he started it] he was then taken out of his vehicle and thrown back into the police vehicle." Pl. Mem at 3.

The officers brought Gonzalez to the 61 st precinct, where the arrest was processed. His handcuffs were eventually removed. He claims that at that time he noticed scrapes and bruises on his wrists. Plaintiff mentioned these bruises in his 50-H testimony, but did not refer to them in his deposition. Gonzalez 50-H Tr. at 56.

P.O. Ryder re-handcuffed Gonzalez and took him to Central Booking. Gonzalez contends that again the handcuffs were too tight, he complained, and was ignored. Gonzalez EBT Tr. at 97-99. According to Gonzalez, it took about fifty minutes to get to Central Booking. *Id.* at 99. There, according to defendants, a brief medical screening was conducted. The report of that screening indicates that plaintiff did not report that he was sick and did not complain of any injuries. Central Booking Medical Screening Report, Cohen Dec. Ex. G. Gonzalez testified that he does not recall receiving a medical screening at Central Booking. Gonzalez EBT Tr. at 110, 229-30. After spending a night in a cell, Gonzalez made his first appearance before the State Court and received an adjournment contemplating dismissal concerning his arrest. Cohen Dec. Ex. F.

**\*2** One week after being released from custody, Gonzalez went to Coney Island Hospital because of pain in his right

wrist, hand, index finger, thumb, and arm. Hospital Record dated May 12, 1999, Pl.Ex. J. Since that time, Gonzalez has had several medical examinations and received physical therapy on a number of occasions. Gonzalez EBT Tr. at 175-76. He claims that his hand is injured as a result of the incident and that still cannot grip or hold anything in his right hand for more than two minutes. *Id.* at 191.

Dr. Irving Friedman, a neurologist, examined Gonzalez four times between January 29, 1999 and October 15, 1999. In his affidavit, Dr. Friedman states that based on his examination and testing of the plaintiff, and on medical records that were created after plaintiff's arrest, he believes:

> [a]s a result of the blunt trauma and the excessively tight handcuff, Mr. Gonzalez sustained serious injuries including post-traumatic right radial nerve palsy ... tear of the tendon of the right index finger ... chronic pain syndrome, post-traumatic right wrist arthropathy ... [and] post-traumatic stress disorder ... It is also my opinion that the prognosis for the right hand injury is poor and as of the date of my last examination on October 15, 1999, Mr. Gonzalez had limited use of his right hand. Mr. Gonzalez remains with a significant and painful disability at the [sic] as a result of the injuries sustained on May 4, 1997.

Pl.Ex. G.

Richard Trachtman Ph.D., the Clinical Supervisor at the Jewish Board of Family and Children's Services, Inc., wrote to plaintiff's counsel in October 1999 that Mr. Gonzalez is being treated weekly with psychotherapy and medication:

> He reports suffering almost daily flashbacks to a period when he was arrested and, allegedly, treated harshly by police. He spends most of his days isolated in a room with a dog where he feels safe. He reports crying often. He finds it exceedingly difficult to go

out of doors unescorted and becomes panicky any time he sees a uniformed policeman.

Pl.Ex. H.

*DISCUSSION*

I. *Summary Judgment Standard*

Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of proof on such motion. *See United States v. All Funds,* 832 F.Supp. 542, 550-51 (E.D.N.Y.1993).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry, et al.,* 77 F.3d 34, 26 (2d Cir.1996).

II. *False Arrest and False Imprisonment*

**\*3** Probable cause is a complete defense to an action for false arrest or false imprisonment, under both federal and state law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) *cert denied,* 517 U.S. 1189 (1996); *Caracciola v. City of New York,* No. 95 Civ. 3896 CSH, 1999 WL 144481 *6 (S.D.N.Y. March 17, 1999); *Quigley v. City of Auburn,* 701 N.Y.S.2d 580. 581

Gonzalez v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 516682

(4 th Dep't 1999). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer* 63 F.3d at 118; *see also Weyant* 101 F.3d at 852.

In the present case, plaintiff was stopped because his car's taillights were covered by a heavy tinted plastic covering. In New York, a car must have taillights, each of which are "red to amber" and each one must be visible from at least five hundred feet. N.Y. Veh. & Traf. Law ("VTL") § 375 (McKinney 1999). [1] Plaintiff was then arrested because it was discovered that he was driving with a suspended license, which is a misdemeanor. VTL § 511 (McKinney 1999) . [2]

---

[1]     N.Y. VTL § 375(40)(b) reads:

> Every motor vehicle, except a motorcycle, operated or driven upon the public highways of the state, if manufactured on or after January first, nineteen hundred fifty-two, shall be equipped with at least two stop lamps, one on each side, each of which shall display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied.

[2]     N.Y. Veh. & Taf. Law § 511

> 1. Aggravated unlicensed operation of a motor vehicle in the third degree.
> (a) A person is guilty of the offense of aggravated unlicensed operation of a motor vehicle in the third degree when such person operates a motor vehicle upon a public highway while knowing or having reason to know that such person's license or privilege of operating such motor vehicle in this state or privilege of obtaining a license to operate such motor vehicle issued by the commissioner is suspended, revoked or otherwise withdrawn by the commissioner.
> (b) Aggravated unlicensed operation of a motor vehicle in the third degree is a misdemeanor. When a person is convicted of this offense, the sentence of the court must be: (i) a fine of not less than two hundred dollars nor more than five hundred dollars; or (ii) a term of imprisonment of not more than thirty days; or (iii) both such fine and imprisonment.

Section 140.10(1)(a) of N.Y.Crim. Proc. provides that a police officer may make an arrest without a warrant "when he has reasonable cause to believe that such a person has committed such offense in his presence." Gonzalez was driving while suspended in the presence of Officer Ryder. Therefore, there was probable cause for plaintiff's arrest and his claims for false arrest and false imprisonment under both federal and state law are dismissed.

III. *Plaintiff's § 1983 Excessive Force Claim*

Section 1983 of Title 42 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) *cert. denied,* 512 U .S. 1240 (1994). Plaintiff alleges in his Complaint that defendants used excessive force against him in violation of the Fourth Amendment *See Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989).

Police are privileged to use reasonable force to effectuate an arrest and to protect themselves from injury and dangers posed by an escapee. N.Y. Penal Law § 35.30 (McKinney 1998); [3] *Graham,* 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effectuate it.") The reasonableness of the use of force must be judged from the perspective of "a reasonable officer at the scene." *Id.* "Not every push and shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Id.* (*citing Johnson v. Glick,* 481 F.2d 1028. 1033 (2d Cir.) *cert. denied,* 414 U.S. 1033 (1973)).

---

[3]     N.Y. Penal Law § 35.30 reads in part:

> Justification; use of physical force in making an arrest or in preventing an escape
> 1. A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or attempting to prevent the escape from custody, of a person whom he reasonably believes to have committed an offense, may use physical force when and to the extent he reasonably believes such to be necessary to effect the arrest, or to prevent the escape from custody, or to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force ...

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 133 of 158
Gonzalez v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 516682

**\*4**  If a plaintiff sustains an injury during an arrest, this is a relevant factor for the court in considering whether the force used was reasonable. However, reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury. *Hudson v. McMillian,* 503 U.S. 1, 7 (1992).

Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result. *See Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990) (plaintiff had swollen and bleeding wrists from the tight handcuffs, as well as a faintly detectable scar on her left wrist from the incident). However, if the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force. *See Brumfield v. Jones,* 849 F.2d 152, 156 (5 [th] Cir.1988); *Van Houten v. Baughman,* 663 F.Supp 887, 891 (C.D.Ill.1987).

"The Fourth Amendment inquiry is an exclusively objective one, and requires consideration of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Hemphill v. Schott,* 141 F.3d 412, 417 (2d Cir.1998) (citing *Graham,* 490 U .S. at 396, 109 S.Ct. at 1872). In the present case, plaintiff was not charged with a serious crime, did not pose a threat to the safety of the officers, and was not resisting arrest. Officer Ryder testified that Gonzalez was a "gentleman," Ryder Dep. at 68, and Officer Steven stated that he did not resist arrest. Stevens Dep. at 71.

Plaintiff's version of the events on the day he was arrested, along with the medical evidence he has put forward, raises a genuine issue of fact for trial. If he is believed, plaintiff, who was undisputedly not resisting arrest, was dragged to the front of the police car, slammed against the hood of the vehicle and forcibly handcuffed by Officer Ryder. He was placed in very tight handcuffs for more than two hours, first, up until the time he was taken to the 61 [st] precinct, and then when he was taken to Central Booking. During that time, he repeatedly complained that his wrists hurt and asked that the handcuffs be loosened, but was ignored. As a result, he sustained serious injury to his right hand.

Defendants respond that plaintiff initially did complain about his handcuffs, but they were quickly adjusted and no further complaints were made. They assert that plaintiff was handcuffed for less time than he alleges. They also question the existence and seriousness of plaintiff's injuries.

Plaintiff did not seek immediate medical assistance. One week after his arrest he went to the Coney Island Hospital complaining about his right wrist and hand. Plaintiff's medical expert testified that plaintiff suffered serious injuries resulting from his arrest on May 4, 1997. It is true that Dr. Friedman did not examine plaintiff until more than a year after his arrest. Moreover, Dr. Friedman conceded that the MRI of plaintiff's wrist showed that it was normal, and admitted that he relied exclusively on information from plaintiff and medical records subsequent to May 4, 1997. Friedman Dep. at 38, 55-56, 61, 63-65. Although these facts raise issues as to the credibility of plaintiff's expert, that is a matter that for the jury to decide.

**\*5**  Viewing these facts in a light most favorable to Gonzalez, a factual dispute does exist as to whether Officer Ryder used excessive force and unreasonably caused injury to the plaintiff.

Under the "reasonableness standard" of the Fourth Amendment, Officer Ryder is not entitled to qualified immunity. Assuming Gonzalez's version of events is true, no reasonable officer could believe that the abusive application of handcuffs was constitutional, given the fact that he did not resist arrest. *See Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9 [th] Cir.1993) (defendants not entitled to qualified immunity where officer refused to loosen plaintiff's handcuffs, resulting in bruises that lasted for several weeks); *Quesinberry v. Rouppasong,* 331 S.C. 589, 587 (S.C.S.C.1998) (qualified immunity denied where plaintiff repeatedly claimed handcuffs were too tight and was later diagnosed with carpal tunnel syndrome.) Therefore summary judgment as to plaintiff's § 1983 claim against Officer Ryder is denied.

### *CONCLUSION*

For the reasons stated above, defendants' motion for summary judgment is granted with respect to the claims of false imprisonment and false arrest under both federal and state law. Summary judgment is denied as to plaintiff's § 1983 claim against Ryder for excessive force and his state law claims for assault and battery.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 516682

**Gonzalez v. City of New York, Not Reported in F.Supp.2d (2000)**
2000 WL 516682

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 5:24-cv-01391-BKS-MJK   Document 5   Filed 12/11/24   Page 135 of 158
Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)
2005 WL 2482549

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Graham v. City of New York,   E.D.N.Y.,   March 6, 2013

KeyCite Overruling Risk - Negative Treatment
Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2005 WL 2482549
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Christian VOGELER and Derek J. Kiechle Plaintiffs,
v.
Police Officer Michael COLBATH, Defendant.

No. 04 Civ. 6071(LMS).
|
Oct. 6, 2005.

*DECISION AND ORDER*

SMITH, Magistrate J.

**\*1** This matter is before me by consent of the parties pursuant to 28 U.S.C. § 636(c). Plaintiffs filed this cause of action pursuant to 42 U.S.C. § 1983 against Rockland County, Town of Ramapo Police Officer Michael Colbath, Village of Spring Valley Police Officer Kevin Freeman, and Unknown Police Officers 1 through 5. In a stipulation agreed upon by the Plaintiffs and Defendant Colbath, the claims against Rockland County and Police Officer Kevin Freeman were dismissed with prejudice. [1] Plaintiffs claim that Defendant arrested them without probable cause, impermissibly searched their persons and conducted a strip search, maliciously prosecuted them, and exerted excessive force during the course of their arrest. Defendant filed a motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure seeking to have all claims against him dismissed. Plaintiffs then filed a cross-motion for summary judgment pursuant to Rule 56(a). For the foregoing reasons, I grant the Defendant's motion for summary judgment in its entirety and dismiss all claims against him. Accordingly, Plaintiffs' cross-motion for summary judgment on all claims is denied.

[1]     *See* Docket Entry # 40, Stipulation and Order of Discontinuance as to Defendants Rockland County and Police Office Kevin Freeman.

*BACKGROUND*

The parties do not dispute the following facts that are material to a decision in this case.

On the evening of May 1, 2003, Plaintiffs Christian Vogeler ("Vogeler") and Derek Kiechle ("Kiechle") were inside Room 308 at the Wellesley Inn ("Room 308,") located in Ramapo, New York, when the Rockland County Task Force ("Task Force") executed a no-knock search warrant on Room 308. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pls' Statement") at ¶¶ 1, 13; Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def's Statement") at ¶ 12. Defendant Michael Colbath ("Colbath,") as a member of the Town of Ramapo Police Department, worked with the Task Force and was present when the no-knock search warrant was executed. Def's Statement at ¶ 1,7; Plaintiffs' Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Pls' Resp.") at ¶¶ 1,7. The Task Force had been conducting an investigation into allegations of narcotics activity within Room 308. Def's Statement at ¶ 8; Pls' Resp. at ¶ 8. As a part of its investigation, the Task Force had utilized the assistance of a confidential informant, and on two occasions had directed him to purchase narcotics from "Nino," the suspected dealer, who was then located in Room 308. Def's Statement at ¶ 9; Pls' Resp. at ¶ 9.

On May 1, 2003, the Task Force obtained a search warrant from a Village of Airmont Justice Court Judge for Room 308. Def's Statement at ¶ 10; Pls' Resp. at ¶ 10. The Task Force, including the Defendant, executed the search warrant. Def's Statement at ¶ 12; Pls' Resp. at ¶ 12. Subsequent to execution of the warrant, Plaintiffs Vogeler and Kiechle, along with "Nino," the suspected dealer, were arrested. Def's Statement at ¶ 19; Pls' Resp. at ¶ 19. Plaintiffs were handcuffed, placed face-down on the floor, frisked and searched. Pls' Statement at ¶ 16; Defendant's Response to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Def's Resp.") at ¶ 16. While no illegal substances were recovered from the Plaintiffs' persons, Pls' Statement at ¶ 23; Def's Resp. at ¶ 23, the Task Force seized and removed from the room nine clear bags containing a white powder, subsequently identified as cocaine, nine clear bags containing a green leafy substance, later identified as marijuana, an additional sandwich bag

containing marijuana, an electronic scale, numerous empty clear zip lock bags, and a sizable amount of U.S. currency. Def's Statement at ¶ 17; Pls' Resp. at ¶ 17.

**\*2** Plaintiffs were charged with Criminal Possession of a Controlled Substance in the Third Degree, N.Y. PENAL LAW § 220.16(1) (Consol.2005), and Unlawful Possession of Marijuana, N.Y. PENAL LAW § 221.05 (Consol.2005). Pls' Statement at ¶ 25; Def's Resp. at ¶ 25. After additional investigation, the District Attorney dismissed the charges. Pls' Statement at ¶ 27; Def's Resp. at ¶ 27. Plaintiffs then initiated this cause of action against the Defendants for false arrest and false imprisonment, illegal search and seizure, malicious prosecution and use of excessive force during the course of arrest.

*DISCUSSION*

A. *Introduction*

Plaintiffs assert that Defendant Colbath violated their Fourth Amendment rights to be free from false arrest and false imprisonment, to be free from unreasonable searches and seizures, to be free from malicious prosecution, and to be free from excessive force by the police when making an arrest. Plaintiffs' Complaint ("Pls' Compl.") at ¶ 15. The Defendant moves for summary judgment on the first three claims as he had probable cause to arrest the Plaintiffs and therefore cannot be liable. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def's Mem.") at 1. The Defendant also seeks summary judgment on the Plaintiffs' claim of excessive force as there is no evidence in the record indicating that it was the Defendant who lifted the Plaintiffs from the ground. Def's Mem. at 6. Defendant seeks summary judgment on this claim on the separate ground that any force exerted during the arrest was reasonable, and thus he is entitled to summary judgment as a matter of law. *Id.* Lastly, Defendant exerts a broad of claim of qualified immunity insulating him from civil liability for his actions, if any, which may have violated the Plaintiffs' constitutional rights. [2] *Id.* at 11.

[2]  Although the Defendant invokes the protection of qualified immunity, I need not determine whether he is entitled to its protection because I conclude at no point did he violate the Plaintiffs' constitutional rights. Under the Supreme Court's holding in *Saucier v. Katz,* 533 U.S. 194, 201 (2001), a court must conduct a two-step analysis when determining whether a police officer is entitled to qualified immunity. A court must first determine whether the defendant violated the plaintiff's constitutional rights. *Id.* If the court determines that the defendant's actions did not constitute a violation, the qualified immunity analysis ends. *Id.*

Because a review of the record in this case indicates that there are no genuine issues of material fact, I hereby grant the Defendant's motion for summary judgment on all claims and deny the Plaintiffs' cross-motion for summary judgment.

B. *Summary Judgment*

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 320-23 (1986). "Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." LOCAL CIV. R. 56.1(a). A fact is "material" when it may affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Id.* at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.*

**\*3** Where a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56. Under Local Rule 56.1(b), "the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate,

short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." LOCAL CIV. R. 56.1(b). Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." ' *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex,* 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson,* 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 97 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson,* 477 U.S. at 261 n. 2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

In the present case, a review of the record shows that there is no genuine issue of any material facts and that therefore, the Defendant, the moving party, is entitled to a judgment as a matter of law, FED. R. CIV. P. 56(c), and Plaintiffs' cross-motion for summary judgment must be denied.

## C. *Plaintiffs' Causes of Action*

### 1. *False Arrest and False Imprisonment*

To successfully establish a cause of action for false arrest and false imprisonment, each Plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged ." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (citations omitted); *Boose v. Rochester,* 421 N.Y.S.2d 740, 745 (N.Y.App. Div 1979). Probable cause is a complete defense to the claims of false arrest and false imprisonment. *Bernard v. U.S.,* 25 F.3d 98, 102 (2d Cir.1994). The burden is on the Defendant to show the existence of probable cause as an affirmative defense. *Broughton v. State of New York, et. al.,* 37 N.Y.2d 451, 458 (1975).

**\*4** Defendant is entitled to summary judgment on the claims of false arrest and false imprisonment because he had probable cause to arrest the Plaintiffs. Under the Fourth Amendment, a police officer must have probable cause to arrest an individual without an arrest warrant. *Beck v. Ohio,* 379 U.S. 89, 91 (1964). A constitutionally valid arrest turns upon whether the police had the requisite "facts and circumstances within their knowledge ... to warrant a prudent man in believing that the [individual] [has] committed or was committing an offense." *Id.* It is undisputed that on May 1, 2003, the Defendant entered Room 308 pursuant to a search warrant issued by a Village of Airmont Justice Court Judge. Def's Statement at ¶ 12; Pls' Statement at ¶ 12. It is also undisputed that the Plaintiffs were present in the room when the search warrant was executed. Def's Statement at ¶ 16; Pls' Resp. at ¶ 16. Once in the room, the Defendant seized several transparent zip lock bags that were identified via field testing as containing cocaine and marijuana, an electronic scale, and a large quantity of U.S. currency.[3] Def's Statement at ¶ 17. Moreover, the Task Force's confidential informant reported that a drug transaction had occurred in Room 308 in the Plaintiffs' presence just prior to the officers' execution of the search warrant. Defendant's Affirmation in Reply and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Def's Opp'n Statement"), Ex. C.

3    The Plaintiffs correctly point out that there is an inconsistency in the Defendant's testimony regarding the location of the currency seized from Room 308. *Compare* Pls' Statement Ex. 9 at 7 (grand jury testimony of Defendant that U.S. currency recovered from clothing found within Room 308), *with* Pls' Statement Ex. 15 at ¶ 4 (Defendant's affadavit stating that money recovered from tabletop in corner of Room 308). This discrepancy, however, is of no value to the Plaintiffs because the issue surrounding the currency's location within Room 308 is not a material fact. In order for a fact to be material, and thus meaningful for this court to examine on a motion for summary judgment, the fact must alter or possibly alter the outcome of the case. *Anderson,* 477 U.S. at 248. Immaterial facts have no bearing on this court in deciding a motion for summary judgment. *Celotex Corp,* 477 U.S. at 323.

Moreover, Plaintiff Voegeler's grand jury testimony and Plaintiff Kiechle's depositions are not without inconsistency either. Plaintiff

Vogeler claims that Plaintiff Kiechle was driving on the evening of May 1, 2003. *See* Pls' Statement Ex. 8 at 5, lines 12-14; *see also* Pls' Statement Ex. 12 at 10-11, lines 25-1. Plaintiff Kiehcle, however, claims Plaintiff Vogeler was driving on the night of May 1, 2003. *See* Pls' Statement Ex. 11 at 13 lines 16-24. While this inconsistency does not go to a material fact either, it is worth noting that neither Plaintiffs' nor Defendant's statements are wholly consistent.

The presence of illegal narcotics within Room 308, as well as the information relayed by the confidential informant, gave the Defendant sufficient probable cause to arrest the room's occupants based upon the suspicion that they committed or were committing a criminal offense. *See Beck,* 379 U.S. at 91; *Provost v. City of Newburgh,* 262 F.3d 146, 157 (2d Cir.2001). Defendant's motion for summary judgment on the Plaintiffs' claim of false arrest and false imprisonment must be granted therefore, because the Defendant had probable cause to arrest them. *Broughton,* 37 N.Y.2d at 458.

Defendant cites to N.Y. PENAL LAW § 220.25(2) (Consol.2005) as additional support for his argument that he had sufficient probable cause to arrest the Plaintiffs subsequent to the search warrant's execution. N.Y. PENAL LAW § 220.25(2) provides, in part,

> [t]he presence of a narcotic drug, narcotic preparation, marihuana or phencyclidine in open view in a room, other than a public place, under circumstances evincing an intent to unlawfully mix, compound, package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance at the time such controlled substance was found....

New York's statutory constructive possession presumption, however, is subsidiary to the primary establishment of probable cause to arrest the Plaintiffs stemming from the Defendant's seizure of illegal narcotics from the hotel room

in which they were located. Thus, the contentions Plaintiffs raise regarding their awareness of narcotics in plain view and their personal proximity to the narcotics are of no issue. [4] The Plaintiffs' presence in Room 308 during an illegal narcotics distribution, as well as their presence in the room when illegal narcotics were seized, provided the requisite probable cause to substantiate their arrest.

4    Plaintiffs assert that they were unaware of the presence of illegal narcotics within Room 308. Pls' Statement at ¶ 10. Their subjective awareness and proximity to the narcotics, however, is of no importance in this instance because the Defendant had probable cause to arrest the Plaintiffs upon the seizure of illegal narcotics from the room. *See, e.g. Maryland v. Pringle,* 540 U.S. 366, 374 (2003) (holding officer had probable cause to believe individual possessed cocaine and therefore could arrest individual, absent a warrant, based upon presence of narcotics and money within car).

**\*5** Because the Defendant had sufficient probable cause to arrest the Plaintiffs, I must grant the Defendant's motion for summary judgment on the Plaintiffs' false arrest and false imprisonment causes of action.

2. *Illegal Search and Seizure*

a. *Search of Plaintiffs' Persons*

Plaintiffs additionally assert that the Defendant violated their Fourth Amendment rights to be free from illegal searches and seizures when the Defendant searched their persons. Because the Defendant entered Room 308 and searched the Plaintiffs' persons pursuant to a valid search warrant, and permissibly searched their persons under the search-incident-to-arrest doctrine, the Defendant's motion for summary judgment must be granted.

In accordance with the requirements established by the United States Supreme Court, a search warrant is valid if it is issued by a neutral and disinterested magistrate upon a showing by affidavit of probable cause. *Dalia v. U.S.,* 441 U.S. 238, 255 (1979). The search warrant must also describe with sufficient particularity the location to be searched, the items to be seized, and the persons who may be searched. *Id.*

In addition to these fundamental requirements, New York courts recognize the constitutionality of an "all persons" search warrant, such as the one used here, when probable

Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)
2005 WL 2482549

cause exists to believe that any and all individuals found within a given location are involved in criminal activity. *Campbell v. Fernandez,* 54 F.Supp.2d 195, 197 (S.D.N.Y.1999); *People v. Nieves,* 36 N.Y.2d 396, 404 (1975). Most commonly, "all persons" search warrants are issued when the police suspect illegal narcotics trafficking or distribution from a particular location, but are unable to name the specific individuals to be searched. *See, e.g. People v. Miner,* 510 N.Y.S.2d 300, 302 (N.Y.App. Div 1987) ("all persons" search warrant valid where probable cause existed to believe area and persons involved in drug trafficking); *People v. Soler,* 460 N.Y.S.2d 537, 541 (N.Y.App.Div.1983) (search of bystander in room during execution of "all persons" search warrant valid because of suspected drug trafficking).

The Defendant entered Room 308 pursuant to a validly executed search warrant authorizing the search of "all persons" found within Room 308. Defendant's Affidavit in Support of Motion for Summary Judgment ("Def's Aff."), Ex. B. A neutral and disinterested judge issued a sufficiently particular search warrant identifying the location to be searched and the items to be seized. Def's Aff., Ex. B. The judge issued the search warrant upon receiving the Defendant's affidavit establishing probable cause. The Defendant developed probable cause to believe criminal activity was taking place within Room 308 based upon the information provided by a confidential informant working with the Task Force. A police officer may rely upon the reports of an informant to establish probable cause when the "totality of the circumstances" indicates that the informant's information is reliable and truthful. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). The Defendant had reason to rely on the confidential informant's information based upon two prior successful drug transactions the informant conducted with "Nino," within Room 308, at the request of the Task Force. Def's Aff., Ex. B at ¶¶ 5 & 6. Based upon these transactions, the Defendant could conclude with sufficient probability that criminal activity was afoot in Room 308. *People v. Miner,* 510 N.Y.S.2d 300, 302 (N.Y.App. Div 1987) (two controlled purchases of illegal narcotics is sufficient evidence to establish probable cause of "activity inconsistent with innocent behavior.").

 **\*6** Because the Defendant entered Room 308 and searched the Plaintiffs' person pursuant to a valid search warrant, the Defendant is entitled to summary judgment on the Plaintiffs' claims of illegal search and seizure.

In addition to the authority to search the Plaintiffs per the search warrant, the Defendant was also authorized to search the Plaintiffs' persons under the "search incident to arrest" doctrine articulated by the Supreme Court in *Chimel v. California,* 395 U.S. 752 (1969). In *Chimel,* the Supreme Court recognized that it is reasonable for a police officer to conduct a search of the arrestee's person, and the area around the aresstee's person, known as his or her wing span, even in the absence of a warrant. 395 U.S. at 763.

Naturally, *Chimel'* s search-incident to arrest doctrine only applies when there is a valid basis for an arrest. As noted, *supra,* upon entering Room 308 to execute the valid search warrant, the Defendant found several transparent zip lock bags, later identified as containing cocaine and marijuana, as well as an electronic scale and a large quantity of U.S. currency. The presence of such narcotics and drug paraphernalia within Room 308 provided the Defendant ample justification to arrest the Plaintiffs on the suspicion that they were involved in the commission of a crime. Because the Defendant had probable cause to arrest the Plaintiffs, the Defendant was authorized to search their persons upon arrest under *Chimel.*

Plaintiffs cite to *Ybarra v. Illinois,* 444 U.S. 85 (1979), in support of the proposition that the search of their persons was unconstitutional. Reliance on *Ybarra,* however, is mistaken. *Ybarra* dealt with the execution of a no-knock search warrant at a tavern. 444 U.S. at 88. The search warrant only authorized the police to search the tavern and one named suspect, the bartender. *Id.* Upon entering the tavern, however, the police frisked all persons located within the tavern, including petitioner Ybarra. *Id* . As a result of the frisk of Ybarra's person, the police seized a package of cigarettes containing heroin. *Id.* at 89.

In suppressing the evidence of narcotics possession, the Supreme Court held that each person who entered the tavern continued to hold his or her individualized Fourth Amendment right to be free from unreasonable searches and seizures. *Id.* at 91. The Court noted that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* The Court held that the reasonable suspicion required to frisk each occupant of the tavern could not be extrapolated from the probable cause supporting the issuance of the search warrant. *Id.*

The present situation, however, is markedly different from the one posed in *Ybarra.* Unlike *Ybarra,* where the search warrant

only authorized the search of the premises and one individual, here, the Defendant entered Room 308 with a search warrant authorizing him to search "[a]ll persons found within [Room 308 of the Wellesley Inn]." Def's Aff., Ex. B. Additionally, upon entry, the Defendant seized several clear bags containing illegal narcotics from a table located towards the back of the room. Pls' Statement Ex. 6 at 6-7, lines 18-4. Differing from *Ybarra*, here, illegal contraband was *first* found within the room *and then* the Defendant searched the Plaintiffs. In *Ybarra,* just the opposite was true: the initial search of the petitioner led the police to discover illegal contraband. *Cf. Md. v. Pringle,* 540 U.S. 366, 373 (2003) (noting the Fourth Amendment protection recognized in *Ybarra* does not equally apply to individuals in private locations who are in close proximity to illegal narcotics).

 **\*7** Unlike *Ybarra,* in which the petitioner was frisked only because of his presence in the bar, the Plaintiffs here were arrested and searched due to the presence of illegal narcotics within the room. Additionally, the properly issued search warrant authorized the searches of the Plaintiffs' persons. Accordingly, the Defendant is entitled to summary judgment on Plaintiffs' claim of illegal search and seizure.

### b. *Strip Search*

Plaintiffs additionally assert their constitutional right to be free from illegal searches and seizures was violated when they were subjected to full body strip searches subsequent to their arrest. Plaintiffs are correct in arguing that pre-trial detainee strip searches are governed by the Fourth Amendment's reasonableness standard. *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). Plaintiffs are unable, however, to establish that the Defendant was the individual who conducted the strip searches. In order for Plaintiffs to succeed on their § 1983 claim for illegal search and seizure, Plaintiffs must establish, with sufficient definiteness, the precise actor or actors who deprived them of their constitutional rights. *See Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1994) (personal involvement of defendant prerequisite to award of damages under 1983); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (absence of evidence of defendant's personal involvement in alleged deprivation of rights fatal to § 1983 claim against defendant). Because the Plaintiffs have not provided sufficient evidence from which a finder of fact could conclude that the Defendant conducted or oversaw the strip searches, their claim cannot survive the Defendant's motion for summary judgment.

The evidence put forth by Plaintiffs fails to identify the Defendant as the police officer who conducted the strip search. The deposition of Plaintiff Vogeler ends with the Plaintiff explicitly denying that he had "any interaction with Police Officer Colbath" on the evening of May 1, 2003. Pls' Statement Ex. 12 at 48, lines 20-22. Plaintiff Kiechle's deposition only affirms the fact that he was strip searched; at no time does the Plaintiff identify who conducted the strip search. Pls' Statement Ex. 11 at 43, lines 18-22.

Plaintiffs assert that the Defendant's name on their arrest reports establishes that the Defendant was the officer who "oversaw" their respective strip searches. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross Motion for Summary Judgment ("Pls' Memo") at 12. Such a nominal assertion on the part of the Plaintiffs, without more, does not create a genuine issue of material fact. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (a "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" when attempting to establish a genuine issue of material fact). The Defendant, however, testified that his presence in Room 308 was only to serve as the evidence officer, the individual responsible for gathering any illegal contraband seized during the execution of a search warrant. Pls' Statement Ex. 6 at 6, lines 1-9. While Defendant's name is on the arrest report for both Plaintiffs, Pls's Statement Ex. 2 and Ex 4, absent more specific evidence upon which a jury could find that the Defendant administered or oversaw the challenged strip searches, this court must grant the Defendant's motion for summary judgment on the claim of unconstitutional strip searches.

### 3. *Malicious Prosecution*

 **\*8** Plaintiffs also assert a claim of malicious prosecution. The elements of malicious prosecution in New York are: "(1) the defendant commenced or continued a criminal proceeding against plaintiff, (2) the proceeding terminated in plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant initiated the criminal proceeding out of malice." *Bernard v. U.S., et al.,* 25 F.3d 98, 104 (2d Cir.1994) (citation omitted). Some type of judicial proceeding must occur prior to the complained of deprivation of rights because the "essence of malicious prosecution is the perversion of proper legal procedures." *Singer,* 63 F.3d at 117 (quoting *Broughton v. State of New York,* 37 N.Y.2d 451, 457 (1975)). Generally, the required judicial proceeding is in the form of a warrant, an arraignment, or an indictment by a Grand Jury. *Singer,* 63 F.3d at 117. A claim

for malicious prosecution cannot survive summary judgment absent evidence of bad faith or malice on the part of the police. *Bernard,* 25 F.3d at 104..

In the present case, the Defendant served as the affiant for the search warrant leading to the arrest and search of the Plaintiffs' persons. Pls' Statement at Ex. 7. Plaintiffs were subsequently charged with Criminal Possession of a Controlled Substance in the Third Degree, N.Y. PENAL LAW § 220.16(1) (Consol.2005), and Unlawful Possession of Marijuana, N.Y. PENAL LAW § 221.05 (Consol.2005). Akin to the absolute probable cause defense Defendant can raise to the false arrest and false imprisonment claim, and the illegal search and seizure claim, Defendant is also entitled to summary judgment on the malicious prosecution charge because he acted pursuant to probable cause. *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). As explained, *supra,* Defendant had probable cause to believe that criminal activity was conducted within Room 308 of the Wellesley Inn based upon the information provided by the confidential informant. *See supra,* Sections (C)(1) and (C)(2). Using this information, the Defendant validly obtained a search warrant. Upon entry into Room 308, the Defendant seized several bags of illegal narcotics, including cocaine and marijuana, arrested the Plaintiffs, and conducted a valid search of their persons. As such, the Plaintiffs cannot establish that the Defendant acted without the requisite probable cause necessary to establish a successful claim of malicious prosecution.

Moreover, Plaintiffs have asserted no evidence of actual malice on the part of the Defendant. Evidence of actual malice is required to establish an actionable claim for malicious prosecution. Such evidence can be inferred from a lack of probable cause, *Sulkowska v. City of New York,* 129 F.Supp.2d. 274, 295 (S.D.N.Y.2001), by proof of the defendant's recklessly or grossly negligent conduct, *Boose v. Rochester,* 421 N.Y.S.2d 740, 749 (N.Y.App.Div.1979), or by some evidence that the Defendant had an improper motive for initiating the proceedings, *Hernandez v. City of Rochester,* 260 F. Supp 2d 599, 615 (W.D.N.Y.2003).

**\*9** In this case, actual malice cannot be inferred from the lack of probable cause because the Defendant had the requisite probable cause to believe Room 308 was being used for criminal purposes, to arrest the Plaintiffs, and to search their persons. Plaintiffs' only offer of evidence of Defendant's actual malice is a taunt, attributed to the Defendant by Plaintiff Kiechle, upon the Plaintiffs' arrest. Pls' Statement Ex. 11 at 28, lines 7-12 (unidentified member of the Task

Force told Plaintiffs they "were in trouble," upon arrest). This statement, alone, neither establishes actual malice, nor evinces bad faith on the part of the Defendant required for a successful malicious prosecution cause of action. [5] *Hernandez,* 260 F.Supp.2d. at 615 (absence of evidence of improper motive fatal to malicious prosecution claim on summary judgment).

[5]     Further supporting Defendant's motion for summary judgment is the fact that this statement is not even firmly attributed to the Defendant. *See* Pls' Statement Ex 11 at 28, lines 7-12.

Because the Plaintiffs have failed to establish evidence of the required actual malice for a successful malicious prosecution claim, and because the Defendant had probable cause to obtain a search warrant and arrest the Plaintiffs, Defendant's motion for summary judgment on the Plaintiffs' malicious prosecution claim is granted.

### 4. *Excessive Force*

Unlike Plaintiffs' three other causes of action, Plaintiffs' claim for excessive force does not turn on whether the Defendant acted upon the requisite degree of probable cause, but whether the Defendant's conduct was "objectively reasonable" in light of the facts and circumstances as presented to the Defendant at the time of the Plaintiffs' arrest. *Graham v. Connor,* 490 U.S. 386, 397 (1989) (quoting *Scott v. U.S.,* 436 U.S. 128, 137-139 (1978)). In order to succeed on a claim of excessive force, the Plaintiffs must put forth evidence that the Defendant's conduct was "objectively sufficiently serious or harmful...." *U.S. v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999). Generally, the force used by the Defendant must be more than de minimis in order for the Plaintiffs' claim to be actionable. *Graham,* 490 U.S. at 397; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Finally, Plaintiffs must also allege, and support with evidence, the personal involvement of the Defendant in the actions underlying their claim. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (personal involvement of Defendant is predicate for award for damages under § 1983).

Plaintiffs base their excessive force claim upon two separate instances during the course of their arrest. First, Plaintiffs claim they were both subjected to tight handcuffing when arrested. Pls' Memo. at 13. Second, Plaintiffs claim they were lifted and dragged off the ground by their arms while their hands were cuffed behind their backs. *Id.* Like their other claims, because the record does not establish a genuine issue

of material fact, I grant Defendant's motion for summary judgment.

#### a. *Tight Handcuffing*

When analyzing a claim of excessive force based upon the use of handcuffs, in addition to evidence of the fact that the handcuffs were too tight and that the Plaintiffs' requests for them to be loosened went unanswered, the court may consider the degree of injury suffered by the Plaintiffs. *Esmont v. City of New York,* 371 F. Supp 2d 202, 215 (E.D.N.Y.2005). While tight handcuffing, alone, can give rise to a cause of action under § 1983, *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990), the plaintiffs must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable. *Id.* (excessive force claim proper when tight handcuffing lead to bloody wrist and scarring). Though the Plaintiffs' injuries need not be severe or permanent, some injury must be asserted. *Esmont,* 371 F. Supp 2d at 215.

**\*10** Both Plaintiffs claim they were tightly handcuffed when arrested, Pls' Statement Ex. 11 at 41, lines 12-13; Pls' Statement Ex. 12 at 46 lines 9-11, and that their requests for their cuffs to be loosened went unheaded. Pls' Statement Ex. 11 at 47, lines 2-7; Pls' Statement Ex. 12 at 46, lines 9-20. Despite these complaints, Plaintiff Kiechle testified that he was neither injured nor hurt during the course of arrest. Pls' Statement Ex. 11 at 41, lines 66-67. Plaintiff Vogeler also testified that he was not hurt during the course of his arrest. Pls' Statement Ex. 12 at 46, lines 21-23 and Ex. 12 at 47, lines 6-10. Neither Plaintiffs' testimony establishes they suffered any harm, let alone any measurable harm. Unlike prior excessive force cases where plaintiffs have survived summary judgment by putting forth evidence of bleeding and scarring, *Simpson,* 741 F. Supp at 1078, or prolonged bruising, *Robinson v. Via,* 821 F.2d 913 (2d Cir.1993), the Plaintiffs' mere claims of minor discomfort do not establish a triable issue that can withstand Defendant's motion for summary judgment. *Esmont,* 371 F.Supp.2d. at 215 (quoting *Carter v. Morris,* 164 F.3d 215, 219, n. 3 (4th Cir.1999)).

#### b. *Handling of the Plaintiffs' Persons*

Plaintiffs also claim that they were lifted off the ground by their arms while lying handcuffed face down on the ground. Pls' Statement Ex 11 at 68, lines 16-24; Pls' Statement Ex. 12 at 47, lines 8-10. This claim, however, suffers from many of the same defects that the Plaintiffs' other causes of action suffer. Plaintiffs have neither provided sufficient evidence to establish that the Defendant was personally involved in the

excessive force, *Hernandez,* 341 F.3d at 144, nor have they proven that they suffered any injury from the complained-of activity. *Esmont,* 371 F.Supp.2d. at 215. As such, the Plaintiffs fail to establish a triable issue of fact that can survive Defendant's motion for summary judgment.

While both Plaintiffs complain of being lifted from the ground while handcuffed, Pls' Statement at ¶ 3, neither Plaintiff has identified the offending officer. Both Plaintiffs' depositions are replete with generic references to "the officers," and allusions to multiple police officers being present during the course of their arrest. *See, e.g.* Pls' Statement Ex. 11 at 28; Pls' Statement Ex. 12 at 22, 47. Plaintiff Kiechle is unable to identify the police officer or officers that physically handled him that evening. Pls' Statement Ex. 11 at 66. Likewise, Plaintiff Vogeler cannot recall any police officer exhibiting any "vicious propensities" or using excessive force during the course of the arrest. Pls' Statement Ex. 12 at 33-34, lines 25-7. Most explicit, Plaintiff Vogeler claims he had no personal interaction with the Defendant on the night of his arrest, May 1, 2003. Pls' Statement Ex. 12 at 48, lines 20-22. [6]

> [6] In fact, this is the only time the Defendant is mentioned by name during the course of either Plaintiffs' deposition. Though having no legal significance, it is interesting to note that the only reason the Defendant's name appears anywhere in the course of either Plaintiffs' deposition provided to the court is because it was brought up by Mr. Specht, an attorney for the Town of Ramapo.

Assuming, *arguendo,* that Plaintiffs could establish that the Defendant was the individual who physically lifted them from the ground, the Defendant's actions would be assessed against the Fourth Amendment's reasonableness standard. *Saucier v. Katz,* 533 U.S. 194, 204 (2001); *Graham v. Connor,* 490 U.S. 386, 397 (1989). Under this standard, the police have the latitude to "use some degree of physical coercion or threat thereof" to effectuate an arrest. *Graham,* 490 U.S. at 396. Factors that a court may consider when evaluating an excessive force claim include the severity of the crime, whether the suspect posed a threat to the officers, and whether the suspect was resisting or attempting to evade arrest. *Id.*

**\*11** In their motion for summary judgment, Plaintiffs employ the tautological argument, "no use of force was permitted because none was required." Pls' Mem. at 13. The standard articulated by the Supreme Court, however, is not whether force was required, but rather whether the use of

force was reasonable under the circumstances as presented to the officers at the time of arrest. *Graham,* 490 U.S. at 396. As has been quoted numerous times when assessing excessive force causes of action, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal citations omitted).

Plaintiffs' claim that the Defendant exerted "gratuitous and unnecessary" force during the course of their arrest cannot withstand Defendant's motion for summary judgment. While Plaintiffs may have been lifted in an unconventional manner, they have failed to show that such action was any more than de minimis force exerted during the course of an arrest following the raid of a suspected drug trafficking locale. *See, e.g. Roundtree v. N.Y.,* 778 F. Supp 614, 622-23 (E.D.N.Y.1991) (defendant's motion for summary judgment on claim of excessive force proper when plaintiff suffered no physical injuries and required no medical attention); *but see, Maxwell v. City of New York,* 380 F.3d 106, 109 (2d Cir.2004) (allowing an excessive force claim to survive defendant's

motion for summary judgment when plaintiff suffered from post-concussive syndrome).

Because the Plaintiffs have failed to produce the requisite proof required to establish a "genuine issue of material fact" regarding their claims of excessive force against the Defendant, the Defendant's motion for summary judgment on the claim for excessive force must be granted.

### *CONCLUSION*

For the foregoing reasons, I grant the Defendant's motion for summary judgment in its entirety. Accordingly, I deny the Plaintiffs' cross-motion for summary judgment.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2482549

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Kinch v. Artuz, Not Reported in F.Supp. (1997)

1997 WL 576038

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 144 of 158

1997 WL 576038
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danilo KINCH, Plaintiff,

v.

Superintendent C. ARTUZ; Deputy Superintendent
D. Bliden; Rabbi M. Chill, Defendants.

No. 97 CIV. 2419 (LAP).
|
Sept. 15, 1997.

*MEMORANDUM AND ORDER*

PRESKA, District J.

**\*1** Plaintiff, a prisoner currently an inmate in the custody of the Green Haven Correctional Facility ("Green Haven"), brings this *pro se* action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Rabbi M. Chill ("Rabbi Chill") denied plaintiff access to Jewish Sabbath Services provided at Green Haven as well as the right to participate in the kosher food program at Green Haven. Defendant Superintendent C. Artuz ("Artuz") and defendant Deputy Superintendent D. Bliden ("Bliden") have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure. For the reasons that follow, defendants' motion to dismiss is granted.

*BACKGROUND*

Kinch is currently an inmate at Green Haven. (Complaint ("Compl.") at 2). Artuz and Bliden are employed by the New York State Department of Correctional Services ("DOCS") as Superintendent and Deputy Superintendent for Programs at Green Haven, respectively. (Compl. at 3).

Plaintiff alleges that Rabbi Chill discriminated against plaintiff in violation of DOCS' Directive 4202. (*Id.*). Directive 4202 provides as follows:

Resident Chaplains are responsible for pastoral care for the entire inmate population and for staff. They also provide spiritual guidance, religious activities and volunteers, ongoing pastoral counseling, and religious education for particular faith groups. Chaplains report directly to the Deputy Superintendent for Program Services, but as situations warrant, may consult directly with the superintendent.

Plaintiff claims that he attempted to attend Sabbath Services but was denied the right to attend because he is a Black Hebrew Israelite. (*Id.*). Plaintiff further alleges that on September 6, 1996, Rabbi Chill informed plaintiff that Hebrew Israelites could not participate in the kosher food program at Green Haven. (*Id.* at 3-a). Two days later plaintiff made a written request for an interview with Rabbi Chill. (*Id.*). Rabbi Chill responded to plaintiff's request with a request for documentation verifying plaintiff's affiliation with the Jewish faith. Plaintiff subsequently provided Rabbi Chill with a letter from a rabbi outside of DOCS by the name of Simeon Ben Israel verifying that plaintiff was in fact a Jew/Hebrew. (*Id.*). Plaintiff claims that although Rabbi Chill acknowledged receipt of this verification, Rabbi Chill continued to deny plaintiff access to the kosher food program. (*Id.*). Nowhere in the body of the complaint does plaintiff allege that either Artuz or Bliden played any role whatsoever in the denial of religious services.

*DISCUSSION*

I. Standard Applicable to A Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993); *see City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n.2 (1977) (both referring to "well-pleaded allegations"). "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus., Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 145 of 158

Kinch v. Artuz, Not Reported in F.Supp. (1997)

1997 WL 576038

of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *quoted by Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994). "The latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir. 1991).

**\*2** Furthermore, because Mr. Kinch filed this action *pro se,* I must judge his pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, *reh'g denied,* 405 U.S. 948 (1972); *accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [the *pro se* party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Hanlin v. Mitchelson,* 794 F.2d 834, 838-39 (2d Cir. 1986) (citing *Haines* to support the principle that *pro se* pleadings are given a liberal construction); *see Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988) (referring to the "special solicitude" afforded *pro se* litigants when confronted with motions for summary judgment).

Nevertheless, proceeding *pro se* does not altogether relieve Mr. Kinch from the usual pleading requirements. *See Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "*pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991), *reh'g granted on other grounds,* 914 F. Supp. 1004 (S.D.N.Y. 1996); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080 (PKL), 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("The work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual."); *Stinson v. Sheriff's Dep't,* 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Applying these standards to plaintiff's complaint, I find that plaintiff has not stated a claim upon which relief may be granted.

II. Section 1983 Claim Requirement of Personal Involvement

Kinch has sued under 42 U.S.C. § 1983. According to this provision,

[e]very person who, under any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under section 1983, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978) (citations omitted)). Furthermore, the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control. *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). Although both Artuz's and Bliden's names appear in the caption of the complaint, the complaint contains no allegations with respect to Artuz or Bliden. Nowhere in the complaint does plaintiff suggest that either of these two defendants was personally involved in the alleged deprivation of plaintiff's rights. Nor does the complaint suggest that defendants were grossly negligent in managing their subordinates who caused the alleged constitutional violation or that they created a policy or custom permitting the alleged violation to occur.

**\*3** Plaintiff does assert in his memorandum that he wrote Bliden on October 14, 1996 and again on November 18, 1996 "to have him correct the on going discriminatory practices of Rabbi Chill." (Plaintiff's Memorandum in Support of Opposition to Motion to Dismiss at 1, 4). Plaintiff also asserts in his memorandum that he "made no direct claim as to Artuz and Bliden's involvement because their function, responsibilities, authorities, and duties are covered under

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 146 of 158
Kinch v. Artuz, Not Reported in F.Supp. (1997)
1997 WL 576038

the Department of Correctional Services directives. Even if these allegations had been contained in plaintiff's complaint and thus could properly be considered as part of plaintiff's pleadings, such allegations would be insufficient to withstand a motion to dismiss.

With respect to plaintiff's first argument, even if a letter complaining of discrimination were sufficient to plead a claim under § 1983, plaintiff has not even alleged that any such letter was sent to Artuz. Thus, regardless of the significance of plaintiff's letter, plaintiff has not alleged any involvement whatsoever on behalf of Artuz. Furthermore, even if the letter had been sent or forwarded to Artuz, sending a letter to a supervisory official does not amount to the level of personal involvement necessary to state a claim under § 1983, because

> ... it is well established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegation made therein is insufficient to hold that official liable for the alleged violations.

*Greenwaldt v. Coughlin,* 1995 WL 232736, *4 (S.D.N.Y. 1995); *see also Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1110 (S.D.N.Y. 1997) (citing *Candelaria v. Coughlin,* 787 F. Supp. 368, 373 (S.D.N.Y. 1992), *aff'd,* 979 F.2d 845 (2d Cir. 1992); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989)).

Plaintiff's second argument is directly contrary to the holdings of *Monell* and its progeny. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978); *accord City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915 (1988); *see also Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir. 1997); *Champion v. Artuz,* 76 F.3d 483, 486-87 (2d Cir. 1996); *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995). Plaintiff argues that Artuz and Bliden are liable by virtue of their supervisory position with respect to Rabbi Chill. In *Monell,* however, the Supreme Court stated unequivocally that a plaintiff may not rely on the doctrine of *respondeat superior* to impose liability on a supervisory official in a § 1983 action. *Monell,* 436 U.S. at 691, 98 S. Ct. at 2036. Accordingly, plaintiff's motion with respect to defendants Artuz and Bliden must be dismissed.

*CONCLUSION*

For the reasons set forth above, the motion of defendants Artuz and Bliden to dismiss plaintiff's claims against them is granted.

SO ORDERED:

Dated: New York, New York
 **\*4** September 10, 1997

**All Citations**

Not Reported in F.Supp., 1997 WL 576038

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 147 of 158

2023 Massachusetts Senate Bill No. 2669, The 193rd..., 2023 Massachusetts...

2023 Massachusetts Senate Bill No. 2669, The 193rd General Court of the Commonwealth of Massachusetts

MASSACHUSETTS BILL TEXT

**TITLE: An Act relative to recovery high schools**

VERSION: Introduced

April 01, 2024

Joint Committee on Education

📄 Image 1 within document in PDF format.

SUMMARY: An Act relative to recovery high schools

**TEXT:**

Notwithstanding any general or special law to the contrary, the department of elementary and secondary education, in consultation with the principals of the 5 recovery high schools in the commonwealth, shall: (i) examine the costs associated with sending students to a recovery high school, as defined in subsection (a) of section 91 of chapter 71 of the General Laws; (ii) determine the average cost per pupil at recovery high schools in the commonwealth; and (iii) determine, in consultation with the department of public health, whether enrollment in a recovery high school should require a medical diagnosis of "substance use disorder or dependency, as defined by the Diagnostic and Statistical Manual of Mental Disorders IV-TR".

The department shall submit its findings to the chairs of the house and senate committees on ways and means, the chairs of the joint committee on education and the chairs of the joint committee on mental health, substance use and recovery not later than June 30, 2025.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Fauconier v. Committee on Special Education, Not Reported in F.Supp.2d (2003)

2003 WL 21345549

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Exxon Mobil Corp. v. Saudi Basic Industries Corp.,    U.S.,
March 30, 2005

2003 WL 21345549
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard FAUCONIER, Plaintiff,

v.

COMMITTEE ON SPECIAL EDUCATION, District
3, New York City Board of Education, Defendant.

No. 02 Civ.1050 RCC.
|
June 10, 2003.

**Synopsis**

Noncustodial parent sued special education committee under
Individuals with Disabilities Act (IDEA), challenging denial
of mainstream educational placement for student. Committee
moved to dismiss. The District Court, Casey, J., held that:
(1) nonattorney parent could not proceed pro se, representing
interests of student under IDEA, and (2) *Rooker-Feldman*
doctrine barred suit.

Case dismissed.

West Headnotes (2)

[1]    **Infants** ⚷ Schools and education

Nonattorney parent could not proceed pro
se to represent interests of student in suit
under Individuals with Disabilities Education
Act (IDEA) challenging school committee's
decision to retain student in special private
education setting rather than mainstreaming him.
20 U.S.C.A. § 1400 et seq.

14 Cases that cite this headnote

[2]    **Courts** ⚷ Constitutional questions, civil
rights, and discrimination in general

*Rooker-Feldman* doctrine, precluding federal
court review of state court final judgment,

barred suit under Individuals with Disabilities
Education Act (IDEA) by noncustodial
parent challenging school district's denial of
mainstream educational placement for disabled
student; claimant was trying to obtain federal
court reversal of state court determination that
he could not represent student's interests under
IDEA, because he was not custodial parent. 20
U.S.C.A. § 1400 et seq.

2 Cases that cite this headnote

OPINION & ORDER

CASEY, J.

I. Background

**\*1** *Pro se* Plaintiff Richard Fauconier ("Plaintiff") initiated
this action on behalf of himself and his son, M.F., [1] against
the Committee on Special Education of District 3 of the
New York City Board of Education ("Defendant") alleging
violations of the Individuals with Disabilities Education
Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* On July 24,
2002, Defendant filed a motion to dismiss the complaint.
By Report and Recommendation ("Report") Judge Ronald
Ellis recommended that Defendant's motion to dismiss be
granted and that Plaintiff's complaint be dismissed without
prejudice. Thereafter, the Plaintiff filed timely objections
to the Report. Accordingly, the Court reviews the matter *de
novo.* Fed.R.Civ.P. 72(b).

1       In the interests of privacy, the child will be referred
to in these proceedings as "M.F."

The Plaintiff is the non-custodial parent of M.F., who has been
diagnosed with Attention Deficit Hyperactive Disorder. M.F.
is a student at a private institution for emotionally, physically
and mentally challenged students. Due to his disability, public
funds are used to pay for M.F.'s education.

On five separate occasions, from August, 1994 to March,
2001, M.F. was evaluated by District 3. As a result of each
evaluation, District 3 found it to be in M.F.'s best interest
that he continue to attend a private educational institution.
The Plaintiff, however, sought to have his son placed in
a mainstream school. District 3 denied Plaintiff's request

2003 WL 21345549

for a reevaluation and transfer of M.F. and declined to include Plaintiff as a member of M.F.'s IEP team. In reaching these decisions, District 3 cited Plaintiff's status as the non-custodial parent.

As a result, on November 5, 2001, Plaintiff filed an order to show cause in an Article 78 Special Proceeding in the State of New York Supreme Court, New York County. Plaintiff sought: (1) a reevaluation of M.F.; (2) placement of M.F. in a mainstream academic setting with support services; (3) permission for M.F. to take the standardized testing for fourth grade math and English; and (4) a position on M.F.'s IEP team with full access to his educational records. By final disposition, the state court denied Plaintiff's claims in light of his non-custodial status. Plaintiff then commenced this federal action on February 11, 2002.

## II. Discussion

 **[1]**    In his Report, Judge Ellis recommended that Plaintiff's complaint be dismissed without prejudice on the ground that under *Cheung v. Youth Orchestra Foundation of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990), Plaintiff could not proceed *pro se* to litigate M .F.'s interests. For the following reasons, the Court concludes that pursuant to its affirmative duty to enforce the *Cheung* rule, the claims that Plaintiff brings on behalf of his son must be dismissed. Additionally, the Court finds that Plaintiff's remaining claims brought on his own behalf are barred by the *Rooker–Feldman* doctrine.

## A. Representing Children Pro Se

The Second Circuit has made clear in *Cheung* that a court has an affirmative duty to enforce the rule that a non-attorney parent must be represented by counsel when bringing an action on behalf of his or her child. *See id.* at 61. In fact, the Second Circuit in *Cheung* enforced this affirmative duty prior to addressing the jurisdictional issues present in that case. This Court therefore has a duty to enforce the *Cheung* rule, for " '[t]he infant is always the ward of every court wherein his rights or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done to him." ' *Wenger v. Canastota Cent. Sch. Dist.,* 146 F.3d 123, 125 (2d Cir.1998) (quoting *Johns v. County of San Diego,* 114 F.3d 874, 877 (9th Cir.1997). On the other hand, a parent is entitled to represent himself when claiming that his rights under the IDEA have been violated. *Id.* at 126. Here, Counts One and Two of Plaintiff's Amended Complaint are claims that exclusively concern M.F.'s rights. Additionally, Counts Three and Five concern both Plaintiff's and M.F.'s rights. Under

*Cheung,* however, Plaintiff may not litigate the interests of M.F. Therefore, at the outset the Court dismisses Counts One and Two of Plaintiff's complaint. Counts Three and Five are dismissed to the extent that they concern M.F.'s rights. Thus, the remaining claims not barred by *Cheung* are Plaintiff's record-access claim, Plaintiff's claim that he be permitted a seat on M.F.'s IEP team, and his claim that Defendant has violated his Fourteenth Amendment rights.

## B. Rooker–Feldman

 **\*2**   **[2]**    The *Rooker–Feldman* doctrine holds that a party may not take an appeal of a state court decision to a federal court. Plaintiff, however, requests that this Court do precisely that.

Plaintiff's claims that he be permitted access to M.F.'s educational records and that he be given a seat on M.F.'s IEP team were precisely the subject of Plaintiff's order to show cause brought in state court. Therefore, as discussed below, under the *Rooker–Feldman* doctrine these claims may not be re-litigated here. Accordingly, the Court finds that it lacks subject matter jurisdiction over these claims.

A challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction and therefore may be raised at any time by either party or *sua sponte* by the Court. *Moccio v. New York State Officers of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996). Generally speaking, the *Rooker–Feldman* doctrine directs that a federal district court lacks authority to review the final judgment of state courts in judicial proceedings. *Kropelnicki v. Siegel,* 290 F.3d 118, 128 (2d Cir.2002). The doctrine is derived from two Supreme Court decisions. In the first, *Rooker v. Fidelty Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), the Court held that appeals from state court judgments are reserved to the Supreme Court, and therefore the lower federal courts lack jurisdiction to entertain such appeals. Sixty years later, in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the Court extended *Rooker* by barring reconsideration of claims that were implicitly decided by the state court as well. In crafting the "inextricably intertwined" test, the Court held:

> If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's denial in a judicial

proceeding ... then the district court is in essence being called upon to review the state-court decision. This the district court may not do.

*Feldman,* 460 U.S. at 483–84 n. 16.

Under the *Rooker–Feldman* doctrine, the Court may address two questions: (1) whether a party is attempting to directly challenge a state court decision in federal court and (2) whether such a suit is inextricably intertwined with the previous state court proceedings. Given that a challenge under the *Rooker–Feldman* doctrine as an inquiry into the Court's subject matter jurisdiction, the Court may consider materials extrinsic to the complaint. *Phifer v. City of New York,* 289 F.3d 49, 55 (2d Cir.2002). The Court now turns to this inquiry.

In his attempt to appeal the decision of the state court to the federal courts, Plaintiff asserts that this action contains claims under the IDEA that were never raised in the state court proceeding. *See* Plaintiff's Memorandum of Law ¶ 38. The Court, however, finds Plaintiff's assertion disingenuous. In his November 15, 2001 Affidavit filed in New York Supreme Court, Plaintiff himself stated that his cause of action was partly "governed by the federal Individuals with Disabilities Education Act (IDEA)." Moreover, in state court Plaintiff asserted that despite the fact that he is M.F.'s non-custodial father, *Doe v. Anrig,* 651 F.Supp. 424 (D.Mass.1987), supported his claim that he could still assert claims under the IDEA. *See* Plaintiff's Nov. 15, 2001 Aff. ¶ 7(i). Nevertheless, the state court concluded that because Plaintiff is not the custodial parent, he lacked decision making authority for M.F. *See* Ex. O to Am. Compl.

**\*3** On December 6, 2001 Plaintiff filed this action contending that the state court was insensitive to the facts forming the basis of his federal claims and that the state

court failed to protect his federal rights. Plaintiff's Amended Complaint asserts that the state court "made no mention of *Doe v. Anrig"* and that "apparently, no judicial notice is taken of cases in federal district courts such as *Doe v. Anrig,* and the educational system's escape of scrutiny is assured." Am. Compl. ¶¶ 33, 34. Accordingly, the Court finds that Plaintiff's pleadings demonstrate that he has brought this action because he is dissatisfied with the state court decision. In effect, Plaintiff is asking the Court to review the state court's determination that he lacks educational decision making authority because he is not the custodial parent. The *Rooker–Feldman* doctrine squarely bars a litigant from complaining of a result in state court by asking a federal court to entertain an appeal of that result. *See Kropelnicki,* 290 F.3d at 128. To consider Plaintiff's claims, the Court would be required to determine whether the IDEA protects the rights of both custodial and non-custodial parents, a question the state court has already ruled upon in this case. This type of request is squarely barred under the *Rooker–Feldman* doctrine. *See Corsini v. Ross,* 152 F.3d 917 (2d Cir.1998) ("[D]istrict courts 'do not have jurisdiction ... over challenges to state court decisions ... even if those challenges allege that the state court's action was unconstitutional .' ") (quoting *Feldman,* 460 U.S. at 486). Accordingly, the Court lacks subject matter jurisdiction in this case.

### III. Conclusion

For the reasons stated above, under *Cheung* Plaintiff's claims brought on behalf of M.F. are dismissed. Additionally, Plaintiff's remaining claims pertaining to his rights under the IDEA are dismissed under the *Rooker–Feldman* doctrine. The Clerk of the Court is hereby directed to close the case.

### All Citations

Not Reported in F.Supp.2d, 2003 WL 21345549

---

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3340646

2013 WL 3340646
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shaun SIMMONS, Plaintiff,
v.
GOWANDA CORRECTIONAL FACILITY, Defendant.

No. 13–CV–0647Sc.
|
July 1, 2013.

**Attorneys and Law Firms**

Shaun Simmons, Gowanda, NY, pro se.

**DECISION AND ORDER**

RICHARD J. ARCARA, District Judge.

***INTRODUCTION***

**\*1** Plaintiff, Shaun Simmons, an inmate of the Gowanda
Correctional Facility, initially filed this *pro se* action seeking
relief under 42 U.S.C. § 1983 (Docket No. 1, 6) in the
United States District Court for the Southern District of New
York and has both requested permission to proceed *in forma
pauperis* and filed a signed Authorization (Docket No. 7).
Plaintiff claims that on one day, April 18, 2013, he was
exposed to asbestos when the windows above his dorm, C–
West Two, were being removed. He claims that a construction
worker came through the dorm and told everyone to close
the windows so they were not exposed to asbestos. Plaintiff
has named only the Gowanda Correctional Facility as a
defendant. For the reasons discussed below, plaintiff's request
to proceed as a poor person is granted and the complaint is
dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

***DISCUSSION***

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a) and filed an Authorization with respect
to this action, plaintiff is granted permission to proceed *in
forma pauperis.* Sections 1915(e)(2)(B) and 1915A(a) of 28
U.S.C. require the Court to conduct an initial screening of

this complaint. In evaluating the complaint, the Court must
accept as true all of the factual allegations and must draw
all inferences in plaintiff's favor. *See Larkin v. Savage,* 318
F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,*
189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged
to construe [*pro se* ] pleadings liberally, particularly when
they allege civil rights violations," *McEachin v. McGuinnis,*
357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted
*pro se* must meet the notice requirements of Rule 8 of the
Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360
F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and
the plaintiff "need only 'give the defendant fair notice of
what the ... claim is and the grounds upon which it rests.'
" *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167
L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)
(internal quotation marks and citation omitted). Generally, the
Court will afford a *pro se* plaintiff an opportunity to amend
or to be heard prior to dismissal "unless the court can rule out
any possibility, however unlikely it might be, that an amended
complaint would succeed in stating a claim." *Abbas v. Dixon,*
480 F.3d 636, 639 (quoting *Gomez v. USAA Federal Savings
Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam )).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To
state a valid claim under 42 U.S.C. § 1983, the plaintiff must
allege that the challenged conduct (1) was attributable to a
person acting under color of state law, and (2) deprived the
plaintiff of a right, privilege, or immunity secured by the
Constitution or laws of the United States." *Whalen v. County
of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston
v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its
evaluation of the complaint, the Court finds that plaintiff's
claim must be dismissed pursuant to 28 U.S.C. §§ 1915(e)
(2)(B)(ii) and 1915A(b) because it fails to state a claim upon
which relief may be granted.

**A. PLAINTIFF'S CLAIM**

**\*2** As summarized above, plaintiff's sole claim is that he
was exposed to asbestos on one date in April 2013, when
a construction crew was removing windows in the dorm
unit above his and a member of the construction crew came
through his dorm to alert everyone to shut the windows.
This claim must be dismissed because the lone defendant,
Gowanda Correctional Facility, is not subject to suit and
because, even if a proper defendant was sued, the complaint
fails to state a claim upon which relief can be granted.

### 1. Eleventh Amendment

The Eleventh Amendment bars federal court claims against states, absent their consent to such suit or an express statutory waiver of immunity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "An official arm of the state," such as ((the New York State Department of Corrections and Community Supervision and Gowanda Correctional Facility), "enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). *See also Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006) (Eleventh Amendment immunity extends to "state agents and state instrumentalities that are, effectively, arms of a state.") (internal quotation marks and citations omitted); *Saxon v. Attica Medical Dept.,* 468 F.Supp.2d 480, 484 (W.D.N.Y.2007) (Larimer, D.J.) (claims against Attica Medical Department are barred by Eleventh Amendment immunity). Accordingly, plaintiff's complaint against Gowanda must be dismissed.

### 2. Asbestos Exposure–Eighth Amendment

Various courts have held that an inmate's unwilling exposure to an "unreasonably high concentration of air-borne asbestos particles" may constitute a cognizable claim under the Eighth Amendment. *Pack v. Artuz,* 348 F.Supp.2d 63, 79 (S.D.N.Y.2004) (citing *LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998); *Herman v. Holiday,* 238 F.3d 660, 665 (5th Cir.2001); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990); *Klos v. Burke,* 1996 WL 77446, *1 (N.D.N.Y. Feb.15, 1996)) "For exposure to airborne asbestos fibers to create a substantial risk of serious harm, however, the intensity and duration of the exposure must both be significant." *Pack,* 348 F.Supp. at 79 (citing *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 324 (E.D.N.Y.2000) (noting that development of asbestos-related diseases correlates with the duration and intensity of exposure to asbestos fibers).

Because plaintiff's allegations do not establish that the one-time potential exposure to asbestos created an unreasonable risk of serious harm to his health and safety and that some unnamed prison officials acted with deliberate indifference

to that risk, *see Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Pack,* 348 F.Supp.2d at 90, *n. 32* ("Thus the risk resulting from low-level exposure is not unreasonable for purposes of an Eighth Amendment claim, since to violate contemporary standards of decency, the risk must apply to anyone who is subjected to the low level exposure ....) (citing *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (plaintiff must also prove that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency.")), plaintiff's complaint must be dismissed with prejudice. *See Cuoco v. Moritsugu,* 222 F.3d 99,112 (2d Cir.2000) (an opportunity to replead should be denied as futile where "[t]he problem with [plaintiff's] cause[ ] of action is substantive" such that "[b]etter pleading will not cure it.")

### CONCLUSION

**\*3** Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee. Accordingly, plaintiffs request to proceed *in forma pauperis* is granted and, for the reasons discussed above, the complaint is dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. Plaintiff is forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. *See* 28 U.S.C. § 1915(g).

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that plaintiffs request to proceed *in forma pauperis* is granted;

FURTHER, that the complaint is dismissed with prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3340646

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8188396
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin DRAWHORNE, Plaintiff,

v.

M. ALOISE et al., Defendants.

6:23-cv-01278-TJM-TWD
|
Signed November 27, 2023

**Attorneys and Law Firms**

KEVIN DRAWHORNE, 23-R-0208, Marcy Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff Kevin Drawhorne ("Plaintiff") alleging M. Aloise, Melinda Katz, Commissioner Davis, and The People of the State of New York violated his civil rights. (Dkt. No. 1.) Plaintiff, who is currently in the custody of New York State Department of Corrections and Community Supervision ("DOCCS") at Marcy Correctional Facility in Marcy, New York, has not paid the filing fee for this action and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 2.)

**II. IFP APPLICATION**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein,* No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, Plaintiff's IFP application demonstrates economic need. (Dkt. No. 2.) Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and has filed the inmate authorization form required in this District, he is granted permission to proceed IFP. (Dkt. Nos. 2, 3.)

**III. BACKGROUND**

Plaintiff initiated this action against Melinda Katz, M. Aloise, Commissioner Davis, and The People of the State of New York on October 13, 2023. (Dkt. No. 1.) The Court takes judicial notice Melinda Katz is the District Attorney of Queens County [1] and M. Aloise is a judge in the New York Supreme Court 11th Judicial District in Queens County, New York. [2]

[1]    DA Melinda Katz, https://queensda.org/team/da-katz/ (last visited Nov. 27, 2023).

[2]    Michael Aloise, BALLOTPEDIA, https://ballotpedia.org/Michael_Aloise (last visited Nov. 27, 2023).

Plaintiff has filed a threadbare complaint devoid of details. Plaintiff claims on January 5, 2023, Judge Aloise "violated" his rights "throughout the court proceedings." (Dkt. No. 1 at 4.) He further alleges he was deprived "from [h]aving good counsel and being full[y] able to cross-examine [his] defendant(s)." *Id.* Moreover, he "was never able to see [his] discovery nor attend [his] grand Jury." *Id.* Plaintiff claims he was "fully coerced" into taking a plea and never given a chance to create "a good defense." *Id.* According to Plaintiff, his attorney was "aware of all violations and still never objected to it." *Id.* Finally, DA Katz "acted out of color by stating wrongful facts of the case." *Id.* On February 23, 2023, Plaintiff's motions for a hardship hearing and to defer surcharges were denied. *Id.*

Plaintiff's first claim states on April 4, 2022, DA Katz violated his Fourteenth, Eighth, and Second Amendment rights by "not allowing" Plaintiff to testify at the Grand Jury, speak freely in court, and "not able to make a defense." *Id.* at 5.

**\*2** Plaintiff's second claim states Judge Aloise would not allow Plaintiff to obtain new counsel. *Id.* He then states he was coerced into making a plea, but it is unclear if he is alleging Judge Aloise, DA Katz, or both coerced him into doing so. *Id.*

Plaintiff's third claim states The People of the State of New York violated Plaintiff's rights by "not allowing [him] to be

Drawhorne v. Aloise, Not Reported in Fed. Supp. (2023)

2023 WL 8188396

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 155 of 158

[ ] able to build a defense in his case" that he could "fight." *Id.* Finally, Plaintiff requests $15 million for violations of his constitutional rights, including "due process," "unlawfully imprisonment," "duress," mental anguish, and pain and suffering. *Id.*

## IV. DISCUSSION

### A. Legal Standard

The Court shall dismiss a complaint in a civil action if the Court determines it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b)(1)-(2); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint, or portion thereof, when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest.*" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston*, 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it

rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**\*3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. (Dkt. No. 1.) "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### B. The People of the State of New York

To the extent Plaintiff seeks money damages against The People of the State of New York, which the Court construes as claims against the Queens County District Attorney's Office, those claims are barred by the Eleventh Amendment. *See Best v. Brown*, No. 19-CV-3724, 2019 WL 3067118, at \*2 (E.D.N.Y. July 12, 2019) (dismissing the plaintiff's claim against the Office of the Queens County District Attorney as barred by the Eleventh Amendment); *see also D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New*

Drawhorne v. Aloise, Not Reported in Fed. Supp. (2023)

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 156 of 158

2023 WL 8188396

*York*, No. 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry v. New York*, No. 21-CV-0319 (GTS/ML), 2021 WL 3037709, at *6 (N.D.N.Y. June 14, 2021) (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York—as barred by the Eleventh Amendment) *adopted by*, 2021 WL 3032691 (N.D.N.Y. July 19, 2021). Therefore, the Court recommends Plaintiff's Section 1983 claims against The People of the State of New York be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### C. Commissioner Davis

"The standard set forth in *Twombly* and affirmed in *Iqbal* requires more than mere conclusory statements; rather, it demands sufficient factual allegations against a defendant to reasonably lead to the discovery of illegal conduct." *Johnson v. Gonzalez*, No. 9:14-CV-0745 LEK/CFH, 2015 WL 1179384, at *6 (N.D.N.Y. Mar. 13, 2015) (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555-56). "It is well-settled that 'where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.' " *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (citation omitted).

The Court notes Plaintiff lists Commissioner Davis as a defendant in the caption of his complaint but fails to assert any allegations against him or her. *Id.* at 1, 3; *see Johnson*, 2015 WL 1179384, at *6; *Jaffer v. Chemical Bank*, No. 93-CV-8459, 1994 WL 392260, at *3 (S.D.N.Y. July 26, 1994) (holding "[w]hen a complaint's caption names a defendant but the complaint does not indicate that the named party injured the plaintiff or violated the law, the motion to dismiss must be granted"); *Serrano v. New York State Dep't of Envtl. Conservation*, No. 12-CV-1592, 2013 WL 6816787, at *15 (N.D.N.Y. Dec. 20, 2013) (dismissing the plaintiff's claims against two defendants who were listed as parties in the complaint and in the caption, but not elsewhere in the complaint).

**\*4** Therefore, the undersigned recommends dismissing the claims against Commissioner Davis without prejudice.

### D. DA Katz

To the extent Plaintiff seeks to sue DA Katz, she is likely protected by prosecutorial immunity.[3] Prosecutors are immune from civil suit for damages in their individual capacities for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are "intimately associated with the judicial phase of the criminal process." *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)) (internal quotation marks omitted); *see Imbler*, 424 U.S. at 431 ("[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."). In addition, prosecutors are immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).

[3]   While the Court recognizes the issue of venue as it relates to claims against DA Katz and Judge Aloise arising out of Plaintiff's criminal proceedings in Queens, New York, a transfer of those claims would be futile. *See Robinson v. New York State Corr.*, No. 9:19-CV-1437 (DNH/TWD), 2020 WL 1703669, at *3 (N.D.N.Y. Apr. 8, 2020).

In short, absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (internal quotation marks and citations omitted). Immunity even extends to the falsification of evidence and the coercion of witnesses, the knowing use of perjured testimony, the deliberate withholding of exculpatory information, the making of false or defamatory statements in judicial proceedings, and conspiring to present false evidence at a criminal trial. *See Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981); *Imbler*, 424 U.S. at 431 n.34; *Burns v. Reed*, 500 U.S. 478, 490 (1991); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).

Moreover, " '[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.' " *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) (quoting *Baez*

Case 5:24-cv-01391-BKS-MJK    Document 5    Filed 12/11/24    Page 157 of 158

Drawhorne v. Aloise, Not Reported in Fed. Supp. (2023)

2023 WL 8188396

*v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014 (1989)); *see also Rich*, 2022 WL 992885, at *5 n.4 ("[A]ny claims Plaintiff may raise against the [District Attorney] Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry*, 2021 WL 3037709, at *6 (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York—as barred by the Eleventh Amendment).

**\*5** Plaintiff's threadbare allegations in the complaint do not clarify the context of his claims. For instance, Plaintiff complains DA Katz violated his Fourteenth, Eighth, and Second Amendment rights by not allowing him to testify at the Grand Jury, speak freely in court, or make a defense. (Dkt. No. 1 at 3.) He also appears to allege DA Katz coerced him into taking "a Bid." *Id.* Nevertheless, Plaintiff appears to complain DA Katz violated his rights while performing her official duties as a prosecutor. *Simon*, 727 F.3d at 171. Because Plaintiff's allegations against DA Katz relate to non-investigative actions she has taken in her official capacity as a prosecutor, she is entitled to prosecutorial immunity. *Simon*, 727 F.3d at 171; *see, e.g., Matthews v. Cty. of Cayuga*, No. 5:17-CV-1004 (MAD/TWD), 2018 WL 2926272, at *3 (N.D.N.Y. June 8, 2018) (dismissing claims against prosecutor on initial review because of prosecutorial immunity). Thus, Plaintiff's Section 1983 claims against DA Katz fail as a matter of law.

Therefore, the Court recommends that Plaintiff's Section 1983 claims against DA Katz be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### E. Judge Aloise
To the extent Plaintiff seeks to sue Judge Aloise, judges are immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). This is true however erroneous an act may have been, and however injurious its consequences were to the plaintiff. *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994); *see also Stump v. Sparkman*, 435 U.S. 349, 357 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction."). This immunity applies to state court judges who are sued in federal court pursuant to Section 1983. *Pizzolato v. Baer*, 551 F. Supp.

355, 356 (S.D.N.Y. 1982), *aff'd sub nom. Pizzolato v. City of New York*, 742 F.2d 1430 (2d Cir. 1983).

Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The only two circumstances in which judicial immunity does not apply is when he or she acts "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12. Again, while not entirely clear, to the extent Plaintiff complains of any wrongdoing related to a criminal proceeding, Judge Aloise would be entitled to absolute judicial immunity.

Therefore, the Court recommends that Plaintiff's Section 1983 claims against Judge Aloise be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### V. CONCLUSION
For the reasons stated herein, it is hereby

**ORDERED** that Plaintiff's IFP application [4] (Dkt. No. 2) is **GRANTED**; and it is further

[4] Plaintiff should note that although his IFP application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's claims against Commissioner Davis be **DISMISSED WITHOUT PREJUDICE**; and it is further

**RECOMMENDED** that Plaintiff's claims against The People of the State of New York, DA Katz, and Judge Aloise be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*6** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

2023 WL 8188396

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

5     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation

was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8188396

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.